Mary Elizabeth Galvan
Wyoming Bar No. 5-1879
Galvan & Fritzen
410 East Grand Avenue, Suite 211
P.O. Box 1071
Laramie, Wyoming 82073-1071
Tel: (307) 745-7091
mgalvan@wyoming.com

Robert Madden
Texas Bar No. 00784511
1360 Walnut Street, Suite 302
Boulder, Colorado 80302
Tel: (713) 302-9408
rjmadden@mac.com
Pro Hac Vice Pending

Attorneys for Plaintiff Wyoming Association
of Professional Archaeologists

**FILED**

**Margaret Botkins**
**Clerk of Court**

*4:21 pm, 7/24/26*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

WYOMING ASSOCIATION OF
PROFESSIONAL ARCHAEOLOGISTS,

Plaintiff,

v.

DOUGLAS J. BURGUM, in his official
capacity as Secretary of the Interior;
UNITED STATES DEPARTMENT OF
THE INTERIOR; BUREAU OF LAND
MANAGEMENT; ACTING STATE
DIRECTOR, BUREAU OF LAND
MANAGEMENT, WYOMING, in their
official capacity; and ACTING STATE
DIRECTOR, BUREAU OF LAND
MANAGEMENT, COLORADO, in their
official capacity,

Defendants.

Civil Action No. 26-cv-223-KHR

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
## AND VACATUR UNDER THE ADMINISTRATIVE PROCEDURE ACT

Plaintiff the Wyoming Association of Professional Archaeologists ("WAPA" or "the Association"), by and through its undersigned counsel, alleges as follows:

## I.
## NATURE OF THE ACTION

1.      The Wyoming Association of Professional Archaeologists, a nonprofit voluntary professional association of field archaeologists, academic researchers, and museum and repository professionals, brings this action to halt ongoing unlawful transfers of, and denial of research access to, archaeological resources owned, administered, curated, or regulated by the United States, including without limitation the six specific examples from Wyoming and Colorado described below. These unlawful transfers and denials of access are the result of the enactment and enforcement of an unauthorized and unlawful regulatory scheme generated and imposed by the Department of the Interior ("Interior") between 2010 and 2024 that rewrites the Native American Graves Protection and Repatriation Act, 25 U.S.C. §§ 3001–3013 ("NAGPRA"), expanding its reach far beyond the boundaries of the 1990 statute.

2.      The terms and conditions of NAGPRA embody a carefully crafted statutory compromise. As Senator John McCain explained when presenting the bill for final passage, NAGPRA "balances the interest of Native Americans in the rightful and respectful return of their ancestors with the interest of our Nation's museums in maintaining our rich cultural heritage, the heritage of all American peoples." 136 Cong. Rec. S17,173 (daily ed. Oct. 26, 1990). McCain advised the Senate that "this bill represents a true compromise" in which "each party had to give a little in order to strike a true balance." *Id.* The *ultra vires* regulations challenged in this action upset that balance and abrogate that compromise. They take from

museums, researchers, educators, and the public what Congress deliberately preserved for them, and they grant what Congress deliberately withheld.

3.      These *ultra vires* regulations, and the unlawful transfers and denials of access carried out pursuant to them, injure WAPA, its members, and professional archaeologists nationwide by interfering with their ability to investigate, study, document, preserve, and curate the archaeological record. They injure the public by depriving it of access to, and the educational and scientific benefits of, an irreplaceable material record (developed over more than a century of archaeological investigation, funded in significant part by the United States) that belongs to the American people and is permanently diminished each time a part of it is unlawfully transferred, reburied, or removed from study. And they injure the United States by requiring federal agencies, and private institutions subject to federal regulation or federal curation obligations, to transfer ownership of irreplaceable archaeological resources far beyond the scope of what Congress authorized in NAGPRA.

4.      For these reasons, and for those set out in more detail below, WAPA brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. It asserts a facial challenge to the unlawful regulations detailed in Section VII below on the grounds that they exceed the scope of the authority delegated by Congress to Interior in NAGPRA. WAPA does not seek to reverse or unwind any transfer already completed under the challenged regulations. Rather, WAPA asks as relief: (a) that the challenged regulations be vacated and declared invalid, (b) that Defendants be enjoined from enforcing, applying, or relying on those regulations to authorize or carry out transfers or denials of access anywhere in the United States (including without limitation the five Wyoming and one Colorado transfers described below), and (c) that

3

preliminary status-quo relief be granted to prevent the threatened Wyoming and Colorado transfers described below from proceeding while this action is litigated.

5. WAPA does not challenge NAGPRA, nor does it oppose lawful repatriation when Congress's statutory requirements are satisfied. WAPA does not ask this Court to decide whether any Tribe has cultural, spiritual, historical, or moral interests in any particular remains or objects. Nor does it ask the Court to decide whether the challenged regulations are good public policy. Rather, WAPA raises a narrow legal question: whether the regulations purporting to implement NAGPRA that are challenged here, and BLM's reliance on those regulations in connection with the Wyoming and Colorado transfers described below, go beyond the statutory compromise Congress enacted and are therefore unlawful.

6. NAGPRA authorizes the transfer, repatriation, or disposition of human remains, associated funerary objects, unassociated funerary objects, sacred objects, and objects of cultural patrimony when, *but only when,* those remains or objects satisfy the express requirements and conditions set forth in the statute. Strict compliance with NAGPRA's statutory requirements is particularly called for here because Congress alone controls the disposition of federal property and federally administered archaeological resources, meaning an agency may transfer or relinquish such materials only to the extent Congress has expressly authorized it to do so. Although NAGPRA authorizes Interior to issue regulations to effectuate NAGPRA, it does not authorize Interior to expand the property, remains, objects, or collections subject to transfer by altering the statutory requirements enacted by Congress.

7. Despite these limitations, Interior has promulgated rules and regulations permitting transfers beyond those authorized by Congress. Among other things, the challenged

4

regulations: (a) relax, alter, or eliminate NAGPRA's cultural-affiliation requirements; (b) authorize disposition of culturally unidentifiable or unaffiliated remains without the statutory predicates Congress required for NAGPRA transfer; (c) expand the statutory definitions of "cultural item," "funerary object," "sacred object," and "object of cultural patrimony" beyond the categories Congress enacted; (d) require federal agencies and museums to defer to a broad and vaguely defined category of "expert opinion" termed Native American traditional knowledge, which can include undisclosed "confidential" philosophies or beliefs of individual Native Americans, in a manner that displaces the statutory standards of proof Congress prescribed; and (e) restrict access, exhibition, study, or documentation of federal archaeological materials beyond what NAGPRA authorizes. It is these regulations and related provisions identified below in Section VII that WAPA challenges and seeks vacatur of in this action.

8.      When NAGPRA was presented for passage in the Senate, the sponsor of the bill and chairman of the Select Committee on Indian Affairs, Senator Daniel Inouye, assured his colleagues that the compromise embodied in the statute as drafted would not "result in a wholesale raid on museum collections." 136 Cong. Rec. S17,174 (daily ed. Oct. 26, 1990). Yet that is exactly what has occurred as a result of Interior's subsequent imposition of the *ultra vires* regulatory regime challenged here.

9.      Since the 2010 regulations took effect, thousands of unidentified, unaffiliated remains and related archaeological resources not encompassed by NAGPRA as enacted have been unlawfully divested (and continue to be divested) from archaeological repositories and museum collections in the United States in reliance on these *ultra vires* regulations. Since the 2024 regulations took effect, thousands (likely millions) more archaeological resources have

been unlawfully divested (and continue to be divested) from archaeological repositories as a result of Interior's *ultra vires* redefinition of NAGPRA's key terms, expanding the scope of material subject to transfer far beyond the scope of that authorized by Congress. In addition, because of these unauthorized redefinitions and the imposition of a new requirement of affirmative Tribal consent before any exhibition of, access to, or research on materials swept in by the new definitions, major museums and repositories have closed galleries, covered display cases, removed or restricted access to Native American cultural materials, and suspended educational programming.

10.    Unless the challenged regulations are vacated, they will continue to be used to restrict access to and diminish and destroy the archaeological record of the United States held at federally funded and regulated museums and repositories nationwide, one collection at a time.

11.    The threatened transfer by the Bureau of Land Management's Wyoming State Office ("BLM Wyoming") and Colorado State Office ("BLM Colorado") of the six site collections described below is another concrete example of the results of Interior's unlawful regulatory scheme. Acting in reliance on the regulations challenged below, BLM Wyoming has claimed that entire archaeological collections from the Shute Creek (48LN1296), 48UT920,[1] Wardell Bison Trap (48SU301), Upper Muddy Creek Village (48CR325), and Studhorse Butte (48SU4479) sites, housed at the University of Wyoming Archaeological Repository ("UWAR"), are associated funerary objects subject to repatriation. Similarly, BLM Colorado has claimed, in reliance on the challenged regulations, that the entire collection from the Eagle Rock Shelter site

---

[1] Unlike the other specific archaeological sites discussed herein, site 48UT920 does not have a recorded name, but rather is identified in official records only by its Smithsonian Institution Trinomial System ("SITS") identifier. The SITS system assigns a three-part unique identifier to each site consisting (in order) of: (i) a one- or two-digit code for the state, (ii) a two-letter code for the county (or equivalent) within the state, and (iii) one or more digits assigned to the specific site, based on the order in which it was listed in the county.

(5DT813), housed at the Fort Bridger State Historic Site curation facility in Uinta County, Wyoming ("Fort Bridger"), constitutes unassociated funerary objects, sacred objects, and/or objects of cultural patrimony subject to disposition under NAGPRA. Those Wyoming and Colorado collections include lithic debitage (stone tool-making debris), faunal remains, soil samples, fire-cracked rock, bison-kill assemblages, campsite refuse, and other archaeological materials that do not become NAGPRA cultural items merely because they were recovered from sites where human remains (in these cases culturally unaffiliated "unidentified" human remains) were also identified. One site, 48UT920, does not contain human remains but was associated with a separate burial site, located a distance of 300 meters, as a result of an administrative error.

12.     For the Wardell Bison Trap, Shute Creek, Upper Muddy Creek Village, and 48UT920 sites, BLM Wyoming has issued Notices of Inventory Completion under 25 U.S.C. § 3003. For the Studhorse Butte site, BLM Wyoming has issued a Notice of Intended Disposition under 25 U.S.C. § 3002. BLM Wyoming has demanded that UWAR transfer these collections to the University of Wyoming Human Remains Repository (UWHRR) to associate them with human burials, and has communicated that it will take possession of the subject collections in the near future. For the Eagle Rock Shelter site, BLM Colorado has issued a Notice of Intended Disposition under 25 U.S.C. § 3002, demanded that the Fort Bridger curation facility turn over the entire site collection, and communicated that it will take possession of the collection on August 7, 2026. The five Wyoming collections remain in UWAR custody as of the date of this Complaint, and the Colorado collection remains in the custody of the Fort Bridger curation facility, but transfer is imminent. Absent immediate relief from this Court, the threatened transfers are likely to occur before this action can be adjudicated on the merits.

7

13.    WAPA brings this action as a professional association whose members are directly and irreparably injured when federal agencies, relying on unlawful regulations, restrict access to or remove archaeological collections from lawful curation, research, teaching, analysis, preservation, and public education, including but not limited to the Wardell Bison Trap, Shute Creek, Upper Muddy Creek Village, Studhorse Butte, 48UT920, and Eagle Rock Shelter site collections. WAPA seeks a declaration that the challenged regulations are unlawful; vacatur of the challenged regulations; preliminary and permanent injunctive relief prohibiting Defendants from enforcing, applying, or relying on those regulations; and status-quo relief preventing BLM Wyoming and BLM Colorado from transferring, repatriating, disposing of, relinquishing control over, or otherwise removing the Wardell Bison Trap, Shute Creek, Upper Muddy Creek Village, Studhorse Butte, 48UT920, and Eagle Rock Shelter collections from the custody of the repositories where they are currently held unless and until the Court determines that the regulations on which such transfers are premised are authorized by NAGPRA.

## II.
## PARTIES

14.    Plaintiff Wyoming Association of Professional Archaeologists is a nonprofit voluntary professional association. According to its Constitution and Bylaws, the Association exists to maintain and promote the goals of professional archaeology in the State of Wyoming.

15.    WAPA's purposes include supporting the preservation and conservation of archaeological resources; establishing and promoting high standards of archaeological research, reporting, and management; establishing and promoting professional archaeological interests in political and public forums; promoting communication with the archaeological community; providing forums for discussing research problems and data; promoting public education and

interest in cultural resource preservation and conservation; promoting investigations in prehistoric and historic cultural resources; and providing Association input to appropriate state, federal, and local agencies.

16.     WAPA's membership includes professional archaeologists, researchers, students, curators, educators, cultural-resource professionals, and other qualified persons with professional interests in Wyoming archaeology. Individual voting members generally must hold at least a bachelor's degree in anthropology or a closely related discipline and have at least twelve months of full-time professional archaeological experience, subject to case-by-case exceptions.

17.     WAPA's members conduct, supervise, publish, teach, curate, analyze, and rely upon archaeological research concerning prehistoric and historic cultural resources from Wyoming as well as the rest of the United States and beyond. WAPA members have concrete professional, scholarly, educational, curatorial, and preservation interests in archaeological collections, including without limitation collections curated at UWAR and Fort Bridger and collections threatened by the BLM Wyoming and BLM Colorado repatriation actions described in this Complaint.

18.     WAPA brings this case on behalf of itself and its members to protect its members' professional, research, educational, and preservation interests in the Wyoming, Colorado, and greater United States archaeological record.

19.     Defendant Douglas J. Burgum is the Secretary of the Interior and is sued in his official capacity. The Secretary is responsible for implementing NAGPRA, promulgating regulations to carry out the statute, and supervising Interior agencies and officials responsible for the challenged regulations and agency actions.

9

20.    Defendant United States Department of the Interior is an executive department of the United States. Interior promulgated the challenged NAGPRA regulations through the Office of the Secretary and is responsible for administering NAGPRA through its component agencies and officials.

21.    Defendant Bureau of Land Management is an agency within Interior. BLM is the federal agency responsible for the BLM Wyoming and BLM Colorado NAGPRA determinations, Notices of Inventory Completion, Notices of Disposition, correspondence, demands, and threatened repatriation actions described in this Complaint.

22.    Defendant the Acting State Director of the Bureau of Land Management, Wyoming State Office, is sued in their official capacity and is designated by official title rather than by name pursuant to Federal Rule of Civil Procedure 17(d). The Acting State Director is the BLM official responsible for the BLM Wyoming actions described in this Complaint, including the challenged determinations, Notices of Inventory Completion, Notices of Intended Disposition, correspondence, demands to UWAR, and threatened transfer, repatriation, reclassification, or relinquishment of custody or control over the identified UWAR collections. The office is currently held in an acting capacity by Kris Kirby.

23.    Defendant the Acting State Director of the Bureau of Land Management, Colorado State Office, is sued in their official capacity and is designated by official title rather than by name pursuant to Federal Rule of Civil Procedure 17(d). The Acting State Director is the BLM official responsible for the BLM Colorado actions described in this Complaint, including the challenged determinations, Notice of Intended Disposition, correspondence, demands to Fort Bridger, and threatened transfer, repatriation, reclassification, or relinquishment of custody or

control over the identified Fort Bridger collection. The office is currently held in an acting capacity by Thomas Heinlein.

## III.
## JURISDICTION AND VENUE

24. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the APA and NAGPRA.

25. This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

26. The United States has waived sovereign immunity under 5 U.S.C. § 702 because WAPA seeks relief other than money damages and challenges final agency action and agency action unlawfully withheld or taken in excess of statutory authority.

27. The challenged regulations constitute final agency action under 5 U.S.C. § 704 because they mark the consummation of Interior's decisionmaking process and impose legal consequences on federal agencies, museums, repositories, regulated parties, and persons affected by NAGPRA determinations. NAGPRA contains no express judicial-review bar. The APA's presumption of reviewability under 5 U.S.C. § 701(a) therefore governs without qualification.

28. BLM Wyoming's Notices of Inventory Completion and Notices of Intended Disposition and BLM Colorado's Notice of Intended Disposition are final agency actions under 5 U.S.C. § 704. Each notice marks the consummation of BLM Wyoming's and BLM Colorado's NAGPRA determinations for the remains and objects identified in the notice, and each carries direct legal consequences by establishing the legal predicate for inventory completion, repatriation, disposition, transfer, or relinquishment of custody or control. See 25 U.S.C. §§

11

3002, 3003, 3005; *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997). The notice periods applicable to these Notices of Inventory Completion and Notices of Intended Disposition have expired; transfer under each of those notices is now legally permissible under the challenged regulations. The embedded regulatory determinations are reviewable as part of that final agency action: each notice applies the challenged regulatory definitions, standards, and procedures to the collections at issue, and those determinations are what give the notice its operative legal effect. See *Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597–598 (2016).

29.     By letter dated July 17, 2025, BLM Wyoming has communicated to UWAR that it considers all administrative steps complete and that it intends to take physical possession of the Wyoming collections described herein in the near future. By email dated July 16, 2026, BLM Colorado has communicated to Fort Bridger curation facility that it intends to take possession of the Eagle Rock Shelter collections on August 7, 2026. The imminence of these transfers compounds the harm already established by the final agency actions described above, leaves no administrative remedy available to WAPA, and confirms the need for this Court's intervention before the threatened transfers occur and render effective relief impossible.

30.     Venue is proper in this District under 28 U.S.C. § 1391(e) because Defendants are officers or agencies of the United States, a substantial part of the events or omissions giving rise to the claims occurred in Wyoming, the six specifically delineated archaeological collections for which WAPA seeks injunctive relief and vacatur are curated in Wyoming, BLM Wyoming made the challenged determinations with respect to the five Wyoming site collections, and WAPA resides and conducts its principal activities in Wyoming.

**IV.**
**GOVERNING LEGAL STANDARDS**

12

31.    WAPA's claims are timely. Under *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, 603 U.S. 799 (2024), an APA claim under 28 U.S.C. § 2401(a) accrues when the plaintiff suffers an injury from the challenged agency action, not when the regulation is promulgated. WAPA's claims accrued when Defendants took the challenged agency actions, in reliance on the challenged regulations, that injure WAPA and its members, including BLM Wyoming's June 2025 and April 2026 Notices of Inventory Completion, Notice of Intended Disposition, and its July 2025 demand to UWAR, and BLM Colorado's July 15, 2026, Notice of Intended Disposition, each of which occurred within six years of the filing of this Complaint. WAPA does not seek to reverse or unwind any transfer already completed under the challenged regulations. WAPA seeks prospective relief, vacatur of the challenged regulations, and permanent injunctive relief against their continued enforcement, to prevent all future transfers not yet completed that rest on the unlawful regulatory standards challenged in this action.

32.    WAPA's challenge to the 2010 culturally unidentifiable-remains regulation and any successor provisions is independently timely on two additional grounds. First, the 2024-effective regulations reopened, revised, incorporated, and re-promulgated the 2010 culturally unidentifiable human remains disposition regime as part of a comprehensive rulemaking. Thus, even if WAPA's injury accrued on the date of the promulgation of the challenged regulations, WAPA's injury from those re-promulgated provisions accrued no earlier than their effective date of January 12, 2024, within six years of the filing of this Complaint. Second, BLM Wyoming's and BLM Colorado's reliance on those provisions in 2025 and 2026 to issue Notices of Inventory Completion and Notice of Intended Disposition, and their demand for imminent transfer of the UWAR and Fort Bridger collections constitutes final agency action in its own

13

right, giving rise to a cause of action that independently accrued at the time of those enforcement actions.

33.     Under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), courts applying the APA exercise independent judgment in determining the meaning of a statute and may not defer to an agency's interpretation of its authorizing legislation. Because WAPA's claims present questions of whether the challenged regulations are consistent with NAGPRA's text and structure, those questions are subject to *de novo* judicial review.

34.     WAPA's claims are ripe for judicial review. The legal questions presented, whether the challenged regulations exceed NAGPRA's statutory authority, require no further factual development and are fit for immediate adjudication. Withholding review imposes concrete hardship: BLM Wyoming and BLM Colorado have invoked the challenged regulations to demand transfer of the UWAR and Fort Bridger archaeological collections, and those transfers, once completed, will not be reversible, and leaving the questions raised in this lawsuit unresolved threatens the continuation of a national pattern of unlawful transfers.

35.     The challenged regulations also implicate the major questions doctrine. Under *West Virginia v. EPA*, 597 U.S. 697, 724 (2022), when an agency claims authority to make regulatory decisions of vast economic and political significance, or claims "to discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority," courts require a clear statement from Congress before concluding that such authority was delegated. By its 2010 and 2024 regulations, Interior claims to have discovered newfound powers, decades after NAGPRA was enacted, to transform a narrowly tailored statute governing specifically defined categories of human remains and cultural items into a broad mandate to

14

divest the United States, as well as museums and other institutions receiving federal funds, of sweeping archaeological assemblages far beyond what was envisioned by Congress, a transformation affecting thousands of federally administered collections nationwide. That expansion requires clear congressional authorization. NAGPRA provides none.

## V.
## STATUTORY BACKGROUND

### A.
### NAGPRA

36.     Congress enacted NAGPRA in 1990 to balance the interests of Native groups seeking possession of human remains and cultural items against the interests of museums, repositories, researchers, educators, the public, and the United States in preserving and studying the North American archaeological record. It did so by marking out a subset of existing remains and associated artifacts, identifiable by reference to a series of express conditions and definitions, that would be eligible for transfer to lineal descendants and Tribal groups with a demonstrable cultural affiliation with the materials.

37.     For example, NAGPRA defines "burial site" as any natural or prepared physical location into which individual human remains are deposited as part of the death rite or ceremony of a culture. 25 U.S.C. § 3001(1).

38.     NAGPRA defines "cultural affiliation" as a relationship of shared group identity that can be reasonably traced historically or prehistorically between a present-day Indian Tribe or Native Hawaiian organization and an identifiable earlier group. 25 U.S.C. § 3001(2).

15

39.    NAGPRA defines "cultural items" as human remains and associated funerary objects, unassociated funerary objects, sacred objects, and objects of cultural patrimony. 25 U.S.C. § 3001(3).

40.    NAGPRA defines "Native American" to mean "of, or relating to, a tribe, people, or culture that is indigenous to the United States." 25 U.S.C. § 3001(9). That definition is a threshold requirement. If human remains or cultural items are not "Native American" within NAGPRA's statutory meaning, NAGPRA does not authorize their transfer, repatriation, or disposition.

41.    NAGPRA defines "associated funerary objects" as objects that, as part of the death rite or ceremony of a culture, are reasonably believed to have been placed with individual human remains either at the time of death or later, where both the human remains and associated funerary objects are presently in the possession or control of a federal agency or museum, except that items exclusively made for burial purposes or to contain human remains are considered associated funerary objects. 25 U.S.C. § 3001(3).

42.    NAGPRA defines "unassociated funerary objects" as objects that, "as a part of the death rite or ceremony of a culture, are reasonably believed to have been placed with individual human remains either at the time of death or later," where the remains are not in the possession or control of the federal agency or museum and where the objects "can be identified by a preponderance of the evidence as related to specific individuals or families or to known human remains or, by a preponderance of the evidence, as having been removed from a specific burial site of an individual culturally affiliated with a particular Indian tribe." 25 U.S.C. § 3001(3)(B).

16

43.     NAGPRA defines "sacred objects" as specific ceremonial objects needed by traditional Native American religious leaders for the practice of traditional Native American religions by present-day adherents. 25 U.S.C. § 3001(3)(C).

44.     NAGPRA defines "cultural patrimony" as "an object having ongoing historical, traditional, or cultural importance central to the Native American group or culture itself, rather than property owned by an individual Native American, and which, therefore, cannot be alienated, appropriated, or conveyed by any individual regardless of whether or not the individual is a member of the Indian tribe or Native Hawaiian organization and such object shall have been considered inalienable by such Native American group at the time the object was separated from such group." 25 U.S.C. § 3001(3)(D).

45.     NAGPRA requires federal agencies and museums to prepare inventories of Native American human remains and associated funerary objects and, to the extent possible based on information possessed by the museum or federal agency, identify the geographical and cultural affiliation of such items. 25 U.S.C. § 3003(a).

46.     NAGPRA requires written summaries for unassociated funerary objects, sacred objects, and objects of cultural patrimony in federal agency or museum holdings or collections, 25 U.S.C. § 3004(a), and establishes procedures for their expeditious repatriation upon request when statutory criteria are satisfied, 25 U.S.C. § 3005.

47.     NAGPRA's repatriation requirements are subject-matter limited and predicate-bound. For Native American human remains and associated funerary objects held by a museum or federal agency, NAGPRA requires expeditious return upon request when cultural affiliation has been established through the inventory process, or, where it has not been established, when

17

the requesting Indian Tribe or Native Hawaiian organization shows cultural affiliation by a preponderance of the evidence. 25 U.S.C. §§ 3003, 3005(a)(1), (a)(4). For unassociated funerary objects, sacred objects, and objects of cultural patrimony, repatriation likewise depends on satisfaction of the statutory predicates, including lineal descent, cultural affiliation, or lack of right of possession, as applicable. 25 U.S.C. §§ 3001(13), 3005(a)(2)–(5). A showing of cultural affiliation may rely on geographic information, consultation, oral tradition, and other relevant evidence, but the statutory requirement is not satisfied by geographic proximity or consultation as substitutes for the required finding: a relationship of shared group identity that can be reasonably traced, historically or prehistorically, between the claimant and an identifiable earlier group. 25 U.S.C. § 3001(2). Items for which the required statutory predicate cannot be made are not subject to statutory repatriation.

48.    NAGPRA created a review committee, including scientific, museum, and Native American representatives, with responsibilities that include monitoring and reviewing inventory and identification processes, facilitating resolution of disputes, and compiling an inventory of culturally unidentifiable human remains, that is, remains not culturally affiliated through NAGPRA's inventory process. 25 U.S.C. § 3006(b), (c)(1)–(5). Although Congress authorized this review committee to recommend specific actions for developing a process for disposition of unaffiliated remains, that is a recommendatory function addressed to Congress, not a delegation of regulatory authority to Interior. 25 U.S.C. § 3006(c)(5), (e). Congress has never enacted legislation acting on those recommendations and has never enacted legislation directing the divestiture of existing culturally unaffiliated remains or objects.

18

49.     Congress also addressed institutional good faith in a limited but important way. NAGPRA provides that a museum that repatriates cultural items in good faith pursuant to the statute is not liable for claims by an aggrieved party or for claims of breach of fiduciary duty, public trust, or state-law violations inconsistent with NAGPRA. 25 U.S.C. § 3005(f). That protection does not authorize repatriation beyond the statutory categories Congress enacted, and it does not create a safe harbor for denying research access or for transferring materials that are not statutory NAGPRA items. But it confirms Congress's assumption that museums and federal agencies would exercise independent judgment in determining whether NAGPRA applies. The 2024 regulations upset that structure by replacing independent institutional judgment with mandatory deference, expanded and uncertain definitions, and a consent gate that makes ordinary access risky whenever materials might later be characterized as covered. 43 C.F.R. § 10.1(a)(3), (d)(2)–(3).

50.     While NAGPRA authorizes the Secretary to "promulgate regulations to carry out this chapter," 25 U.S.C. § 3011, that rulemaking authority is implementation authority, not transfer authority beyond the statute. It does not authorize Interior to rewrite Congress's definitions, dilute Congress's statutory predicates, create substantive transfer rights Congress did not enact, or authorize federal agencies to dispose of archaeological resources that do not qualify as NAGPRA human remains or cultural items.

51.     To the contrary, NAGPRA must be read against the background principle that federal agencies may transfer, dispose of, release, or relinquish federal property and federally administered resources only when Congress has authorized them to do so. See *Royal Indem. Co. v. United States,* 313 U.S. 289, 294 (1941). Where, as here, Congress has specified categories of

19

property subject to transfer, Interior may not expand those categories by regulation or by agency practice. Accordingly, any transfer, repatriation, disposition, reclassification, or relinquishment of possession or control undertaken in reliance on regulations that exceed NAGPRA's statutory limits is unlawful. WAPA seeks judicial review to ensure that transfers occur only when authorized by Congress, not when authorized only by Interior's *ultra vires* regulations. That principle is reinforced by the settled understanding that the federal public domain and federally administered public resources are held by the United States in a public capacity, not as ordinary private property. As the Supreme Court recognized in *United States v. Beebe*, the public domain is held by the government as part of a public trust, and the United States is charged with protecting it from unlawful appropriation. 127 U.S. 338, 342 (1888). That principle confirms that Federal agencies may dispose of public property and federally administered archaeological resources only pursuant to lawful congressional authorization.

52.    That statutory boundary must also be understood against the longstanding federal commitment to identify, study, preserve, and curate the archaeological record of the United States embodied in the National Historic Preservation Act of 1966 (NHPA), 54 U.S.C. § 300101 et seq. (formerly codified at 16 U.S.C. § 470 et seq.), and the Archaeological Resources Protection Act of 1979 (ARPA), 16 U.S.C. § 470aa et seq. Through these and other enactments, for more than a century Congress and federal agencies have treated archaeological resources as public resources of historical, scientific, educational, and cultural importance worthy of investigation, protection, and preservation. That commitment predates NAGPRA and continued after NAGPRA's enactment.

53.     Congress did not enact NAGPRA against a blank slate. It enacted NAGPRA against this longstanding federal preservation framework. NAGPRA created rights and procedures for repatriation of Native American human remains and specifically defined cultural items when statutory conditions are met. But Congress did not silently repeal ARPA, the NHPA, and other federal curation obligations (discussed below), or the broader federal commitment to preserve archaeological resources that do not fall within NAGPRA's defined categories.

54.     The challenged regulations disregard that statutory context. By expanding NAGPRA beyond Congress's defined categories and predicates, Interior's regulations have converted, and if not stopped will continue to convert, archaeological resources that Congress has long required federal agencies to identify, preserve, curate, study, and make available for appropriate public, educational, and scientific uses into materials subject to transfer and divestiture under NAGPRA. That result is inconsistent with the statutory framework Congress enacted and with the substantial public investment that framework was designed to protect.

### B.
### ARPA, the NHPA, and Federal Curation Obligations

55.     The Archaeological Resources Protection Act reflects Congress' longstanding judgment that archaeological resources on public lands and "Indian lands" are valuable public resources held for the present and future benefit of the American people. ARPA provides the legal framework governing archaeological materials that do not fall within NAGPRA's defined categories, the framework that the challenged regulations effectively nullify by reclassifying those materials as NAGPRA cultural items through regulatory redefinition.

56.     ARPA and its implementing regulations recognize archaeological resources to include material remains of past human life or activities of archaeological interest, including

pottery, tools, structures, rock art, graves, human skeletal materials, and portions or pieces thereof.

57.    Prior to the enactment of ARPA, the National Historic Preservation Act, established the federal framework for identifying, evaluating, and protecting historic properties, including archaeological sites, on federal lands. Section 106 of the NHPA requires federal agencies to consider the effects of their undertakings on such properties and to consult with preservation authorities before proceeding. Like ARPA, the NHPA reflects a congressional judgment that archaeological and historic resources have lasting scientific, cultural, and historic value warranting federal protection and preservation.

58.    In addition, federal curation regulations at 36 C.F.R. Part 79, promulgated under 54 U.S.C. § 302107, formerly Section 101(a)(7) of the NHPA, and applicable to collections subject to ARPA, 16 U.S.C. § 470aa et seq., establish procedures, standards, and guidelines for preserving federally owned or administered archaeological collections and associated records. Those regulations reflect the federal government's continuing commitment to preserving archaeological collections and associated records after excavation or recovery.

59.    Those curation regulations require federal agencies and repositories to manage, preserve, and provide access to collections for scientific, educational, and religious uses subject to appropriate protective terms and conditions. Qualified professionals, students under professional supervision, educators, researchers, scholars, curators, conservators, exhibitors, and collection managers all depend on those preserved collections and records.

60.    NAGPRA, NHPA, and ARPA can operate together only if NAGPRA is limited to the human remains and cultural items Congress defined. Materials that do not satisfy

22

NAGPRA's statutory definitions and transfer conditions remain subject to ARPA, NHPA, federal curation obligations, and other applicable law. Interior cannot avoid those obligations by regulation simply by labeling archaeological resources as NAGPRA cultural items.

**VI.**
**REGULATORY BACKGROUND**

**A.**
**The 1995 Regulations**

61. Five years after NAGPRA became law, Interior promulgated regulations establishing definitions and procedures for lineal descendants, Indian Tribes, Native Hawaiian organizations, museums, and federal agencies to use in carrying out NAGPRA. Native American Graves Protection and Repatriation Regulations, Final Rule, 60 Fed. Reg. 62,134 (Dec. 4, 1995) (codified at 43 C.F.R. pt. 10); 25 U.S.C. § 3011.

62. The 1995 regulations generally tracked the statute's defined categories and developed a systematic process for determining the rights of lineal descendants, Tribes, and Native Hawaiian organizations to certain Native American human remains, funerary objects, sacred objects, and objects of cultural patrimony with which they were affiliated. *See* 60 Fed. Reg. at 62,134; 43 C.F.R. pt. 10 (1995).

63. For decades, NAGPRA and related statutes were implemented within an understood statutory compromise: valid NAGPRA human remains and cultural items would be repatriated according to Congress' criteria, while archaeological resources outside those statutory categories would remain subject to preservation, curation, research, educational access, and other legal protections. WAPA seeks to reinstate that statutory compromise.

**B.**
**The 2010 Regulation of Culturally Unidentifiable / Unaffiliated Remains**

64.    Under NAGPRA, human remains discovered prior to its enactment with no cultural identification, that is, remains for which no lineal descendant can be identified, and no cultural affiliation can be established, are not subject to repatriation. NAGPRA's repatriation provisions expressly require either lineal descent or a showing of cultural affiliation: "a relationship of shared group identity which can be reasonably traced historically or prehistorically between a present-day Indian tribe or Native Hawaiian organization and an identifiable earlier group." 25 U.S.C. §§ 3001(2), 3005(a). Where neither criterion is satisfied, the statute imposes no repatriation obligation and creates no right of transfer for existing materials. The legislative history confirms that this limitation was intentional. As the Senate Report stated: "The requirement of continuity between present day Indian tribes and materials from historic or prehistoric Indian tribes is intended to ensure that the claimant has a reasonable connection with the materials." S. Rep. No. 101-473, at 9 (1990).

65.    Congress addressed culturally unidentifiable human remains in the possession or control of federal agencies and NAGPRA-covered museums directly in 25 U.S.C. § 3006(c)(5), and that provision does not itself authorize transfers of those remains. In 25 U.S.C. § 3006, Congress established a review committee to monitor and review implementation of the statute's inventory and repatriation processes and charged it with, among other things, monitoring the inventory and identification process under 25 U.S.C. §§ 3003 and 3004 to ensure fair and objective consideration of all available relevant information; reviewing and making findings related to the identity or cultural affiliation of cultural items and the return of such items, upon request of any affected party; facilitating dispute resolution among Indian Tribes, Native Hawaiian organizations, lineal descendants, federal agencies, and museums; compiling an

24

inventory of culturally unidentifiable human remains and recommending specific actions for developing a process for disposition of such remains; consulting with Tribes, Native Hawaiian organizations, and museums on matters within the committee's scope; consulting with the Secretary in the development of regulations to carry out the Act; making recommendations regarding future care of cultural items to be repatriated; and submitting annual reports to Congress. See 25 U.S.C. § 3006(c)(1)–(9), (h).

66.    Throughout, the committee's role is advisory and recommendatory: it monitors, reviews, facilitates, and recommends, but does not issue regulations or make binding determinations. Among all of these functions, one subparagraph of NAGPRA, § 3006(c)(5), addresses culturally unidentifiable human remains in the possession or control of federal agencies and NAGPRA-covered museums. It directs the committee to compile an inventory of such remains and to "recommend specific actions for developing a process for disposition" of those remains. That is a recommendation to Congress, not a delegation of regulatory authority to Interior. The House Report confirms that Congress anticipated receiving those recommendations and acting, or choosing not to act, on them legislatively as it so chose: "The Committee looks forward to the review committee's recommendations in this area." H.R. Rep. No. 101-877, at 16 (1990). Congress has never enacted a disposition mandate for culturally unidentifiable human remains in museum or federal-agency collections. The task of developing one, if it is to be done at all, belongs to Congress and was not delegated to Interior.

67.    Twenty years after the passage of NAGPRA, and despite the clear lack of authority to do so, Interior issued its 2010 regulatory mandate for the disposition of unidentified remains discovered prior to the statute's enactment. 43 C.F.R. § 10.11. In an attempt to justify

25

this plainly *ultra vires* act, Interior invoked its general rulemaking authority under 25 U.S.C. § 3011, which directs the Secretary to "promulgate regulations to carry out this chapter." But a general "carry out this chapter" directive authorizes regulations that implement the statute's enacted provisions; it does not enlarge the agency's substantive jurisdiction to create transfer rights the statute withholds. *See Lyng v. Payne*, 476 U.S. 926, 937 (1986) (general rulemaking authority does not expand statutory coverage).

68.    Indeed, the text of NAGPRA makes clear that Congress knew how to authorize Interior to issue binding disposition regulations in consultation with the review committee when it intended to do so. Section 3002 of the statute governs cultural items excavated or discovered on Federal or Tribal lands after NAGPRA's enactment and establishes a priority framework for identifying claimants under § 3002(a). Where no lineal descendant, Indian Tribe, or Native Hawaiian organization comes forward to claim such items under that framework, § 3002(b) directs that they "shall be disposed of in accordance with regulations promulgated by the Secretary in consultation with the review committee." In this section, Congress expressly and unambiguously delegated to Interior the authority to issue regulation for the disposal of these unclaimed Native American cultural items. In contrast, although Congress sought recommendations from the review committee regarding culturally unidentifiable human remains in § 3006(c)(5), it did *not* grant authority to regulate on this topic as it did in the context of unclaimed Native American cultural items in § 3002(b). That omission is controlling. Where Congress included an express directive to regulate in one review-committee context and omitted it in the other, the omission reflects a deliberate choice, not an oversight. Interior may not supply by regulation what Congress withheld by design.

26

69. Interior's 2010 rule did exactly what Congress withheld authority to do. It converted a statutory recommendation function concerning culturally unidentifiable human remains into a binding disposition regime requiring museums and federal agencies to transfer such remains under regulatory criteria not enacted by Congress. That rule therefore rests on a claim of regulatory authority that NAGPRA does not contain.

70. WAPA challenges those portions of the 2010 rule set forth in Section VII *infra*, and any current provisions that continue, expand, or implement the same statutory defect to the extent they remain operative, were reopened, revised, incorporated, retained, or re-promulgated in the 2024-effective regulatory scheme, and are relied upon by Defendants to dispose of culturally unidentifiable or unaffiliated remains, or associated objects, without the statutory predicates Congress required.

**C.**
**The 2023 Final Rule / 2024-Effective Regulations**

71. On December 13, 2023, Interior published a final rule revising and replacing the definitions and procedures for implementing NAGPRA. 88 Fed. Reg. 86,452 (Dec. 13, 2023) (codified at 43 C.F.R. pt. 10). The rule became effective January 12, 2024. 88 Fed. Reg. at 86,452.

72. The 2024 regulations replace NAGPRA's statutory evidentiary framework, which requires cultural affiliation to be established by a preponderance of relevant evidence, with a regime requiring museums and federal agencies to defer to a broadly defined class of "expert opinion" labeled "Native American traditional knowledge," which is to be given preferential weight "throughout NAGPRA processes." 25 U.S.C. § 3005(a)(4); 43 C.F.R. §§ 10.1(a)(3), 10.2, 10.3; see also 88 Fed. Reg. at 86,453, 86,467.

27

73.    The 2024 regulations define "Native American traditional knowledge" broadly to include knowledge, philosophies, beliefs, traditions, skills, and practices developed, embedded, and often safeguarded by or confidential to individual Native Americans, Indian Tribes, or the Native Hawaiian Community, and provide that Native American traditional knowledge is expert opinion. 43 C.F.R. § 10.2. This definition is so sweeping and without effective limits that it reaches any knowledge, belief, philosophy, or tradition held by any member of any Tribe on virtually any subject, immunizes that content from outside scrutiny by allowing it to remain confidential, and then converts it into "expert opinion" without requiring that it bear any demonstrable connection to the specific objects, sites, or time periods at issue.

74.    The 2024 regulations then incorporate Native American traditional knowledge into the definitions of cultural item, funerary object, sacred object, and object of cultural patrimony. 43 C.F.R. § 10.2.

75.    The 2024 regulation also redefined and expanded the definition of "funerary objects" to cover materials beyond those authorized by Congress. 43 C.F.R. § 10.2; see also 88 Fed. Reg. 86,452, 86,453 (Dec. 13, 2023). NAGPRA defines funerary objects as materials "placed with individual human remains," a word choice that requires a direct, demonstrable association between a specific object and a specific burial. 25 U.S.C. § 3001(3)(A)–(B). "With" ties the object to the grave: it was placed there, as part of the burial act, in connection with those particular remains. The 2024 regulations supplant this requirement and redefine funerary objects as materials "placed with *or near* human remains," but do not define "near" or impose any objective spatial, provenience, or contextual boundary. The addition of the undefined and unbound "or near" severs the connection with burials established by Congress. Once proximity

to any human remains anywhere on a site is enough, the definition expands to potentially encompass every object recovered from any site that contains a burial, including materials from completely separate activity areas, different time periods, or hundreds of feet away. The Shute Creek NIC is a concrete example of the consequences of this expansion: 17,055 objects[2] swept up as "associated funerary objects" because they came from a site that has burials, not because they were placed with those burials. 90 Fed. Reg. 24,661 (June 11, 2025).

76.     The 2024 regulations also expand the definition of unassociated funerary object to include objects removed from a specific area where a burial site of an individual or individuals with cultural affiliation to a Tribe or Native Hawaiian organization is known to have existed, but where the burial site is no longer extant. 43 C.F.R. § 10.2

77.     The 2024 regulations modify the process for determining cultural affiliation, including by allowing a single type of information, such as geographical information, to be sufficient in some circumstances, and by replacing the prior preponderance-of-the-evidence standard with a "clearly or reasonably identify" standard. 43 C.F.R. § 10.3(a)

78.     The 2024 regulations impose a new "duty of care" on museums and federal agencies that have possession or control of NAGPRA-covered materials that requires them to obtain "free, prior, and informed consent" from the relevant lineal descendant, Indian Tribe, or Native Hawaiian organization before exhibition of, access to, or research on human remains or cultural items. 43 C.F.R. § 10.1(d)(3).

79.     Interior was warned during rulemaking that the proposed regulations' broad deference to Native American traditional knowledge, expanded definitions, altered affiliation

---

[2] Although the Shute Creek NIC states that the site assemblage consists of 17,055 objects, it nonetheless requires transfer of the entire site assemblage, which in reality totals 44,955 objects.

29

standards, and new access-and-consent requirements could lead agencies and museums to treat ordinary archaeological resources outside Congress's statutory categories as repatriable NAGPRA materials. See 88 Fed. Reg. 86,477, 86,481–82 (Dec. 13, 2023). Commenters also warned that the proposed rule could restrict access to museum and repository collections, impair scientific research, and conflict with federal preservation and curation obligations. See id. at 86,461, 86,463, 86,481. Interior nonetheless promulgated the final rule. Id. at 86,452.

80.    The text and structure of the challenged regulations, and BLM Wyoming's and BLM Colorado's implementation of them, demonstrate that these rules operate to displace statutory criteria and requirements.

81.    WAPA challenges those portions of the 2024-effective regulations set forth in Section VII *infra*.

82.    The consequences of the challenged regulations extend beyond Wyoming and Colorado. Since the 2024 regulations took effect, major institutions, including the Field Museum in Chicago and the American Museum of Natural History, have covered exhibits, closed galleries, and suspended educational programs in response to the regulations' expanded duty of care requirements. Once materials fall within the regulations' expanded definitions of human remains or cultural items, access, exhibition, study, and public education are immediately restricted unless consent is obtained. BLM Wyoming's and BLM Colorado's attempts to classify whole UWAR archaeological assemblages as associated funerary objects is a more concrete and immediate manifestation of the same unlawful expansion.

83.    The mechanism in both cases is the same: the 2024 regulations combine a definitional expansion with a consent gate in a way that is more disruptive than either change

30

would be alone. The definitional provisions – the "or near" expansion of associated funerary objects, the incorporation of Native American traditional knowledge as a sufficient basis for classification, and the elimination of the preponderance standard – enlarged the regulated category and made its boundaries uncertain. The consent provision, which requires free, prior, and informed consent before any exhibition of, access to, or research on covered materials, made access to materials within that expanded, uncertain category contingent on Tribal approval. Before 2024, a researcher or institution could identify, with reasonable confidence, which materials fell within NAGPRA's defined categories and which did not. The vast majority of the archaeological record, (ordinary campsite refuse, tool-making debris, and faunal assemblages) fell outside those categories and remained accessible under repository discretion. After 2024, the same materials may qualify as covered items depending on consultations whose outcomes cannot be predicted in advance, and access without prior consent is now prohibited if they do.

84.    As a consequence of the 2024 regulations, covered institutions have defaulted to treating potentially covered assemblages as covered, closed or restricted access, and suspended programming until consent can be obtained, if it can be obtained at all.

85.    The same mechanism also eliminates any practical judgment-based safe harbor for research access. A repository that permits a qualified researcher to examine archaeological materials based on its own professional conclusion that those materials are not NAGPRA cultural items receives no protection if, after consultation, those materials are later characterized as cultural items under the expanded regulatory definitions. Because the regulations require consent before access to covered materials, and because the boundaries of the covered category now depend on broadened definitions and Native American traditional knowledge (which can

31

include undisclosed "confidential" philosophies or beliefs of individual Native Americans) that may not be known until consultation occurs and may change based on the individual consulted, institutions have strong incentives to deny or suspend access to any collection that might conceivably be covered. The result is not merely more consultation; it is a regulatory environment in which independent professional judgment no longer safely supports access, curation, exhibition, documentation, or research.

## VII.
## THE CHALLENGED REGULATORY PROVISIONS

### A.
### 43 C.F.R. § 10.11 (2010) / 43 C.F.R. § 10.7(d) (2024)

*Disposition of Culturally Unidentifiable Human Remains: Mandatory Transfer Regime Exceeding Congressional Authorization*

86.     The review committee created by Congress in NAGPRA was authorized to compile an inventory of culturally unidentifiable human remains (remains for which no lineal descendant or culturally affiliated Tribe could be determined) and to "recommend[] specific actions for developing a process for disposition of such remains." 25 U.S.C. § 3006(c)(5). Thus, Congress assigned the review committee an advisory and recommendatory function. It did not authorize the committee to create a substantive right of disposition or impose a transfer mandate on federal agencies or museums, nor did Congress authorize Interior to do so by regulation.

87.     Nonetheless, in 2010, Interior promulgated 43 C.F.R. § 10.11, which established mandatory procedures for disposition of culturally unidentifiable Native American human remains. Unidentified human remains might include fragmentary remains from ambiguous contexts (e.g., isolated bones or teeth from surface contexts) or extremely ancient remains for which cultural identity cannot be extrapolated from the present to the past. The 2010 regulations

32

addressing these remains required museums and federal agencies to consult with Indian Tribes and Native Hawaiian organizations whose Tribal lands or aboriginal occupancy areas encompassed the area from which the remains were removed, and authorized transfer to a requesting Tribe without requiring any showing of cultural affiliation under the standards Congress established. The 2024-effective regulations continue the same *ultra vires* premise in 43 C.F.R. § 10.7(d), which governs "unclaimed human remains or cultural items" removed from federal or tribal lands and authorizes their transfer or reinterment after no lineal descendant, Indian Tribe, or Native Hawaiian organization with priority for disposition has been identified or has submitted a claim. Under that provision, a federal agency or DHHL may transfer the unclaimed human remains or cultural items to an Indian Tribe or Native Hawaiian organization that requests transfer, or may reinter them according to applicable federal, state, or local law. Although not identical to the 2010 rule, § 10.7(d) carries forward the same statutory defect by authorizing transfer or reinterment without the cultural-affiliation showing Congress required for repatriation from museum and federal-agency collections.

88.     The 2010 rule and the challenged 2024 provisions exceed NAGPRA's statutory authority in two respects. First, Congress authorized the review committee to recommend specific actions for developing a process for disposition, an advisory function addressed to Congress. Congress did not create an enforceable transfer mandate and did not delegate to Interior the authority to create one. Interior converted a recommendatory role for an advisory committee into a substantive regulatory regime without statutory basis. Second, NAGPRA's repatriation provisions for museum and federal-agency collections require a showing of cultural affiliation, defined as "a relationship of shared group identity" reasonably traceable to a present-

day Tribe, 25 U.S.C. §§ 3001(2), 3005(a). The 2010 rule's geographic-proximity surrogate has no basis in those provisions. Congress authorized geographic criteria for field discoveries under § 3002(a), not for museum collections under § 3005.

89.     BLM Wyoming's reliance on this geographic-proximity approach to classify the UWAR collections discussed herein as funerary objects associated with particular Tribes is a concrete illustration of how the 2010 and 2024-effective provisions operate to authorize transfers beyond the statutory scope Congress enacted.

**B.**
**43 C.F.R. § 10.2 (2024)**

*Definitions: Multiple Statutory Definitions Altered, Expanded, or Replaced*

90.     NAGPRA defines "cultural items" at 25 U.S.C. § 3001(3) to mean human remains together with four specifically defined subcategories: (a) associated funerary objects, (b) unassociated funerary objects, (c) sacred objects, and (d) objects of cultural patrimony. Each of these are defined by objective criteria set by Congress. The 2024-effective regulations redefine "cultural items" at 43 C.F.R. § 10.2 as "a funerary object, sacred object, or object of cultural patrimony *according to the Native American traditional knowledge* of a lineal descendant, Indian Tribe, or Native Hawaiian organization." By making Native American traditional knowledge the operative standard for what constitutes a cultural item in the first place, the regulation supplants the objective criteria established by Congress for making this determination, enabling materials to become NAGPRA cultural items subject to repatriation beyond the scope authorized in the statute.

91.     As enacted, NAGPRA does not define, create, or refer to "Native American traditional knowledge" as a regulatory category, evidentiary standard, or mandatory

34

consideration in any substantive determination. Nonetheless, the 2024-effective regulations define "Native American traditional knowledge" at 43 C.F.R. § 10.2 as "knowledge, philosophies, beliefs, traditions, skills, and practices that are developed, embedded, and often safeguarded by or confidential to individual Native Americans, Indian Tribes, or the Native Hawaiian Community." The regulation further provides that such knowledge "is not required to be developed, sustained, or passed through time," and declares that Native American traditional knowledge "is expert opinion," a characterization with no basis in the statute. NAGPRA requires museums and federal agencies to make determinations with immediate legal consequences, including whether remains or objects fall within statutory categories, whether cultural affiliation exists, whether access may be granted, and whether materials must be repatriated or transferred. The 2024 regulations make those determinations depend in substantial part on a category of asserted "expert opinion" that may be confidential, may consist of individual beliefs or philosophies, need not have been passed through time, may vary depending on the individual, Tribe, or Native Hawaiian organization consulted, and may change as different persons are consulted or as views evolve over time. Declaring such a broad, amorphous, and potentially shifting category of "knowledge" as "expert opinion," and making that opinion the operative standard for decision making, creates an evidentiary standard that has no foundation in NAGPRA, one that cannot be evaluated, tested, applied consistently, or rebutted in the manner Congress anticipated for determinations under the statute.

92.    NAGPRA defines "associated funerary objects" as objects that, "as a part of the death rite or ceremony of a culture, are reasonably believed to have been placed with individual human remains either at the time of death or later," and requires that "both the human remains

35

and associated funerary objects are presently in the possession or control of a Federal agency or museum." 25 U.S.C. § 3001(3)(A). The 2024-effective regulations redefine the category of "funerary object" at 43 C.F.R. § 10.2 as "any object reasonably believed to have been placed intentionally with *or near* human remains," connected to a death rite or ceremony "*according to the Native American traditional knowledge of a lineal descendant, Indian Tribe, or Native Hawaiian organization.*" For associated funerary objects specifically, the regulation further redefines the category as "any funerary object related to human remains that were removed and the location of the human remains is known," dropping the statutory requirement that both remains and objects be presently in the same institution's possession or control.

93. These changes depart from the statute in three distinct respects. First, the addition of "or near" has no basis in a statute that requires placement "with" individual remains. This redefinition removes the spatial proximity limitation enacted by Congress because an object "near" remains need not have been placed "with" them as part of a funerary rite. Second, the statute requires an independent objective determination that an object was placed with remains as part of a death rite, whereas the regulation substitutes Native American traditional knowledge for that determination. Third, the statutory "both in possession" requirement prevents claims against one institution for objects when the associated human remains are held at a different institution; the regulation eliminates that limitation, allowing claims wherever human remains are merely "known" to have been removed.

94. NAGPRA defines "unassociated funerary objects" as objects identified "by a preponderance of the evidence as related to specific individuals or families or to known human remains or, by a preponderance of the evidence, as having been removed from a specific burial

36

site of an individual culturally affiliated with a particular Indian tribe." 25 U.S.C. § 3001(3)(B). The 2024-effective regulations redefine "unassociated funerary object" at 43 C.F.R. § 10.2 by adding a fourth qualifying category not found in the statute: objects "removed from a specific area where a burial site of an individual or individuals with cultural affiliation to an Indian Tribe or Native Hawaiian organization is known to have existed, but where the burial site is no longer extant." This new category allows ordinary archaeological materials from any geographic area historically associated with burials to qualify as unassociated funerary objects, even if no specific burial site can be identified and even if the burial site has been entirely lost, a result that directly contradicts Congress's requirement of a link to a specific existing burial site.

95.    NAGPRA defines "sacred objects" as "specific ceremonial objects which are needed by traditional Native American religious leaders for the practice of traditional Native American religions by their present day adherents." 25 U.S.C. § 3001(3)(C). The 2024-effective regulations redefine "sacred object" at 43 C.F.R. § 10.2 as "a specific ceremonial object needed by a traditional religious leader for present-day adherents to practice traditional Native American religion, *according to the Native American traditional knowledge of a lineal descendant, Indian Tribe, or Native Hawaiian organization*." The statute requires an objective determination that an object is specifically "needed" for present-day religious practice, a finding that agencies and courts are responsible for making. The regulation makes Tribal Native American traditional knowledge the governing standard for that determination, effectively replacing independent assessment with an ill-defined, unreviewable, potentially idiosyncratic assertion that an item is a sacred object.

37

96.     NAGPRA defines an "object of cultural patrimony" as an item "having ongoing historical, traditional, or cultural importance central to the Native American group or culture itself, rather than property owned by an individual Native American," which "cannot be alienated, appropriated, or conveyed by any individual" and "shall have been considered inalienable by such Native American group at the time the object was separated from such group." 25 U.S.C. § 3001(3)(D). The 2024-effective regulations redefine "object of cultural patrimony" at 43 C.F.R. § 10.2 as an object having importance central to "a Native American group, including any constituent sub-group (such as a band, clan, lineage, ceremonial society, or other subdivision), according to the Native American traditional knowledge of an Indian Tribe or Native Hawaiian organization." The statute requires importance central to the group or culture itself; the regulation expands this to any constituent sub-group not identified by Congress. The statute also requires a historical determination that the object was considered inalienable at the time of separation; the regulation substitutes present-day, amorphously defined Tribal Native American traditional knowledge, permitting retrospective recharacterization of objects as inalienable that were not so regarded when they were separated.

97.     NAGPRA defines "cultural affiliation" as "a relationship of shared group identity which can be reasonably traced historically or prehistorically between a present day Indian tribe or Native Hawaiian organization and an identifiable earlier group." 25 U.S.C. § 3001(2). The 2024-effective regulations redefine "cultural affiliation" at 43 C.F.R. § 10.2 as "a reasonable connection between human remains or cultural items and an Indian Tribe or Native Hawaiian organization based on a relationship of shared group identity," which "may be identified clearly by the information available or reasonably by the geographical location or acquisition history of

38

the human remains or cultural items." The statutory definition requires that a relationship of shared group identity be traced, a showing of historical or prehistoric connection between a specific earlier group and a present-day Tribe. The regulation substitutes "reasonable connection," eliminates the tracing requirement, and authorizes a determination of cultural affiliation based on geography or acquisition history alone.

98.    Two provisions of NAGPRA's text establish that cultural affiliation requires a connection to a presently existing Tribe. Section 3001(2) defines "cultural affiliation" as "a relationship of shared group identity which can be reasonably traced historically or prehistorically between a present day Indian tribe or Native Hawaiian organization and an identifiable earlier group." Congress's choice of "present day" expressly limits the inquiry to living Tribes. Section 3001(9) reinforces this by defining "Native American" as "of, or relating to, a tribe, people, or culture that is indigenous to the United States." The present-tense "is" likewise requires a group with a continuing, present existence. 25 U.S.C. §§ 3001(2), 3001(9). The 2024-effective regulations depart from both. They define "Native American" at 43 C.F.R. § 10.2 to cover remains or items that "bear some relationship to a Tribe, people, or culture indigenous to the United States," and define "people" broadly to include any group sharing "a common culture, history, language, race, ethnicity, or similar feature," a definition encompassing extinct populations with no present-day Tribal successor. When combined with the provision that geography alone may establish cultural affiliation, the regulations permit ancient remains recovered on federal land to be treated as Native American based solely on geographic location, with no requirement for a reasonable connection with a presently existing indigenous group. Interior made this change despite the fact that, twenty years earlier, the Ninth Circuit had

rejected precisely this formulation as inconsistent with NAGPRA in *Bonnichsen v. United States*, 367 F.3d 864, 875–76 (9th Cir. 2004). There, the court held that the statutory requirement of a reasonable connection to a group "that is" indigenous to the United States unambiguously requires a relationship to a presently existing Tribe, people, or culture.

99.    NAGPRA defines "inventory" at 25 U.S.C. § 3003(e) as "a simple itemized list that summarizes the information called for by this section." The 2024-effective regulations redefine "inventory" at 43 C.F.R. § 10.2 as "a simple itemized list of any human remains and associated funerary objects in a holding or collection that incorporates the results of consultation and makes determinations about cultural affiliation." Congress defined inventory as an information-gathering document, a list summarizing available data. The regulation transforms it into a vehicle for making binding cultural affiliation determinations, which then trigger repatriation obligations under the statute. By embedding binding legal determinations in the inventory process rather than the repatriation process, the regulation bypasses the more demanding evidentiary standards Congress required for repatriation.

**C.**
**43 C.F.R. § 10.1 (2024)**

*Mandatory Deference to Native American Traditional Knowledge: A Regulatory Command Without Statutory Basis*

100.    NAGPRA does not require federal agencies or museums to defer to any particular form of knowledge or evidence in making NAGPRA determinations. Rather, the statute identifies a range of evidence types – "geographical, kinship, biological, archaeological, anthropological, linguistic, folkloric, oral traditional, historical, or other relevant information or expert opinion" – that a requesting Tribe can offer as it attempts to carry its burden of

establishing cultural affiliation by a preponderance of the evidence. 25 U.S.C. § 3005(a)(4). That list reflects Congress's judgment that multiple types of evidence are relevant to affiliation determinations, to be weighed under the preponderance standard. Congress assigned responsibility for making those determinations to federal agencies and museums. It did not instruct them to defer to any particular type of evidence or to any particular party's view of what the evidence establishes.

101.    The 2024-effective regulations impose a mandatory deference requirement that has no counterpart in the statute. The preamble to 43 C.F.R. Part 10 states that "[t]hroughout these systematic processes, museums and Federal agencies *must defer* to the Native American traditional knowledge of lineal descendants, Indian Tribes, and Native Hawaiian organizations." Section 10.1(d)(2) separately requires museums, federal agencies, and the State of Hawai'i Department of Hawaiian Home Lands to "make a reasonable and good-faith effort to incorporate and accommodate the Native American traditional knowledge of lineal descendants, Indian Tribes, or Native Hawaiian organizations in the storage, treatment, or handling of human remains or cultural items." Read together with the regulation's incorporation of Native American traditional knowledge into the operative definitions of cultural item, funerary object, sacred object, object of cultural patrimony, and cultural affiliation, this deference mandate effectively transfers NAGPRA decision-making authority from the federal agencies and museums Congress made responsible for it to the lineal descendants, Tribes, and Native Hawaiian organizations who are the beneficiaries of those decisions.

102.    The mandatory deference requirement exceeds the authority granted by NAGPRA in two respects. First, Congress imposed no deference obligation. The statute requires agencies

41

and museums to consult with Tribes but reserves the substantive determinations to the agencies and museums themselves. Second, because Native American traditional knowledge is defined at 43 C.F.R. § 10.2 to include knowledge that is "often safeguarded by or confidential to" the Tribe, information that by its nature cannot be independently assessed, or tested, mandatory deference to such knowledge eliminates the agency's ability to exercise the independent judgment Congress assigned to it and creates a determination process based on unreviewable evidence that no statute authorizes.

### D.
### 43 C.F.R. § 10.1(d) (2024)

*Duty of Care: Free, Prior, and Informed Consent Requirement for Exhibition, Access, and Research*

103. NAGPRA contains no provision requiring federal agencies or museums to obtain consent from Indian Tribes or Native Hawaiian organizations before allowing exhibition of, access to, or research on human remains or cultural items.

104. The 2024-effective regulations impose at 43 C.F.R. § 10.1(d)(3) a requirement that museums, federal agencies, and the State of Hawai'i Department of Hawaiian Home Lands "obtain free, prior, and informed consent from lineal descendants, Indian Tribes, or Native Hawaiian organizations prior to allowing any exhibition of, access to, or research on human remains or cultural items," defining research to include "any study, analysis, examination, or other means of acquiring or preserving information about human remains or cultural items."

105. This provision exceeds the authority granted by NAGPRA for two independent reasons. First, Congress imposed no consent requirement for exhibition, access, or research. Second, when the consent requirement is applied to the expanded regulatory definitions of

42

"cultural items," which can now sweep in ordinary archaeological materials through the Native American traditional knowledge standard, it operates to block professional research access to broad archaeological assemblages that Congress did not make subject to NAGPRA. This directly conflicts with the affirmative federal obligations under ARPA and 36 C.F.R. Part 79 to preserve and provide access to federally owned or administered archaeological collections for appropriate scientific and educational use.

### E.
### 43 C.F.R. § 10.1(a)(3), (d)(2)–(3) (2024)

*Duty of Care, Deference, and Consent: Loss of Independent Institutional Judgment*

106.    Section 10.1(d)(2) of the 2024 regulations requires museums, federal agencies, and the State of Hawai'i Department of Hawaiian Home Lands to make a "reasonable and good-faith effort" to incorporate and accommodate Native American traditional knowledge in the storage, treatment, or handling of human remains or cultural items. Read together with § 10.1(a)(3), which states that the regulations require deference to Native American traditional knowledge, and § 10.1(d)(3), which prohibits exhibition, access, or research without free, prior, and informed consent, this provision transforms institutional good faith from independent professional judgment into a deference-and-consent regime.

107.    NAGPRA requires consultation, and traditional knowledge may be relevant evidence in NAGPRA determinations. But Congress did not authorize Interior to define institutional good faith as deference to, incorporation of, or accommodation of Native American traditional knowledge in a manner that displaces a museum's or federal agency's independent responsibility to determine whether the statutory elements are satisfied. Congress assigned those

determinations to museums and federal agencies and prescribed the statutory categories and evidentiary predicates that must be met before repatriation, disposition, or transfer may occur.

108.    The practical consequence of the 2024 regulations is to eliminate any meaningful professional-judgment safe harbor for access and curation decisions. A repository that allows research access based on its own good-faith professional determination that materials are not NAGPRA cultural items risks later being found out of compliance if those materials are later characterized as covered cultural items through Native American traditional knowledge. Because § 10.1(d)(3) separately requires consent before access or research on covered materials, institutions have strong incentives to restrict access to broad categories of archaeological material whenever coverage is uncertain.

**F.**
**43 C.F.R. § 10.3 (2024)**

*Determining Cultural Affiliation: Statutory Evidentiary Standard Altered*

109.    NAGPRA establishes the evidentiary standard for cultural affiliation in the repatriation process at 25 U.S.C. § 3005(a)(4): where affiliation has not been established in inventory, human remains and funerary objects shall be returned where the requesting Tribe "can show cultural affiliation by a preponderance of the evidence based upon geographical, kinship, biological, archaeological, anthropological, linguistic, folkloric, oral traditional, historical, or other relevant information or expert opinion." Congress thus prescribed both a specific standard of proof, preponderance of the evidence, and the types of evidence relevant to that showing.

110.    The 2024-effective regulations supplant this standard for cultural-affiliation determinations. Section 10.3 provides that cultural affiliation must be determined based on the information available and that cultural affiliation "may be identified clearly by the information

44

available" or "reasonably by the geographical location or acquisition history." Section 10.3 further provides that "one type of information may be sufficient to reasonably identify the required criteria when no other relevant information is available," and gives as an example that geographical information alone may reasonably identify the earlier group, the present-day Indian Tribe or Native Hawaiian organization connected to the location, and a relationship of shared group identity between the two traced through time. Section 10.3 also states that cultural affiliation "does not require exhaustive studies, additional research, or continuity through time." 43 C.F.R. § 10.3(a)–(c).

111.    These provisions contradict the statute on multiple points. Congress set the standard of proof at preponderance of the evidence; the regulation replaces this with "clearly or reasonably identify," an undefined and lower standard. Congress required that a relationship of shared group identity be "reasonably traced historically or prehistorically." The regulation eliminates this continuity requirement. Congress listed geography as one of many types of relevant evidence to be weighed under the preponderance standard. The regulation makes geography alone sufficient to establish all three elements of cultural affiliation (an earlier group, a present-day Tribe, and a traced relationship between them).

112.    The practical consequence of these alterations is illustrated by BLM Wyoming's actions with respect to the UWAR collections. BLM has relied on geographic and consultative information alone, without the preponderance showing Congress required, to classify entire archaeological assemblages as associated funerary objects culturally affiliated with specific Tribes. The altered affiliation standard is not a procedural clarification. It is a substantive reduction in the statutory predicate Congress established for repatriation.

45

**G.**
**43 C.F.R. § 10.10 (2024)**

*Repatriation of Human Remains and Associated Funerary Objects: Operative Repatriation*
*Provision Implementing Challenged Standards*

113.    Section 10.10 of the 2024-effective regulations establishes the step-by-step process by which museums and federal agencies are required to repatriate human remains and associated funerary objects. Under § 10.10, museums and federal agencies must compile an inventory of holdings that may contain human remains and associated funerary objects, consult with lineal descendants, Indian Tribes, and Native Hawaiian organizations with potential cultural affiliation, make a written determination of cultural affiliation, publish a notice of intended repatriation, and then expeditiously repatriate upon request. Section 10.10 incorporates by reference the definitions in § 10.2 and the cultural affiliation determination standard in § 10.3.

114.    Section 10.10 is the operative provision of the 2024 regulations that translates the challenged definitions and affiliation standards into binding repatriation obligations. When § 10.10 directs a museum or federal agency to repatriate human remains and associated funerary objects based on a cultural affiliation determination made under § 10.3's altered standards - including the provisions allowing affiliation to be established by geography alone, by one type of information, and without continuity through time – and using the definitions in § 10.2 that incorporate Native American traditional knowledge and expand the categories of repatriable items beyond the statutory scope, the repatriation obligation produced is itself unlawful. A repatriation mandate that rests on definitions and affiliation standards that exceed the statute is no more lawful than those definitions and standards themselves.

46

115.    WAPA therefore challenges § 10.10 to the extent it requires or authorizes repatriation of human remains and associated funerary objects based on the unlawfully altered definitions in § 10.2, the mandatory Native American traditional knowledge deference requirement in § 10.1, and the diluted cultural affiliation standard in § 10.3. The challenge to § 10.10 is derivative: if the definitions and standards underlying the § 10.10 repatriation process are vacated, the repatriation obligations § 10.10 imposes on the basis of those definitions and standards cannot stand. WAPA does not challenge the repatriation process established by § 10.10 to the extent it would operate on the basis of the statutory definitions and evidentiary standards Congress actually enacted.

## VIII.
## BLM WYOMING'S AND BLM COLORADO'S CHALLENGED REPATRIATION ACTIONS

### A.
### BLM WYOMING

116.    UWAR is a repository at the University of Wyoming that curates archaeological collections and associated records, including federally owned or administered collections from Wyoming.

117.    On or about January 12, 2025, UWAR notified BLM Wyoming under 43 C.F.R. § 10.8(c) that it had custody of holdings or collections from seven BLM Wyoming archaeological sites from which human remains had been discovered. UWAR stated that the human remains and related cultural items subject to NAGPRA previously identified at those sites were not in its custody, consistent with its policy of not housing NAGPRA-covered items. UWAR further informed BLM Wyoming of its understanding that the archaeological assemblages from these

sites that were in its custody did not contain human remains or related cultural items subject to NAGPRA.

118. UWAR's January 12, 2025, statement listed holdings from multiple BLM Wyoming archaeological sites, including the contested collections from Shute Creek (48LN1296), 48UT920, Wardell Bison Trap (48SU301), Upper Muddy Creek Village (48CR325), and Studhorse Butte (48SU4479). UWAR identified approximately 44,955 artifacts from Shute Creek, approximately 3,361 artifacts from 48UT920, and approximately 179,733 artifacts from Wardell Bison Trap. UWAR also identified holdings from Upper Muddy Creek Village and Studhorse Butte.

119. On June 11, 2025, BLM Wyoming published a Notice of Inventory Completion (NIC) in the Federal Register stating that it had completed an inventory of human remains and claimed associated funerary objects and determined that there was a cultural affiliation between the human remains and associated funerary objects identified in the NIC and certain identified Tribes. 90 Fed. Reg. 24,661

120. The June 11, 2025 Notice of Inventory Completion identified remains of at least 41 individuals (not in UWAR custody) and approximately 24,157 items that BLM Wyoming claimed were associated funerary objects from multiple sites, including 24,096 items from Shute Creek, 48UT920, Wardell Bison Trap, and Upper Muddy Creek Village. The listed objects included projectile points, bifaces, scrapers, formal tools, modified flakes, hammerstones, manos, metates, ground stone, obsidian, fire-cracked rock, lithic debitage (waste flakes produced in toolmaking), mammal bone, shell, organic debris, ceramics, beads, and other items. On the same date, BLM Wyoming published a separate Notice of Intended Disposition (FR Doc. 2025-

48

10597, 90 Fed. Reg. 24,663 (June 11, 2025)) under 25 U.S.C. § 3002 and 43 C.F.R. § 10.7 covering human remains not in UWAR custody and 44 items claimed to be associated funerary objects from multiple BLM Wyoming sites, including 13 items from Studhorse Butte (soil samples, debitage, fauna, and a projectile point).

121.    The June 11, 2025 NIC stated that repatriation of the human remains, not in UWAR custody, and the claimed associated funerary objects in UWAR custody described therein could occur on or after July 11, 2025.

122.    By letter dated July 17, 2025, BLM Wyoming stated that, in consultation with fifteen Tribes, BLM Wyoming had determined that the entirety of the archaeological collections from seven sites currently held by UWAR, including Shute Creek, 48UT920, Wardell Bison Trap, and Upper Muddy Creek Village, are funerary objects associated with NAGPRA human remains housed in the University of Wyoming Human Remains Repository ("UWHRR").

123.    BLM's July 17, 2025 letter further asserted that these archaeological collections are "no longer archeological resources" as defined by ARPA and instead are associated funerary objects as defined by NAGPRA.

124.    BLM stated that it intended to repatriate the claimed associated funerary objects with corresponding human remains and transfer possession and control to claimant Tribes as soon as July 21, 2025.

125.    BLM requested that the claimed associated funerary objects be removed from UWAR's archaeological collections and re-associated with corresponding human remains in the Human Remains Repository by August 30, 2025.

49

126.    BLM directed UWAR to ensure that entire archaeological collections from the listed sites were re-associated with corresponding sets of human remains.

127.    On July 30, 2025, the Office of the Wyoming State Archaeologist (OWSA) responded to BLM. OWSA explained that UWAR had long maintained a policy against housing NAGPRA items and that regular audits had not identified artifacts in UWAR's collection meeting associated-funerary-object criteria.

128.    OWSA identified an 8- to 10-fold discrepancy between the approximately 24,157 objects listed in the June 11, 2025 Federal Register notice and the actual number of artifacts implicated by BLM's July 17, 2025 demand, which OWSA estimated at more than 200,000 items.

129.    OWSA explained that much of the discrepancy stemmed from undercounting of the Wardell Bison Pound and Shute Creek collections. OWSA estimated that complete transfer would involve at least 365 artifact boxes and stated that the Human Remains Repository could not physically accommodate the transfer absent expansion or renovation.

130.    OWSA requested clarification of which artifacts BLM intended to repatriate, solutions for physical space constraints, site-specific documentation demonstrating the rationale for reclassifying archaeological resources as funerary objects, and, if relevant, rescission or amendment of the June 11, 2025 notice.

131.    OWSA explained that, in its view, many of the materials BLM sought to repatriate are archaeological resources, not statutory funerary objects, because they were not placed intentionally with individual human remains at the time of death or later as part of a death rite or ceremony.

132.    On April 16, 2026, two additional Federal Register notices concerning BLM Wyoming's NAGPRA determinations were published. The first, a Notice of Inventory Completion (FR Doc. 2026-07387, 91 Fed. Reg. 20,487) identified additional claimed associated funerary objects from multiple archaeological sites, including the contested collections from the Shute Creek, 48UT920, Wardell Bison Trap, and Upper Muddy Creek Village sites, among others. The additional objects included beads, lithics and stone tools, soil samples, debitage/flakes, faunal remains, projectile points, bone awls, ground stone, fire-cracked rock, charcoal, and shell. The second, a separate Notice of Intended Disposition (FR Doc. 2026-07382, 91 Fed. Reg. 20,480), identified additional claimed associated funerary objects from archaeological sites including Studhorse Butte under 25 U.S.C. § 3002, consisting of soil samples, debitage/flakes, fauna, projectile points, flora, a biface, and a bone awl, and stated that disposition under that notice may occur on or after May 18, 2026.[3]

133.    The April 16, 2026, NIC relating to the Shute Creek, 48UT920, Wardell Bison Trap, and Upper Muddy Creek Village collections stated that repatriation of these claimed associated funerary objects could occur on or after May 18, 2026. That date has passed without transfer. The April 16, 2026, NID relating to the Studhorse Butte collection stated that disposition of these claimed associated funerary objects could occur on or after May 18, 2026. As of the date of this Complaint, the claimed associated funerary objects from the Shute Creek,

---

[3] The notice states the earliest disposition date in two places that do not match. The first sentence of the notice's "DATES" caption recites that disposition "may occur on or after April 16, 2027," but the notice's own "Claims for Disposition" section states that disposition "may occur on or after May 18, 2026." 91 Fed. Reg. at 20,480. May 18, 2026, is the operative date. On July 7, 2026, after consulting the National NAGPRA Coordinator, BLM confirmed in writing that the April 16, 2027, date in the "DATES" caption resulted from a Federal Register miscalculation, that the correct earliest disposition date is the May 18, 2026, date published in the "Claims for Disposition" section, and that BLM had transmitted disposition notices to the claiming Tribes on May 28, 2026. The separate reference to April 16, 2027, as the date after which unclaimed objects "become unclaimed associated funerary objects," is the one-year claim deadline under 43 C.F.R. § 10.7 and does not govern the earliest date on which disposition may occur.

48UT920, Wardell Bison Trap, Upper Muddy Creek Village, and Studhorse Butte collections identified in those notices remain in UWAR custody and have not been transferred, repatriated, or disposed of.

134.    BLM Wyoming has completed all administrative action it deems necessary to authorize transfer of the subject collections and has communicated to UWAR that it will be taking physical possession in the near future, without specifying an exact date. Transfer is therefore imminent. Once the collections are transferred, they would be subject to reburial, dispersal, or loss of curatorial control, and the research, teaching, comparative analysis, and preservation values of those collections would be permanently and irreparably lost. No adequate remedy at law exists to restore that loss. The imminence of BLM Wyoming's stated intent to proceed makes immediate status-quo relief necessary to preserve this Court's ability to grant effective relief on the merits as to these collections.

135.    BLM Wyoming's actions show that Defendants are relying on the challenged regulatory scheme to treat entire archaeological assemblages, or broad lots of archaeological materials, as associated funerary objects even where the materials are ordinary archaeological resources and where temporal, spatial, and behavioral association with individual human remains and death rites as required by Congress in the NAGPRA statute is absent.

## B.
## BLM COLORADO

136.    The Fort Bridger curation facility at the Fort Bridger State Historic Site in Uinta County, Wyoming, curates the archaeological collection from the Eagle Rock Shelter site (5DT813) in Delta County, Colorado, with the exception of a single basket held at the Canyons

of the Ancients Visitor Center curatorial facility in Dolores, Colorado. The collection is the subject of active, ongoing research by a WAPA member.

137.    On July 15, 2026, BLM Colorado published in the Federal Register a Notice of Intended Disposition concerning the Eagle Rock Shelter collection, issued under 25 U.S.C. § 3002 and 43 C.F.R. § 10.7. 91 Fed. Reg. 43,400 (July 15, 2026) (FR Doc. 2026-14178). The Notice states that "one lot" of cultural items removed from the site between 2007 and 2019, consisting of lithic tools, faunal remains, flora remains, bone and wood tools, cordage, leather, yucca sandal fragments, baskets, projectile points, and groundstones, has been identified as unassociated funerary objects "and/or" sacred objects or objects of cultural patrimony. The Notice recites that the unassociated funerary objects are "reasonably believed to have been placed intentionally with or near human remains" "according to the Native American traditional knowledge of a lineal descendant, Indian Tribe, or Native Hawaiian organization," and that the sacred objects and objects of cultural patrimony have been identified according to the Native American traditional knowledge of an Indian Tribe or Native Hawaiian organization. The Notice states that three Tribes have priority for disposition, and that disposition may occur on or after August 14, 2026.

138.    By email dated July 16, 2026, BLM Colorado informed the Fort Bridger curation facility's Site Archaeologist, A. Dudley Gardner, that it intends to take possession of the entire Eagle Rock Shelter collection on August 7, 2026, and to transport it to the Canyons of the Ancients curatorial facility in Dolores, Colorado for final disposition pursuant to the Notice. BLM Colorado has completed all administrative action it deems necessary to authorize disposition. Once the collection is transferred, it would be subject to disposition, dispersal, or

loss of curatorial control, and the research, teaching, comparative analysis, and preservation values of the collection would be permanently and irreparably lost. No adequate remedy at law exists to restore that loss. The imminence of BLM Colorado's stated intent to proceed makes immediate status-quo relief necessary to preserve this Court's ability to grant effective relief on the merits as to this collection.

## IX.
## REPRESENTATIVE SITE EXAMPLES

139.    BLM Wyoming's and BLM Colorado's attempted repatriations and dispositions of the collections described below, and the BLM NICs and NIDs on which they are based, are among the specific agency actions that WAPA asks this Court to set aside. Because those attempted repatriations and underlying notices were issued pursuant to and in reliance on the challenged regulations, they cannot stand if those regulations are vacated as exceeding NAGPRA's statutory authority. To be clear, WAPA's merits claims challenge the regulatory standards themselves, not BLM Wyoming's or BLM Colorado's application of those standards to these particular collections. Thus, the following examples are presented to establish WAPA's standing, to demonstrate the imminence and irreparability of the harm, and to illustrate the concrete consequences of Defendants' reliance on regulatory standards that exceed NAGPRA's statutory authority.

## A.
## 48UT920 and the Bridger Gap Burial

140.    UWAR and OWSA records indicate that the 48UT920 site and the Bridger Gap burial site are two spatially, temporally, and behaviorally distinct locations. 48UT920 is a multicomponent occupation site containing evidence of periodic reuse of the same location over

a span of several thousand years. Bridger Gap is a distinct burial site, located approximately 300 meters distant from 48UT920, dating to a time long after 48UT920 was no longer in use. The two separate locations were grouped under the same or similar site designation in certain records because of an administrative error.

141.    The 48UT920 occupation site contains a prehistoric record spanning the Middle Archaic (around 5000 to 3000 years before the present), Late Archaic (around 3000 to 1800 years before the present), and Late Prehistoric (around 1800 to 1000 years before the present), as well as a historic component dating to approximately AD 1910. The spatially distinct Bridger Gap burial is Protohistoric, likely dating to the seventeenth- or eighteenth-century AD. UWAR/OWSA records indicate that none of the artifacts from 48UT920 are related to the Bridger Gap burial.

142.    Nonetheless, in reliance on the challenged regulations, BLM Wyoming has claimed that thousands of artifacts from 48UT920 are funerary objects associated with the spatially, behaviorally, and temporally distinct burial location, and demanded that these artifacts be repatriated as such.

## B.
## 48SU301 / Wardell Bison Trap

143.    The Wardell Bison Trap (48SU301) is a major communal bison hunting site with evidence of at least three distinct periods of use between approximately 1400 and 1000 years before the present, listed on the National Register of Historic Places. The site consists of a stratified bone bed (layered deposits of bone-bearing sediments) including over 100,000 bison bones intermixed with ceramics, projectile points, flakes, stone tools, beads, ground stone, and charcoal.

144.    Among the thousands of bison bones and other artifacts recovered from the bonebed, records identify a single fragment of a human proximal femur recovered from one of the stratified bone levels.

145.    In reliance on the challenged regulations, BLM Wyoming has claimed that the presence of a single human bone fragment in this massive bison bonebed transforms it into a burial and thereby makes the entire contents of the bonebed (including but not limited to bones, tools, flakes, soil samples, ground stone, fire cracked rock, charcoal, and shell) into associated funerary objects subject to repatriation under NAGPRA, threatening the loss of one of Wyoming's most important bison archaeological collections.

## C.
### 48LN1296 / Shute Creek

146.    The Shute Creek site (48LN1296) is a large open campsite with multiple activity areas and buried components spanning at least 9000 years. UWAR records identify approximately 44,955 artifacts in UWAR custody from the site.

147.    Excavation of the northern portion of Area E of the site yielded two flexed pit interment burials dating to approximately 1200 years before the present. Site reports state that the burials contained no associated funerary objects other than limestone slabs placed beneath and above the human remains. Records also indicate that small human bones may have been displaced by rodent bioturbation into surrounding excavation units.

148.    Nonetheless, in reliance on the challenged regulations, BLM Wyoming has treated the entire site collection, including broad categories of ordinary archaeological materials from a large campsite assemblage not associated with the burials, as associated funerary objects.

### D.

**48CR325 / Upper Muddy Creek Village**

149.    Upper Muddy Creek Village (48CR325) is a Besant-period (approximately 2000 to 1250 years before the present) site located near Muddy Creek in Carbon County, Wyoming, on BLM lands. The site, part of the Muddy Creek District (CR9935) listed on the National Register of Historic Places, contains one of Wyoming's only known burial mounds. In 1979, archaeologists excavated a portion of the burial mound in response to ongoing looting, with BLM approval. Excavation records indicate that the mound yielded the partial remains of at least two subadults, along with diverse materials including bison bone, shell and bone beads, ceramics, side-notched and triangular projectile points, lithic flakes, and cores. A single radiocarbon date places the primary mound construction at approximately 1800 years before the present, though the presence of arrow points suggests the mound was reused for secondary interments over an extended period. The human remains were transferred to the University of Wyoming Human Remains Repository decades ago.

150.    Archaeological materials from the Upper Muddy Creek Village burial mound excavation were discovered in approximately 2020 in the estate of the deceased lead investigator and were accessioned into UWAR by a junior technician who did not recognize their burial-mound origin. Upon discovery of their provenance, OWSA recognized the items as burial-associated, classified them as associated funerary objects, and transferred them to the Human Remains Repository.

151.    Nonetheless, in reliance on the challenged regulations, BLM Wyoming's June 11, 2025 Notice of Inventory Completion claimed that 380 additional artifacts from locations at the site beyond the burial mound (including scrapers, projectile points, fauna, debitage/flakes,

charcoal, drills, gravers, retouched flakes, bifaces, utilized flakes, knives, cores, and mammal bones) were associated funerary objects. BLM's April 16, 2026 Notice of Inventory Completion further expanded this claim to include additional artifacts (bone and glass beads, lithics, soil samples, debitage and flakes, faunal remains, projectile points, bone awls, ground stone, fire-cracked rock, charcoal, and shell), none of which were identified in the known burial mound assemblage.

## E.
## 48SU4479 / Studhorse Butte

152.    The Studhorse Butte site (48SU4479) is an Early and Middle Archaic house pit camp (representing at least 12 occupations dating to between 8000 to 3000 years before the present) in Sublette County, Wyoming, on BLM lands. In 2002, a single human burial (a 60+-year-old female) was discovered within an unlined pit feature (Feature D1) in one of nine structures at the site (Structure D). Because the discovery occurred after NAGPRA's effective date, NAGPRA-compliant protocols were followed by the contractor, local law enforcement, the Eastern Band of the Shoshone, and the BLM Pinedale Field Office at the time of discovery. The site excavation report documented that Structure D appeared to have functioned as a dedicated burial structure distinguishable from the eight surrounding habitation structures. The excavation report expressly states that the burial was not associated with funerary objects. Structure D contained 21 lithic flakes, a mano, burned animal bone, and a utilized flake that the excavation report identifies as intrusive to the structure after its abandonment.

153.    UWAR holds 3,944 artifacts attributed to Studhorse Butte in its collections.

154.    Notwithstanding the excavation report's express determination that the burial was not associated with funerary objects, and notwithstanding that the 3,944 UWAR artifacts were unconnected to the burial feature, BLM Wyoming claimed in its June 11, 2025, Notice of Intended Disposition (FR Doc. 2025-10597, 90 Fed. Reg. 24,663), in reliance on the challenged

regulations, that 13 of those items (soil samples, debitage/flakes, fauna, and a projectile point) are associated funerary objects. An April 16, 2026, Notice of Intended Disposition (FR Doc. 2026-07382, 91 Fed. Reg. 20,480) claimed the additional artifacts from the Studhorse Butte site as associated funerary objects, consisting of charcoal samples, debitage/flakes, fauna, utilized flakes, flaked cobbles, ground stone metates and manos, floral samples, bifaces, red ocher, and cores.

### F.
### 5DT813 / Eagle Rock Shelter

155.    The Eagle Rock Shelter site (5DT813) is located in Delta County, Colorado, on land administered by BLM's Uncompahgre Field Office. From 2007 through 2019, Dr. A. Dudley Gardner, a WAPA member, served as Principal Investigator of archaeological investigations at the site conducted under authorization from BLM. Dr. Gardner has prepared and submitted written reports on the site to BLM, including an interim report, a final contract report, and a revised stratigraphic report. No comprehensive report on the site has been published, and Dr. Gardner's research toward that publication is active and ongoing.

156.    Eagle Rock Shelter is a site of exceptional scientific importance. The evidence gathered over the course of the investigations demonstrates repeated occupation and use of the shelter from approximately 13,000 years before present to approximately 1,800 years before present, based on more than sixty radiocarbon dates taken from the stratified levels of the site. Artifacts were recovered in all levels. Eagle Rock Shelter is accordingly a rare stratified, multicomponent site spanning nearly the entire period of prehistoric human presence in the region, and its earliest occupation levels are among the oldest documented in Colorado. Ongoing

soil and pollen analysis of the oldest occupation levels is producing unique evidence of plant processing at the site dating to approximately 13,000 years before present.

157.    In 2011, the human remains of a single individual were encountered at the site in a burial location on a bedrock shelf near the back of the shelter. No other human remains were ever found at the site. Based on radiocarbon dating of a tooth, the remains date to approximately 3,900 years before present. No artifacts were found in association with the burial. The remains were transferred to the Ute Mountain Ute Tribe in 2015 and reburied. There are no human remains in the Eagle Rock Shelter collection held at the Fort Bridger curation facility.

158.    BLM Colorado's Notice for the Eagle Rock Shelter site is a concrete illustration of how the challenged definitional and evidentiary provisions operate on NAGPRA's disposition track and result in unlawful transfers beyond the scope of the statute. NAGPRA's disposition provision, 25 U.S.C. § 3002, applies only to "Native American cultural items" excavated or discovered on federal or tribal lands after November 16, 1990. To bring an entire research collection containing no human remains within that statutory term, BLM Colorado classified the collection, as a single lot, as unassociated funerary objects "and/or" sacred objects or objects of cultural patrimony, resting each determination on Native American traditional knowledge and on the regulatory expansion of "funerary object" to materials placed "with or near" human remains, without identifying which statutory definition any particular item satisfies. None of those classifications is supportable under the statutory definitions Congress enacted. The site's only burial contained no associated artifacts, and the collection spans occupations that nearly all either predate the burial by thousands of years or postdate it by centuries. Without the challenged regulations, the Eagle Rock Shelter collection is not subject to NAGPRA disposition at all.

## X.
## WAPA'S STANDING AND INJURY

159. WAPA has associational standing to sue on behalf of its members, in that one or more of them would have standing to sue in their own right. In addition, the interests this action seeks to protect are germane to WAPA's purposes, and neither the claims asserted nor the relief requested requires the participation of individual members. WAPA's standing is supported by the executed declarations of seven of its members: David T. Vlcek, Daniel R. Garner, Lawrence C. Todd, Lance M. McNees, A. Dudley Gardner, Todd A. Surovell, and Clarica Johnson. WAPA will file these declarations in support of its motion for a temporary restraining order and preliminary injunction and at each subsequent stage of this action as required.

160. WAPA's declarant members span the archaeological profession: a retired federal agency archaeologist with thirty years of BLM service (Vlcek); a doctoral candidate with active grant funding (Garner); an emeritus professor with more than fifty years of Wyoming research experience (Todd); a retired cultural resource management archaeologist with a thirty-three-year career (McNees); a Registered Professional Archaeologist with fifty years of field experience who is the Principal Investigator of the Eagle Rock Shelter investigations (Gardner); an active university professor and research-institute director (Surovell); and a museum director and educator (Johnson). Their declarations establish three distinct categories of injury: (a) present, actual denial of research access under the challenged regulations; (b) threatened, imminent, and permanent loss of collections through the transfers BLM Wyoming and BLM Colorado have noticed; and (c) present modification of professional conduct and planning caused directly by the challenged regulatory regime.

161.    David T. Vlcek is a retired federal archaeologist who served at the Bureau of Land Management in Wyoming for thirty years (1981–2011), most of that time as the Area Archaeologist and later Pinedale Field Office Archaeologist responsible for the Kemmerer and Pinedale Resource Areas, the region that includes the Wardell site. He served as President of WAPA from 1988 to 1990 and on the Society for American Archaeology's Repatriation Committee from 2014 to 2017. He participated in BLM's 2005 salvage excavations at Wardell, the results of which were never radiocarbon dated or published and are held at UWAR as part of the Wardell collection. In 2025, Mr. Vlcek undertook a research project to write and publish a comprehensive report on the Wardell site timeline using those materials. In January 2026 he wrote to BLM Wyoming requesting access to organic materials from the 2005 excavations for new radiocarbon dating. By letter dated January 15, 2026, BLM Wyoming's Deputy State Director for Resource Policy and Management denied his request, stating that "all research, loans, and exhibit requests for the Wardell site are currently paused until ongoing Tribal consultations have been completed." As a direct result, his research project has been suspended.

162.    Daniel R. Garner is a doctoral candidate in anthropological archaeology at the University of Michigan and a former UWAR curation intern. His dissertation research uses cross-site stable isotope analysis of bison bone to reconstruct ancient bison ecology and human subsistence strategies at the Pleistocene/Holocene transition, and is supported by three competitive grants awarded in 2026 totaling $10,000. Isotope testing consumes small amounts of bone and cannot be performed from photographs or records. When Mr. Garner sought access to bison bone specimens from the Deer Creek/Bischoff Shelter (48BH18) collection at UWAR, UWAR denied his request, explaining that the 2024-effective regulations impose a duty of care

requiring Tribal consultation on every artifact in BLM collections before research access may be permitted, and that UWAR has accordingly, at the direction of BLM, implemented a blanket research prohibition on all BLM collections it holds pending completion of that consultation. He has been unable to conduct the analysis for which his 2026 grants were awarded and has suspended that portion of his dissertation. In addition, in a related research project on the ecology of communal bison hunting during the Late Prehistoric period, Mr. Garner has planned isotope analysis of juvenile bison mandibles contained in the Wardell collection, which is subject to the June 2025 NIC. If the Wardell collection is transferred, he will be permanently unable to conduct that planned analysis.

163.    Lawrence C. Todd is Professor Emeritus of Anthropology at Colorado State University and Adjunct Professor of Anthropology at the University of Wyoming. Since November 2022, he has conducted ancient DNA extraction and high-precision radiocarbon dating of bison petrous bone specimens from five UWAR bison bonebed collections (the Horner, Carter-Kerr-McGee, Finley, Hawken, and Scoggin sites). That research contributes directly to a forthcoming co-authored article in the journal *Science* reconstructing the genetic history of American bison. As the next step in this program, Dr. Todd intends to obtain petrous portions from the Wardell Bison Trap collection at UWAR, which contains one of the largest and best-documented bison bone assemblages from a Great Plains communal hunting context. That analysis requires destructive physical access to the specimens and cannot be performed from photographs, catalogs, or reports. If the Wardell collection is transferred pursuant to the NIC, the data those specimens contain will be permanently lost. In addition, the consent and duty-of-care

requirements imposed by the 2024-effective regulations have created regulatory uncertainty about his ability to continue and extend research under his active UWAR loan.

164. Lance M. McNees is a retired professional archaeologist whose thirty-three-year career focused on the prehistory of the Wyoming Basin. Since retiring he has pursued a long-term research program on Late Prehistoric human occupation of the Wyoming Basin, built on a database he has compiled encoding 396 cultural components from 263 archaeological sites. Four of the five site collections covered by BLM Wyoming's June 2025 NIC are included in that database and are directly relevant to his research: Wardell Bison Trap, Shute Creek, Upper Muddy Creek Village, and 48UT920. His current research requires direct physical examination of the ceramic assemblages from Wardell, Upper Muddy Creek Village, and 48UT920, and portable X-ray fluorescence sourcing of the obsidian assemblages from Wardell, Shute Creek, and 48UT920. Ceramic types are among the most reliable indicators of cultural identity available to archaeologists, and the Late Prehistoric ceramic record of the Wyoming Basin remains poorly understood. If the noticed transfers proceed, he will be permanently unable to conduct the examinations his research requires.

165. A. Dudley Gardner is Professor Emeritus of Western Wyoming Community College, the Principal Investigator of the Western Archaeological and Anthropological Research Institute in Rock Springs, Wyoming, and a Registered Professional Archaeologist with fifty years of field experience. Since 2007 he has been the principal investigator of the Eagle Rock Shelter investigations described above, and since 2014 he has personally paid for forty of the radiocarbon dates from the site at a cost of more than $20,000, as well as for third-party soil and faunal analyses of materials from the collection. His research on the collection is active and

ongoing: he is conducting soil, faunal, and pollen analyses as part of a project to prepare and publish a comprehensive site report, work that requires direct physical access to the collection and cannot be performed from photographs, catalog records, or site reports. By email dated July 16, 2026, BLM Colorado informed him that it intends to take possession of the entire collection on August 7, 2026. If the collection is transferred, Dr. Gardner will lose access to it, will be unable to complete both his ongoing analyses and the comprehensive site report he is preparing for publication, and the results of nearly two decades of investigation, including unique evidence of plant processing dating to approximately 13,000 years before present, would be permanently lost to science.

166.    Todd A. Surovell is a Professor of Anthropology at the University of Wyoming and Director of the George C. Frison Institute of Archaeology and Anthropology. He is the principal investigator of a long-term research program at the Barger Gulch Folsom site in Grand County, Colorado, located on BLM-administered land, from which his team has recovered tens of thousands of artifacts. The Barger Gulch collections are housed at UWAR, his research with them is ongoing, and the site-specific assemblage cannot be replicated or substituted. Because of the challenged regulations, Dr. Surovell has already changed his professional practice: he has modified the research programs he designs to avoid dependence on collections that may be subject to transfer under the challenged standards, and he now avoids planning excavations on federal lands to the extent practicable because of the risk that ordinary archaeological materials he recovers will be claimed as cultural items under the challenged definitions. Since the 2024-effective regulations took effect, he has also found it more difficult to secure contributions of funds and collections for the Frison Institute, because donors and collectors reasonably fear that

donated materials may be transferred, reburied, or removed from professional custody rather than preserved for research and education.

167.    Clarica Johnson is the Executive Director of the Green River Valley Museum in Big Piney, Wyoming, approximately five miles from the Wardell Bison Trap site. The Museum's most prominent exhibit consists of two displays of Wardell materials held on loan from UWAR, and Ms. Johnson personally delivers educational programming built around that exhibit to local second- and third-grade students each year, using actual artifacts recovered from the children's own community. If the Wardell collection is transferred, UWAR's loan will be terminated, the exhibit will be dismantled, and the educational programming that is the core of her professional role will be permanently eliminated. The threat of transfer has already impaired her ability to plan and commit resources to the Museum's educational programming.

168.    These declarations establish that the challenged regulations are already operating to deny WAPA members access to collections, independent of any transfer. At the direction of BLM, UWAR has implemented a blanket research prohibition on all BLM collections it holds, based on the duty-of-care and consultation requirements of the 2024-effective regulations; Mr. Garner's access request was denied on that basis. BLM Wyoming itself has paused all research, loans, and exhibit requests for the Wardell site, citing Tribal consultations that are part of the repatriation process initiated by its NIC; Mr. Vlcek's access request was denied on that basis. Dr. Todd's active destructive-testing loan is burdened by the same regime. These are concrete, particularized, actual injuries occurring now.

169.    The declarations further establish threatened injuries that are imminent and irreparable. BLM Wyoming has completed all administrative steps it considers necessary to

66

transfer the Shute Creek, 48UT920, Wardell Bison Trap, Upper Muddy Creek Village and Studhorse Butte collections and has stated it will take physical possession in the near future, and BLM Colorado has stated that it will take physical possession of the Eagle Rock Shelter collection on August 7, 2026, with disposition to follow on or after August 14, 2026. If these transfers proceed, Dr. Todd will be permanently unable to obtain the Wardell petrous specimens his ongoing research program requires; Mr. McNees will be permanently unable to examine the ceramic and obsidian assemblages central to his Wyoming Basin research; Mr. Garner will be permanently unable to perform the planned isotope analysis of Wardell specimens; Ms. Johnson's museum exhibit and educational programming will be permanently lost; and Dr. Gardner will be permanently unable to complete his soil, faunal, and pollen analyses of the Eagle Rock Shelter collection or the comprehensive site report he is preparing for publication. Because scientific data recoverable only from physical specimens is destroyed for research purposes when a collection is removed from professional curation, no post-transfer remedy could restore what would be lost.

170.    The challenged regulations also injure WAPA members through present, ongoing modification of their professional conduct. Dr. Surovell has redesigned research programs and altered fieldwork strategy to avoid the reach of the challenged definitions, and the Frison Institute's ability to attract donations has been impaired. Dr. Todd's planning for research under his active UWAR loan has been affected by the consent and duty-of-care requirements. Where an unlawful regulatory regime causes professionals to forgo research, alter fieldwork strategies, or refrain from pursuing funded projects they would otherwise pursue, that behavioral change is itself a present injury caused by the regime.

171.    Each of these injuries is fairly traceable to the challenged regulations and to BLM Wyoming's and BLM Colorado's reliance on them. The June 2025 and April 2026 BLM Wyoming NICs and NIDs were issued under the challenged regulations. UWAR's blanket research prohibition, imposed at BLM's direction, rests on the duty-of-care and consultation requirements of those regulations. BLM Wyoming's pause of all Wardell research requests rests on consultations conducted as part of the repatriation process those regulations authorize. BLM Colorado's July 15, 2026 Notice of Intended Disposition likewise was issued under the challenged regulations and rests on the regulatory definitions and Native American traditional knowledge provisions they impose. And the behavioral changes described above respond directly to the expanded definitions, mandatory deference requirement, and consent regime the regulations impose.

172.    To the extent Defendants argue that any claim is moot because a particular repatriation has been completed, that argument fails. Completed repatriations under the challenged regulations permanently reduce the collections available to WAPA members and demonstrate the concrete operation of the challenged regime; the regulations continue to apply to the collections that remain, including the Shute Creek, 48UT920, Wardell Bison Trap, Upper Muddy Creek Village and Studhorse Butte collections still in UWAR custody and the Eagle Rock Shelter collection still in the custody of the Fort Bridger curation facility; and Defendants' continuing enforcement of the challenged regulations presents a live controversy as to every remaining collection on which WAPA members rely.

173.    The injuries to WAPA members are not limited to the UWAR collections. The same definitions, deference requirements, affiliation standards, and consent requirements govern

NAGPRA determinations at federally funded museums, universities, and repositories nationwide. The regulations define "research" to encompass any study, analysis, or examination of covered materials – including osteological analysis, radiocarbon dating, lithic analysis, faunal analysis, photographic documentation, and condition assessment, which are the core professional activities of WAPA's members. Because institutions cannot reliably determine in advance which materials may later be characterized as covered, the predictable institutional response, exemplified by UWAR's blanket prohibition, is to restrict access broadly, injuring WAPA members wherever they work with federally regulated collections.

174. The relief WAPA seeks would redress these injuries. Vacatur of the challenged regulations and set-aside of the NICs, NIDs, and related demands would eliminate the stated legal basis for UWAR's blanket research prohibition and for BLM Wyoming's pause of Wardell research requests; would keep the five contested Wyoming collections at UWAR, and the Eagle Rock Shelter collection at the Fort Bridger curation facility, available for research, teaching, loan, and exhibition; and would remove the regulatory burdens that have altered members' professional conduct. The declarants state their present intention to resume the suspended work if relief is granted: Mr. Garner will immediately renew his request for access to the 48BH18 specimens; Mr. Vlcek will renew his request for the 2005 Wardell materials and complete his site report; Mr. McNees will seek access to the ceramic and obsidian assemblages his research requires; Dr. Todd will seek Wardell petrous specimens and continue his UWAR-based research program; and Dr. Gardner will continue his ongoing analyses of the Eagle Rock Shelter collection and complete his planned publication of the site report.

175.    The interests WAPA seeks to protect are germane to WAPA's purposes, including promoting professional archaeology in Wyoming, establishing and promoting high standards of archaeological research and management, supporting preservation and conservation of archaeological resources, promoting public education and interest in cultural resources, and providing Association input to federal agencies. WAPA's declarants embody those purposes; they include a past President of the Association and members whose careers span federal service, academia, cultural resource management, graduate training, and public education.

176.    Neither the claims asserted nor the relief requested requires the participation of each individual WAPA member. This case presents legal questions concerning the validity of federal regulations under NAGPRA and the APA, to be resolved on the administrative record. The member declarations described above will support standing and preliminary relief; they do not convert WAPA's facial challenge into one requiring individualized adjudication of any member's claims.

## XI.
## CLAIMS FOR RELIEF

### COUNT I
### APA - 2010 Culturally Unidentifiable-Remains Rule and Current Successor Provisions Exceed Statutory Authority

177.    WAPA incorporates by reference all preceding paragraphs.

178.    Under NAGPRA as enacted, the repatriation of human remains and associated funerary objects from existing museum and agency collections is governed by 25 U.S.C. § 3005. That provision conditions all repatriation transfers on either lineal descent or cultural affiliation: "a relationship of shared group identity which can be reasonably traced historically or prehistorically between a present-day Indian tribe or Native Hawaiian organization and an

70

identifiable earlier group." 25 U.S.C. §§ 3001(2), 3005(a). Where that connection does not exist, the statute withholds any right of transfer. The legislative history confirms that this limitation was intentional: the Senate Report stated that "[t]he requirement of continuity between present day Indian tribes and materials from historic or prehistoric Indian tribes is intended to ensure that the claimant has a reasonable connection with the materials." S. Rep. No. 101-473, at 9 (1990). Where that connection does not exist, the statute withholds any right of transfer.

179.    Congress addressed culturally unidentifiable human remains in 25 U.S.C. § 3006(c)(5), which directs the review committee to compile an inventory and "recommend specific actions for developing a process for disposition." That is an advisory function directed to Congress, not a delegation of regulatory authority to Interior. The House Report accompanying NAGPRA confirmed this understanding: "The Committee looks forward to the review committee's recommendations in this area." H.R. Rep. No. 101-877, at 16 (1990). Congress anticipated receiving those recommendations and choosing whether to act on them legislatively. Congress has never done so, and no culturally unidentifiable human remains transfer mandate has ever been enacted.

180.    Interior has attempted to justify its regulation of culturally unidentifiable human remains on its general rulemaking authority under 25 U.S.C. § 3011, which provides that, not later than 12 months after NAGPRA's enactment, the Secretary "shall promulgate regulations to carry out this chapter." That provision directs the Secretary to issue implementing regulations on a specified timetable. It is not an independent subject-matter grant authorizing Interior to create transfer rights, disposition mandates, or substantive categories of repatriable materials that Congress did not enact.

181.    The structural evidence within NAGPRA itself forecloses Interior's position. Congress knew how to authorize binding regulations for the disposition of Native American remains and did so explicitly when it chose to. Section 3002 governs cultural items excavated or discovered on Federal or Tribal lands after NAGPRA's enactment and establishes a priority framework for identifying claimants under § 3002(a). Where no lineal descendant, Indian Tribe, or Native Hawaiian organization comes forward to claim such items under that framework, § 3002(b) directs that they "shall be disposed of in accordance with regulations promulgated by the Secretary in consultation with the review committee." Here, Congress expressly and unambiguously delegated to Interior the authority to issue regulations for the disposal of these unclaimed Native American cultural items. In contrast, in the context of unidentifiable human remains under § 3006(c)(5), Congress sought only recommendations from the review committee, and it granted no authority to Interior to regulate on this topic as it did in the context of unclaimed Native American cultural items in § 3002(b). This omission reflects a deliberate choice, not an oversight.

182.    NAGPRA's structure reinforces this conclusion. Congress established two distinct legal regimes. For Native American cultural items excavated or discovered on federal or Tribal lands after November 16, 1990, NAGPRA imposes a priority framework under 25 U.S.C. § 3002(a), in which Tribal lands and aboriginal lands are relevant criteria. For Native American human remains and associated funerary objects held in museum and federal-agency collections, the class of remains addressed by the 2010 rule, NAGPRA requires lineal descent or cultural affiliation under 25 U.S.C. §§ 3003 and 3005, and does not authorize Interior to substitute geographic proximity for the statutory cultural-affiliation requirement.

72

183.    The 2010 rule collapsed this distinction by applying a geographic-affiliation standard to museum and agency collections, substituting for the cultural-affiliation standard Congress enacted the very geographic criterion Congress had reserved for a different statutory category.

184.    The 2024 regulations do not cure the defects of the 2010 culturally unidentifiable human remains rule. Rather, they compound and extend them. When Interior comprehensively revised 43 C.F.R. Part 10 effective January 12, 2024, it replaced the 2010 culturally unidentifiable human remains rule, formerly codified at 43 C.F.R. § 10.11, as part of a wholesale overhaul of the Part 10 regulatory scheme, while continuing the same statutory premise in 43 C.F.R. § 10.7(d): that Interior may authorize disposition or transfer of human remains and cultural items without the cultural-affiliation showing Congress required for repatriation from museum and federal-agency collections. The 2024 regulations rest on the same *ultra vires* premise as the 2010 rule: that Interior may authorize disposition or transfer under regulatory criteria not enacted by Congress, including geography-based criteria and standards untethered from the cultural-affiliation showing Congress required for repatriation from museum and federal-agency collections. The 2024 regulations then extend that premise beyond the disposition of "culturally unidentifiable" remains by embedding geography-based and other diluted affiliation standards in the definitional, cultural-affiliation, disposition, and repatriation provisions of the 2024-effective regulations, including 43 C.F.R. §§ 10.3, 10.7, and 10.10. These provisions are not isolated rules. They operate together: the definitional and affiliation provisions determine what materials are treated as covered, the disposition and repatriation provisions direct transfer once coverage is found, and the duty-of-care and consent provisions restrict access once

materials are treated as covered. The 2010 rule and the challenged 2024 provisions thus form an integrated regulatory scheme resting on the same unlawful foundation: that Interior may authorize disposition, transfer, repatriation, or denial of access under regulatory standards and procedures that Congress did not enact. The additional *ultra vires* defects introduced by the 2024-specific definitional and procedural provisions are addressed in Counts II through IV.

185.    The integrated character of this regulatory scheme determines the scope of relief. WAPA challenges both the 2010 culturally unidentifiable human remains rule, formerly codified at 43 C.F.R. § 10.11, and the 2024-effective provisions that continue and expand the same statutory defect. Vacatur of the challenged 2024 provisions should therefore be accompanied by a declaration that Interior lacks statutory authority to authorize disposition, transfer, or repatriation based on geographic proximity or other regulatory standards that substitute for the cultural-affiliation showing Congress required. Interior may not avoid such relief by treating the superseded 2010 rule as an independent fallback basis for the Wyoming repatriations. The 2010 rule is independently *ultra vires* for the reasons set forth in this Count, and the 2024-effective regulations carry forward and expand the same unlawful premise. A declaration by this Court that geographic-proximity-based disposition exceeds Interior's statutory authority under NAGPRA therefore operates against both regulatory generations and forecloses any such fallback.

186.    The 2010 culturally-unidentifiable-remains rule, 43 C.F.R. § 10.11 (2010), and the challenged 2024-effective provisions that continue, expand, or implement the same statutory defect, including 43 C.F.R. §§ 10.3, 10.7(d), and 10.10, exceed statutory authority, are contrary to law, and should be declared invalid and vacated. 5 U.S.C. § 706(2)(A), (C).

**COUNT II**
**APA - 2024-Effective Definitions Exceed Statutory Authority and Are Contrary to NAGPRA**

187.    WAPA incorporates by reference all preceding paragraphs.

188.    Under the APA, a reviewing court shall hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

189.    NAGPRA precisely defines the categories of human remains and cultural items subject to its repatriation and disposition provisions.

190.    Interior's 2024-effective definitions codified at 43 C.F.R. § 10.2, including the definitions of cultural item, funerary object, sacred object, object of cultural patrimony, Native American traditional knowledge, Native American, cultural affiliation, and inventory, exceed the authority granted by Congress and are contrary to NAGPRA because they alter the statutory criteria for identifying covered and repatriable items.

191.    Interior may not use general rulemaking authority to transform ordinary archaeological resources into NAGPRA cultural items, to make proximity to human remains or a site area sufficient where Congress required placement with individual human remains as part of a death rite or ceremony, or to substitute regulatory deference for statutory proof.

192.    The challenged definitions in 43 C.F.R. § 10.2 exceed statutory authority, are contrary to NAGPRA, and should be declared invalid and vacated. 5 U.S.C. § 706(2)(A), (C).

**COUNT III**
**APA - Mandatory Deference to Native American Traditional Knowledge Exceeds Statutory Authority and Is Contrary to NAGPRA**

193.    WAPA incorporates by reference all preceding paragraphs.

75

194. Traditional knowledge may be relevant evidence in NAGPRA determinations. But Congress did not authorize Interior to require federal agencies and museums to defer to traditional knowledge in a manner that overrides or displaces statutory definitions, statutory burdens, or agency responsibility to determine whether NAGPRA's criteria are satisfied.

195. The 2024-effective regulations require deference to Native American traditional knowledge throughout NAGPRA processes, 43 C.F.R. §§ 10.1(a)(3), 10.1(d)(2), and define that knowledge as a form of expert opinion, 43 C.F.R. § 10.2. The regulations incorporate that concept into the key definitions governing the scope of repatriable items, 43 C.F.R. § 10.2, and into the standards governing cultural affiliation determinations, 43 C.F.R. § 10.3.

196. The deference requirement exceeds NAGPRA because it transforms consultation evidence into a controlling regulatory standard and causes agencies to classify materials as cultural items without independently satisfying the statutory elements Congress required.

197. The mandatory deference requirement of 43 C.F.R. §§ 10.1(a)(3) and 10.1(d)(2), and the incorporation of Native American traditional knowledge into the definitions in 43 C.F.R. § 10.2 and the cultural-affiliation standards in 43 C.F.R. § 10.3, are contrary to law, exceed statutory authority, and should be declared invalid and vacated. 5 U.S.C. § 706(2)(A), (C).

**COUNT IV**
**APA - Cultural Affiliation Standards Exceed Statutory Authority and Are Contrary to NAGPRA**

198. WAPA incorporates by reference all preceding paragraphs.

199. NAGPRA defines cultural affiliation as a relationship of shared group identity reasonably traceable historically or prehistorically between a present-day Indian Tribe or Native Hawaiian organization and an identifiable earlier group.

76

200.    Interior's 2024-effective cultural affiliation regulations impermissibly dilute the statutory relationship requirement by allowing cultural affiliation to be clearly or reasonably identified based on one type of information, including geographical information, and by eliminating the prior preponderance standard.

201.    The 2024-effective cultural affiliation standard continues and expands the geographic-proximity defect first introduced by the 2010 culturally unidentifiable human remains rule. Where the 2010 rule used geographic proximity as a surrogate for cultural affiliation in the context of culturally unidentifiable remains, the 2024-effective regulations carry that same premise into broader cultural-affiliation determinations under 43 C.F.R. § 10.3. The *ultra vires* defect runs through both regulatory generations: neither the 2010 rule nor the 2024-effective regulations may substitute geographic location for the showing of shared group identity reasonably traceable historically or prehistorically that Congress enacted in 25 U.S.C. § 3001(2).

202.    Geography may be relevant evidence. But Congress did not authorize Interior to replace the statutory requirement of a reasonably traceable relationship of shared group identity with geography alone or with a standard untethered from the statute.

203.    The challenged cultural-affiliation provisions, 43 C.F.R. §§ 10.3 and 10.10 (2024), together with the geographic-proximity surrogate first introduced in the 2010 culturally unidentifiable human remains rule, 43 C.F.R. § 10.11 (2010), exceed statutory authority, are contrary to NAGPRA, and should be declared invalid and vacated. 5 U.S.C. § 706(2)(A), (C).

**COUNT V**
**APA - Access, Research, and Consent Restrictions Exceed Statutory Authority and Are Contrary to NAGPRA**

204.    WAPA incorporates by reference all preceding paragraphs.

205. The 2024 regulations impose a new requirement of free, prior, and informed consent before exhibition of, access to, or research on human remains or cultural items. 43 C.F.R. § 10.1(d)(3).

206. Nothing in NAGPRA authorizes the Secretary to regulate, much less to prohibit, exhibition of, access to, or research on collections held by federal agencies or museums. NAGPRA's operative provisions govern the ownership and disposition of cultural items discovered on federal or Tribal lands after 1990 (25 U.S.C. § 3002); the preparation of summaries and inventories of existing agency and museum collections (25 U.S.C. §§ 3003, 3004); repatriation upon request when the statutory predicates are satisfied (25 U.S.C. § 3005); civil penalties for museum noncompliance (25 U.S.C. § 3007); and related administrative matters. No provision of the statute grants Interior authority over exhibition, access, study, or research, and no provision authorizes Interior to condition those activities on the consent of any third party. Under *Loper Bright*, that statutory silence is dispositive: Interior may not exercise regulatory power Congress never delegated.

207. Where Congress intended NAGPRA to address scientific study, it did so expressly and narrowly. Section 3005(b) requires a federal agency or museum to "expeditiously return" culturally affiliated items upon request "unless such items are indispensable for completion of a specific scientific study, the outcome of which would be of major benefit to the United States," in which case the items must be returned no later than ninety days after the study is completed. 25 U.S.C. § 3005(b). Similarly, in defining the documentation required for inventories, Congress specified that the inventory process shall not "be construed to be an authorization for the initiation of new scientific studies." 25 U.S.C. § 3003(b)(2). These

provisions demonstrate that Congress considered the relationship between scientific research and repatriation and struck the balance itself: research on covered items yields to a valid repatriation claim except in defined circumstances, and the inventory process confers no new study rights. Congress did not prohibit research on agency or museum collections, and it did not condition access, study, or exhibition on Tribal consent. Interior's blanket pre-access consent requirement discards the balance Congress enacted and substitutes a different one of Interior's own design.

208.    The consent requirement operates in combination with the regulations' unlawfully expanded definitions of cultural items to block WAPA members and other qualified professionals from studying archaeological materials that do not satisfy NAGPRA's statutory categories. A professional archaeologist seeking to study lithic debitage or faunal remains from a multi-component site where a burial was found anywhere on the grounds must now determine, before touching the collection, whether those materials have been or may be classified as associated funerary objects under the "or near" standard or under Native American traditional knowledge, and if they might be, must obtain tribal consent before proceeding. Because that determination often cannot be made without the very access it conditions, the practical effect is a default prohibition on research for broad categories of ordinary archaeological material that Congress never made subject to NAGPRA's requirements. The regulations thereby cause the unauthorized consent regime to restrict access in practice even to ordinary archaeological materials that Congress did not make subject to NAGPRA.

209.    The consent requirement is also "not in accordance with law" under 5 U.S.C. § 706(2)(A) because it cannot be reconciled with repositories' affirmative obligations under 36 C.F.R. Part 79. Those regulations require federal agencies and repositories to conduct periodic

inventories, condition assessments, and conservation monitoring of federally owned archaeological collections, activities that necessarily involve physical access to the collections. Because the 2024-effective regulations define cultural items to encompass broad categories of archaeological material previously outside NAGPRA, repositories cannot fulfill their mandatory Part 79 curation obligations without first obtaining tribal consent for routine inventory and condition-reporting activities. A regulation that makes compliance with one set of binding federal obligations contingent on violating another is contrary to law.

210. The unlawfulness of the consent requirement is aggravated by the absence of any practical safe harbor for professional non-coverage determinations. A covered institution that allows access based on its own good-faith professional judgment that materials are not NAGPRA cultural items remains exposed if those materials are later characterized as covered under the expanded definitions, Native American traditional knowledge, or consultation. The predictable result is institutional risk avoidance: access is denied, delayed, or conditioned on consent even for ordinary archaeological materials that Congress did not make subject to NAGPRA. That effect is not incidental to the rule; it follows directly from the interaction of § 10.1(a)(3), § 10.1(d)(2), § 10.1(d)(3), and the expanded definitions in § 10.2, and it demonstrates the concrete, ongoing injury that the unauthorized consent regime inflicts on WAPA's members.

211. The challenged access, research, and consent restrictions, 43 C.F.R. § 10.1(d)(3), together with 43 C.F.R. §§ 10.1(a)(3) and 10.1(d)(2) as they operate on exhibition, access, and research, exceed statutory authority and are contrary to NAGPRA, and should be declared invalid and vacated. 5 U.S.C. § 706(2)(A), (C).

## COUNT VI
### APA - In the Alternative, the Challenged Regulations Are Arbitrary and Capricious

80

212.   WAPA incorporates by reference all preceding paragraphs.

213.   WAPA's principal claim is that the challenged regulations exceed NAGPRA's statutory limits and are contrary to law. In the alternative, the challenged regulations are arbitrary and capricious under 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious where the agency has failed to consider an important aspect of the problem, failed to respond to significant comments, offered an explanation that runs counter to the evidence before it, departed from its prior positions without acknowledging or adequately explaining the change, or failed to assess the serious reliance interests its prior positions engendered. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–33 (2020). This claim is to be resolved on the administrative records of the 2010 and 2024 rulemakings and on the final rules' stated rationales. It requires no discovery into Interior's internal deliberations and no site-specific factfinding.

214.   Interior failed to respond meaningfully to significant comments. During the 2010 rulemaking, commenters warned that Interior lacked authority to impose a mandatory disposition regime for culturally unidentifiable human remains and that the proposed rule would exceed NAGPRA's statutory limits. During the 2024 rulemaking, commenters, including museums, repositories, professional archaeological and scientific organizations, and state archaeologists, warned Interior that the proposed regulations would sweep archaeological materials unrelated to statutory NAGPRA items into repatriation; would replace defined statutory standards with vague and unadministrable ones; would produce confused and arbitrary repatriation practices; would conflict with ARPA, NHPA, federal curation requirements, and scientific research obligations;

81

and would predictably cause institutions to restrict research, exhibition, and curation access across their collections. Interior did not reasonably address those warnings in the final rules. The consequences those commenters predicted are the consequences that have in fact followed. BLM Wyoming's actions and the nationwide institutional closures described above are pleaded not to obtain discovery into Interior's deliberations, but to illustrate the foreseeable consequences that the rulemaking record itself predicted and to establish WAPA's standing, irreparable harm, and need for immediate status-quo relief.

215.    Interior also reversed longstanding agency positions without acknowledging the magnitude of the change, without supplying good reasons for it, and without assessing the serious reliance interests its prior positions had engendered. For nearly three decades, museums, repositories, universities, and federal agencies completed NAGPRA's inventory and summary process, structured their curation practices and their compliance with 36 C.F.R. Part 79, and built loan programs, exhibitions, teaching collections, and federally funded research programs in reliance on the regulatory framework as originally promulgated in 1995, including the preponderance-of-the-evidence standard for cultural affiliation, the statutory "placed with" standard for associated funerary objects, and the institutions' own professional judgment in making NAGPRA determinations. The 2024 regulations displaced each of those settled positions: they eliminated the preponderance standard, expanded "with" to "with or near," subordinated institutional judgment to mandatory deference to Native American traditional knowledge, and conditioned access and research on consent. The 2010 rule likewise converted what had been a recommendation process for disposition of culturally unidentifiable remains – awaiting action by Congress – into a mandatory disposition regime. An agency that changes

position must display awareness that it is changing position and must address the reliance interests at stake. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016); *Fox*, 556 U.S. at 515–16. Interior did neither adequately in either rulemaking.

216.    Interior further failed to consider important aspects of the problem. It failed to reasonably address the access-chilling effect created by the interaction of the expanded definitions, mandatory deference to Native American traditional knowledge, the duty to incorporate and accommodate that knowledge, and the consent requirement for access and research. It did not explain how museums and federal agencies could continue to exercise the independent professional judgment Congress assigned to them while simultaneously deferring to Native American traditional knowledge and denying access absent consent. It failed to reasonably consider the longstanding federal preservation framework in which NAGPRA operates, including ARPA, NHPA, and the federal curation regulations, or to explain how the challenged regulations could convert broad categories of archaeological materials into repatriable NAGPRA items without undermining those statutes and the substantial public investment they protect. And it failed to reasonably address the statutory limitations of 25 U.S.C. §§ 3001(2) and 3001(9), which require a relationship to a present-day Indian Tribe, as confirmed by the persuasive analysis in *Bonnichsen v. United States*, 367 F.3d 864, 875–76 (9th Cir. 2004).

217.    For each of these independent reasons, the challenged regulations, including 43 C.F.R. §§ 10.1(a)(3), 10.1(d)(2), 10.1(d)(3), 10.2, 10.3, 10.7(d), and 10.10 (2024) and 43 C.F.R. § 10.11 (2010), are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and should be declared invalid and vacated. 5 U.S.C. § 706(2)(A).

## COUNT VII

**BLM Wyoming's Reliance on the Challenged Regulations to Transfer the UWAR Collections Is Contrary to Law and in Excess of Statutory Authority**

218.    WAPA incorporates by reference all preceding paragraphs.

219.    BLM Wyoming has relied on the challenged regulatory scheme to classify broad archaeological assemblages and entire collections from the following sites as associated funerary objects or other NAGPRA cultural items: Shute Creek (48LN1296), 48UT920, Wardell Bison Trap (48SU301), Upper Muddy Creek Village (48CR325), and Studhorse Butte (48SU4479) (collectively, the "Wyoming Collections"). The Wyoming Collections remain in UWAR custody as of the date of this Complaint. No portion of the Wyoming Collections has been transferred or repatriated, and BLM Wyoming has communicated that it will take physical possession of them in the near future.

220.    Each of BLM Wyoming's administrative actions concerning the Wyoming Collections was taken under, and rests on, the challenged regulations. The June 11, 2025 and April 16, 2026 Notices of Inventory Completion were issued under 43 C.F.R. § 10.10 and applied the regulatory definitions and cultural-affiliation standards in 43 C.F.R. §§ 10.1, 10.2, and 10.3. The Notices of Intended Disposition concerning Studhorse Butte (48SU4479) were issued under 43 C.F.R. § 10.7 and rest on the challenged disposition regulations for unclaimed human remains or cultural items, including § 10.7(d), together with the challenged definitions in § 10.2. BLM Wyoming's July 17, 2025, letter demands transfer of the entire archaeological collections from the identified sites in reliance on those same regulatory determinations. Because each of these actions rests on *ultra vires* regulations that exceed NAGPRA's statutory definitions and conditions, the threatened transfers are not authorized by Congress and are unlawful.

84

221.    WAPA does not ask this Court to determine whether any item within the Wyoming Collections qualifies as a funerary object under NAGPRA's statutory definitions. Rather, WAPA asks this Court to determine that the regulatory standards BLM Wyoming applied – the definitions of cultural item, funerary object, associated funerary object, and cultural affiliation in 43 C.F.R. § 10.2, the mandatory Native American traditional knowledge deference requirement in 43 C.F.R. § 10.1, the diluted cultural-affiliation standard in 43 C.F.R. § 10.3, the culturally-unidentifiable disposition regime in 43 C.F.R. § 10.7(d), and the repatriation procedures in 43 C.F.R. § 10.10 – are unlawful. That is a legal question that requires no resolution of any site-specific factual dispute. When those regulatory standards are vacated, BLM Wyoming's determinations made in reliance on them lose their legal foundation and cannot stand independent of them.

222.    Federal agencies may not transfer, repatriate, dispose of, relinquish possession or control over, or otherwise remove federally owned, federally administered, federally curated, or federally regulated archaeological materials except as authorized by statute. BLM Wyoming's assertion in its July 17, 2025 letter that the Wyoming Collections are "no longer archeological resources" as defined by ARPA is premised entirely on its classification of those collections as associated funerary objects under the challenged regulatory definitions. That assertion has no independent statutory basis and cannot survive vacatur of the regulations on which it rests. Absent the challenged regulations, the Wyoming Collections remain archaeological resources subject to ARPA and to federal curation requirements, and their transfer is unauthorized.

223.    Because they rest on unlawful regulations, BLM Wyoming's Notices of Inventory Completion, Notices of Intended Disposition, and July 17, 2025 demand concerning the

85

Wyoming Collections are contrary to law and in excess of statutory authority and should be set aside under 5 U.S.C. § 706(2)(A) and (C), and Defendants should be preliminarily and permanently enjoined from transferring, repatriating, disposing of, or relinquishing possession or control over the Wyoming Collections in reliance on the challenged regulations.

**COUNT VIII**
**BLM Colorado's Reliance on the Challenged Regulations to Dispose of the Eagle Rock Shelter Collection Is Contrary to Law and in Excess of Statutory Authority**

224. WAPA incorporates by reference all preceding paragraphs.

225. BLM Colorado has relied on the challenged regulatory scheme to classify the entire archaeological research collection from the Eagle Rock Shelter site (5DT813) as unassociated funerary objects, sacred objects, or objects of cultural patrimony (the "Eagle Rock Collection"). The Eagle Rock Collection remains in the custody of the Fort Bridger curation facility as of the date of this Complaint, with the exception of a single basket held at the Canyons of the Ancients curatorial facility in Dolores, Colorado. No portion of the Eagle Rock Collection has been transferred or disposed of. BLM Colorado has communicated that it will take physical possession of the collection on August 7, 2026, and that disposition may occur on or after August 14, 2026.

226. BLM Colorado's administrative actions concerning the Eagle Rock Collection were taken under, and rest on, the challenged regulations. The July 15, 2026 Notice of Intended Disposition was issued under 43 C.F.R. § 10.7 and applied the regulatory definitions of unassociated funerary object, sacred object, and object of cultural patrimony in 43 C.F.R. § 10.2, including the expansion of "funerary object" to materials placed "with or near" human remains, together with the Native American traditional knowledge provisions of 43 C.F.R. §§ 10.1 and

10.3. Section 3002 of NAGPRA applies only to "cultural items." The classifications by which BLM Colorado brought a research collection containing no human remains within that statutory term rest entirely on the challenged regulatory standards. Because those classifications rest on *ultra vires* regulations that exceed NAGPRA's statutory definitions and conditions, the threatened disposition is not authorized by Congress and is unlawful.

227.    WAPA does not ask this Court to determine whether any item within the Eagle Rock Collection qualifies as an unassociated funerary object, sacred object, or object of cultural patrimony under NAGPRA's statutory definitions. Rather, WAPA asks this Court to determine that the regulatory standards BLM Colorado applied are unlawful. That is a legal question that requires no resolution of any site-specific factual dispute. When those regulatory standards are vacated, BLM Colorado's determinations made in reliance on them lose their legal foundation and cannot stand independent of them.

228.    Federal agencies may not transfer, dispose of, relinquish possession or control over, or otherwise remove federally owned, federally administered, federally curated, or federally regulated archaeological materials except as authorized by statute. Absent the challenged regulations, the materials in the Eagle Rock Collection are not NAGPRA cultural items at all; they remain archaeological resources recovered under federal authorization and subject to ARPA and to federal curation requirements, and their disposition is unauthorized.

229.    Because they rest on unlawful regulations, BLM Colorado's Notice of Intended Disposition and its demand for possession of the Eagle Rock Collection are contrary to law and in excess of statutory authority and should be set aside under 5 U.S.C. § 706(2)(A) and (C), and Defendants should be preliminarily and permanently enjoined from taking possession of,

transferring, disposing of, or relinquishing possession or control over the Eagle Rock Collection in reliance on the challenged regulations.

## XII.
## REQUEST FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

230.    Unless Defendants agree to preserve the status quo during this litigation, WAPA will move for a temporary restraining order and preliminary injunction to prevent BLM Wyoming from transferring, repatriating, relinquishing custody or control over, or otherwise facilitating removal of the Wyoming Collections from UWAR custody, and to prevent BLM Colorado from taking possession of, transferring, or disposing of the Eagle Rock Collection, while the Court adjudicates the legality of the challenged regulations. BLM Wyoming has completed all administrative steps it considers necessary to authorize transfer and has communicated to UWAR that it will take physical possession of the collections in the near future, and BLM Colorado has communicated that it will take physical possession of the Eagle Rock Collection on August 7, 2026. Transfer may occur at any time, and the threatened harm would occur before this action can be adjudicated on the merits. Immediate status-quo relief is therefore necessary to prevent irreparable harm and to preserve the Court's ability to grant effective final relief. WAPA satisfies each of the four factors governing preliminary relief. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

231.    WAPA is likely to succeed on the merits. Under *Mullin v. Doe*, 609 U.S. ___ (2026), in evaluating the likelihood-of-success question for purposes of interim relief, courts may consider both the likelihood that they have jurisdiction and the likelihood that the claims will succeed on the merits. Both are established here. This Court has jurisdiction under 28 U.S.C. § 1331, and the APA, 5 U.S.C. §§ 702 and 704, supplies a cause of action to review the

challenged regulations, the Notices of Inventory Completion, the Notices of Intended Disposition (including BLM Colorado's July 15, 2026 Notice of Intended Disposition), and BLM Wyoming's July 17, 2025 demand as final agency action. Unlike the statute at issue in *Mullin*, NAGPRA contains no bar to judicial review; to the contrary, 25 U.S.C. § 3013 expressly grants the United States district courts jurisdiction over actions brought by "any person" alleging a violation of the chapter. And WAPA is likely to succeed on the merits because, as set forth in Counts I through VIII, the challenged regulations exceed the authority Congress delegated to Interior in NAGPRA and are contrary to the statute's text and structure: purely legal questions that require no factual development and are subject to this Court's independent judgment under *Loper Bright*.

232.    WAPA and its members will suffer irreparable harm absent immediate relief. The transfer, repatriation, reburial, removal, or loss of access to the Wyoming Collections or the Eagle Rock Collection would permanently impair archaeological research, teaching, comparative analysis, curation, publication, and future study. Once transferred, the collections would be subject to reburial, dispersal, or loss of curatorial control, and their research and educational value would be permanently and irreparably lost. Monetary relief cannot remedy that loss, and no adequate remedy at law exists.

233.    The balance of equities and the public interest favor preserving the status quo. WAPA seeks only to prevent irreversible federal action while the Court determines whether Defendants' regulations and BLM Wyoming's and BLM Colorado's reliance on those regulations exceed NAGPRA. Defendants suffer no cognizable injury from a brief delay of transfers they lack statutory authority to make, and the public interest is served by ensuring that

federal agencies act within the limits Congress has set and that no transfer of federally owned or administered archaeological resources occurs unless authorized by Congress. Maintaining the status quo also protects the Court's ability to grant effective final relief.

234.    WAPA's requested preliminary relief is narrowly tailored to the threatened Wyoming and Colorado transfers and is designed solely to preserve the status quo pending a decision on the merits. WAPA requests that the Court temporarily restrain and preliminarily enjoin Defendants from transferring, repatriating, disposing of, relinquishing custody or control over, reclassifying, or otherwise removing the Wyoming Collections, meaning the archaeological collections from Shute Creek (48LN1296), 48UT920, Wardell Bison Trap (48SU301), Upper Muddy Creek Village (48CR325), and Studhorse Butte (48SU4479), as identified in the June 11, 2025 and April 16, 2026 Notices of Inventory Completion and Notices of Intended Disposition, from UWAR custody during the pendency of this action. WAPA further requests that the Court temporarily restrain and preliminarily enjoin Defendants from taking possession of, transferring, disposing of, or otherwise removing the Eagle Rock Collection, meaning the archaeological collection from the Eagle Rock Shelter site (5DT813) identified in BLM Colorado's July 15, 2026 Notice of Intended Disposition, from the custody of the Fort Bridger curation facility during the pendency of this action. This preliminary relief does not ask the Court to adjudicate whether the identified collections are statutory funerary objects; it asks the Court to preserve the status quo until it can determine whether the regulatory standards on which BLM Wyoming's and BLM Colorado's determinations rest are authorized by NAGPRA.

235. WAPA also seeks permanent injunctive relief after final judgment. Preliminary relief is necessary to preserve the status quo with respect to the Wyoming Collections and the

Eagle Rock Collection while this action is litigated. Permanent injunctive relief is necessary to prevent Defendants from continuing to enforce, apply, or rely on the challenged regulations, or any regulatory instrument derived from the same *ultra vires* premise, to authorize future transfers, repatriations, dispositions, access restrictions, or relinquishment of possession or control beyond the categories and conditions Congress enacted in NAGPRA. Without permanent injunctive relief, Defendants will remain free to continue applying the same unlawful regulatory standards to other federally owned, federally administered, federally curated, or federally regulated archaeological collections nationwide, causing continuing and irreparable injury to WAPA, its members, and the public.

### XIII.
### PRAYER FOR RELIEF

WHEREFORE, WAPA respectfully requests that this Court:

A.　　Declare that the challenged regulations exceed the authority Congress delegated to Interior in NAGPRA, are contrary to law, and are unlawful under the APA, 5 U.S.C. § 706(2)(A) and (C);

B.　　Declare that Interior lacks statutory authority under NAGPRA to authorize the transfer, repatriation, or disposition of human remains or cultural items based on geographic proximity to Tribal or aboriginal lands as a surrogate for the showing of cultural affiliation Congress required, whether that authority is asserted through 43 C.F.R. § 10.11 (2010), the challenged 2024-effective provisions, or any regulatory instrument derived from the same *ultra vires* premise;

C.　　Vacate the challenged regulations, including the challenged provisions of 43 C.F.R. §§ 10.1(a)(3), 10.1(d)(2), 10.1(d)(3), 10.2, 10.3, 10.7(d), and 10.10 (2024), and 43 C.F.R.

§ 10.11 (2010) as originally promulgated and as incorporated and carried forward in the 2024-effective regulatory scheme, together with any implementing, dependent, or inseverable provisions, to the extent challenged and found unlawful;

D.    Set aside the Notices of Inventory Completion and Notices of Intended Disposition issued by BLM Wyoming on June 11, 2025 and April 16, 2026 concerning the Wyoming Collections, meaning the archaeological collections from Shute Creek (48LN1296), 48UT920, Wardell Bison Trap (48SU301), Upper Muddy Creek Village (48CR325), and Studhorse Butte (48SU4479), as defined in this Complaint, together with the determinations communicated in BLM Wyoming's July 17, 2025 letter, including its determination that those collections are no longer archaeological resources as defined by ARPA, each of which was issued under and rests on the challenged regulations; and set aside the Notice of Intended Disposition issued by BLM Colorado on July 15, 2026 concerning the Eagle Rock Collection, which likewise was issued under and rests on the challenged regulations;

E.    Temporarily restrain and preliminarily enjoin Defendants, their officers, agents, employees, and all persons acting in concert with them from transferring, repatriating, disposing of, relinquishing custody or control over, reclassifying, or otherwise facilitating removal of the Wyoming Collections from UWAR custody, or of the Eagle Rock Collection from the custody of the Fort Bridger curation facility, unless and until the Court determines that such transfers are authorized by NAGPRA;

F.    Permanently enjoin Defendants from enforcing, applying, or relying on the challenged regulations, or on any regulatory instrument asserting authority to authorize transfers, repatriations, dispositions, access restrictions, exhibition restrictions, research restrictions, or

92

relinquishment of possession or control beyond the categories and conditions Congress enacted in NAGPRA, including regulations that use geographic proximity as a surrogate for cultural affiliation or require consent for access, exhibition, or research beyond what NAGPRA authorizes;

G.    Order Defendants to preserve the status quo with respect to the Wyoming Collections and the Eagle Rock Collection and to provide prompt notice to WAPA and the Court before any transfer, repatriation, disposition, reclassification, or change in custody or control concerning those collections;

H.    Award WAPA its costs of suit and, to the extent permitted by law, reasonable attorney's fees, including under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

I.    Grant such other and further relief as the Court deems just and proper.


Respectfully submitted this 24 day of July, 2026.



Mary Elizabeth Galvan
Wyoming Bar No. 5-1879
Galvan & Fritzen
410 East Grand Avenue, Suite 211
P.O. Box 1071
Laramie, Wyoming 82073-1071
Tel: (307) 745-7091
mgalvan@wyoming.com
*Local Counsel*

Robert Madden
Texas Bar No. 00784511
1360 Walnut Street, Suite 302
Boulder, Colorado 80302

93

Tel: (713) 302-9408
rjmadden@mac.com
*Lead Counsel (Pro Hac Vice Pending)*

*Attorneys for Plaintiff Wyoming Association
of Professional Archaeologists*

94