Mary Elizabeth Galvan
Wyoming Bar No. 5-1879
Galvan & Fritzen
410 East Grand Avenue, Suite 211
P.O. Box 1071
Laramie, Wyoming 82073-1071
Tel: (307) 745-7091
mgalvan@wyoming.com

Robert Madden
Texas Bar No. 00784511
1360 Walnut Street, Suite 302
Boulder, Colorado 80302
Tel: (713) 302-9408
rjmadden@mac.com
Admitted Pro Hac Vice

Attorneys for Plaintiff Wyoming Association
of Professional Archaeologists

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

WYOMING ASSOCIATION OF
PROFESSIONAL ARCHAEOLOGISTS,

Plaintiff,

v.

DOUGLAS J. BURGUM, in his official
capacity as Secretary of the Interior;
UNITED STATES DEPARTMENT OF
THE INTERIOR; BUREAU OF LAND
MANAGEMENT; ACTING STATE
DIRECTOR, BUREAU OF LAND
MANAGEMENT, WYOMING, in their
official capacity; and ACTING STATE
DIRECTOR, BUREAU OF LAND
MANAGEMENT, COLORADO, in their
official capacity,

Defendants.

Case No. 2:26-cv-00223-KHR

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR STAY UNDER 5 U.S.C. § 705 AND PRELIMINARY INJUNCTION**

## I.
## INTRODUCTION

In this action, Plaintiff the Wyoming Association of Professional Archaeologists ("WAPA") asserts a facial challenge to Department of the Interior ("Interior") regulations that expand the 1990 Native American Graves Protection and Repatriation Act, 25 U.S.C. §§ 3001–3013 ("NAGPRA"), beyond the limits Congress enacted. These *ultra vires* regulations permit Interior to treat entire archaeological site collections—largely ordinary campsite debris and plant and animal remains—as grave goods subject to repatriation or disposition regardless of any spatial, behavioral, or temporal association between the archaeological materials and human remains. Congress did not authorize such indiscriminate divestment of the United States' irreplaceable archaeological resources, "the heritage of all American peoples."[1] Upon final judgment, WAPA seeks vacatur under § 706 of the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"), which directs reviewing courts to "hold unlawful and set aside" agency action in excess of statutory authority. Thus, the question presented is narrow: whether Interior's challenged regulations are consistent with the authority Congress granted in NAGPRA.[2]

This motion seeks narrow interim relief under 5 U.S.C. § 705 and Rule 65 to preserve six collections pending judicial review: the Shute Creek (48LN1296), 48UT920, Wardell Bison Trap

---

[1] 136 Cong. Rec. S17,173 (daily ed. Oct. 26, 1990) (Senator John McCain, presenting NAGPRA for final passage in the Senate, explaining that the statute "balances the interest of Native Americans in the rightful and respectful return of their ancestors with the interest of our Nation's museums in maintaining our rich cultural heritage, the heritage of all American peoples.").

[2] WAPA does not challenge the wisdom, adequacy, or factual reasonableness of Interior's explanation for the challenged regulations, its responses to public comments, or its weighing of the evidence. WAPA's claim is that Interior lacked statutory authority to promulgate the challenged regulations and take agency action in reliance upon them.

(48SU301), Upper Muddy Creek Village (48CR325), and Studhorse Butte (48SU4479) collections housed at the University of Wyoming Archaeological Repository ("UWAR") (collectively, the "Wyoming Collections"), and the Eagle Rock Shelter (5DT813) collection in BLM custody at the Canyons of the Ancients Visitor Center and Museum in Colorado (the "Eagle Rock Collection"). Relying on the challenged regulations, BLM has classified the Wyoming Collections as associated funerary objects, and the Eagle Rock Collection as unassociated funerary objects, sacred objects, and/or objects of cultural patrimony, subject to repatriation or disposition under NAGPRA.

To preserve the status quo, WAPA asks the Court to stay: (i) the continuing legal force, effect, and implementation of the collection-specific agency actions summarized in Schedule 1; and (ii) the application and implementation of the challenged regulatory provisions with respect to the six collections. WAPA also seeks corresponding relief under Rule 65 restraining the Federal Defendants from issuing or implementing new notices, determinations, disposition statements, or transfer authorizations concerning those collections in reliance on the challenged regulations pending final judgment.

## II.
## THE CHALLENGED REGULATIONS AND THEIR APPLICATION
## TO THE WYOMING AND EAGLE ROCK COLLECTIONS

Interior's actions rest on six challenged regulatory components: (i) mandatory deference to, and the definition of, "Native American traditional knowledge"; and the redefinitions of (ii) "funerary object," (iii) "cultural item," (iv) "cultural affiliation," (v) "object of cultural patrimony," and (vi) "sacred object."[3]

---

[3] The regulatory provisions described here represent those relied upon by BLM concerning the Wyoming and Eagle Rock Collections. They are not exhaustive of all regulatory provisions challenged by WAPA, which are fully described in Section VII of Plaintiff's First Amended Complaint.

**A.**
**Background: NAGPRA – A Statutory Compromise**

NAGPRA authorizes repatriation or disposition when, *but only when*, specified statutory predicates are satisfied. For existing museum and federal-agency collections, §§ 3003 and 3005 require lineal descent or "cultural affiliation": a shared group identity reasonably traceable between a present-day Tribe and an identifiable earlier group. 25 U.S.C. § 3001(2). Congress also precisely defined the requirements for each category of "cultural item" to be subject to repatriation or disposition: "funerary objects" must have been placed "with" human remains as part of a death rite; "sacred objects" must be specific ceremonial objects needed by present-day religious leaders; and objects of "cultural patrimony" must be of such ongoing central importance to a Native American group or culture that it was inalienable by any individual. Id. § 3001(3)(A)–(D).

Materials outside those defined categories are not "cultural items," and NAGPRA does not authorize their disposition or repatriation. They remain archaeological resources governed by the Antiquities Act of 1906, 54 U.S.C. §§ 320301–320303 ("Antiquities Act"), the National Historic Preservation Act of 1966, 54 U.S.C. § 300101 et seq. ("NHPA"), and the Archaeological Resources Protection Act of 1979, 16 U.S.C. § 470aa et seq. ("ARPA"), which mandate the protection and preservation of archaeological resources.

NAGPRA thus reflects a statutory compromise between returning qualifying Native American remains and cultural items and preserving the Nation's archaeological heritage. The challenged regulations upset that congressionally prescribed balance by extending disposition beyond the categories and predicates Congress enacted.

**B.**
**Mandatory Deference to "Native American Traditional Knowledge"**
**(43 C.F.R. §§ 10.1(a)(3), 10.1(d)(2), 10.2)**

The most glaring and pervasive example of Interior's disregard for the statutory compromise enacted in NAGPRA is its creation and deployment of a new form of dispositive "expert opinion" that supplants the express definitions and evidentiary standards created by Congress for identifying materials subject to disposition and replaces them with a mandate for deference to a category of unreviewable, virtually boundless, *ipse dixit* assertions termed "Native American traditional knowledge" defined as:

> knowledge, philosophies, beliefs, traditions, skills, and practices that are developed, embedded, and often safeguarded by or confidential to individual Native Americans, Indian Tribes, or the Native Hawaiian Community. Native American traditional knowledge contextualizes relationships between and among people, the places they inhabit, and the broader world around them, covering a wide variety of information, including, but not limited to, cultural, ecological, linguistic, religious, scientific, societal, spiritual, and technical knowledge. Native American traditional knowledge may be, but is not required to be, developed, sustained, and passed through time, often forming part of a cultural or spiritual identity. Native American traditional knowledge is expert opinion.

43 C.F.R. § 10.2.

This definition is so sweeping and without effective limits that it literally encompasses *any* claim of knowledge by *any* Native American person on *any* subject. In addition, the definition expressly disclaims any requirement that "Native American traditional knowledge" actually be traditional, by providing that it is "not required to be developed, sustained, and passed through time." Moreover, the definition immunizes claims of such knowledge from outside scrutiny by allowing them to be "confidential" and then decrees that they are to be treated as "expert opinion" without requiring that they have any reasonable basis or bear any demonstrable connection to the specific objects, sites, or time periods at issue. In short, "Native American traditional knowledge," as defined by Interior, can be whatever a Native American declarant says that it is.

Worse still, Interior's regulatory overhaul makes all determinations regarding the scope of archaeological resources subject to NAGPRA subordinate to such assertions, providing that "these regulations require deference to Native American traditional knowledge." 43 C.F.R. § 10.1(a)(3) (emphasis added). In addition to this general requirement for deference, the regulations go on to expressly incorporate Native American traditional knowledge into the standards for determining "cultural affiliation," 43 C.F.R. § 10.3(a)(1)(x), as well as the definitions of "cultural item," "funerary object," "object of cultural patrimony," and "sacred object," providing that each is to be determined "according to" Native American traditional knowledge. 43 C.F.R. § 10.2.

As enacted, NAGPRA does not define, create, or refer to "Native American traditional knowledge" as a regulatory category, evidentiary standard, or mandatory consideration in any substantive determination. While traditional knowledge may be relevant evidence in NAGPRA determinations—the statute identifies "folkloric and oral traditional" information as among the types of evidence that can be considered in attempting to determine cultural affiliation. 25 U.S.C. § 3005(a)(4)—Congress did not authorize Interior to override the statutory definitions and evidentiary standards it wrote into the statute by mandating deference to a vaguely defined and virtually boundless category of unreviewable opinion, labeled "Native American traditional knowledge." Declaring such a broad, amorphous, and potentially shifting category of "knowledge" as "expert opinion," and making that opinion the operative standard for decision making, abrogates the evidentiary standards established by Congress in NAGPRA and replaces them with one that cannot be evaluated, tested, applied consistently, or rebutted in the manner Congress anticipated for determinations under the statute.

In each instance, BLM's attempts to dispose of the Wyoming and Eagle Rock Collections are expressly premised on "Native American traditional knowledge" as the basis for the requisite

findings. As set forth in Schedule 1 to this memorandum, the operative documents by which BLM purports to classify each of these collections as subject to NAGPRA and provide for their repatriation and disposition—the Notices of Inventory Completion, Notices of Intended Disposition, disposition statements, and related documents—are each premised on "Native American traditional knowledge" as a necessary predicate to their findings.

The consequences are illustrated by BLM's treatment of the Wardell and Eagle Rock site collections. Wardell is a multi-level bison-kill site used over several centuries whose assemblage consists of thousands of bison bones and ordinary archaeological materials, yet BLM classified the entire assemblage as funerary objects based on the presence of the remains of a single individual found in a single level, based on Native American traditional knowledge. Todd Decl. ¶ 6; McNees Decl. ¶¶ 6–10; 90 Fed. Reg. 24,652; 91 Fed. Reg. 20,487 (Madden Decl. Exs. B, D). The Eagle Rock collection includes materials from between approximately 13,000 to 1,800 years before present. Based on the presence of a single burial at the back of the shelter with no associated artifacts, dated to around 3,900 years before the present, BLM has classified the entire site collection as funerary objects, objects of cultural patrimony, or sacred objects, based on Native American traditional knowledge. Gardner Decl. ¶¶ 3–5, 8–9; 91 Fed. Reg. 43,400 (Madden Decl. Ex. F).

### C.
### Redefinition of "Funerary Object"
### (43 C.F.R. § 10.2)

NAGPRA defines funerary objects as materials "placed with individual human remains," a word choice that requires a direct, demonstrable association between a specific object and a specific burial. 25 U.S.C. § 3001(3)(A)–(B). "With" ties the object to the grave: it was placed there, as part of the burial act, in connection with those particular remains. Interior's regulations

supplant this requirement and redefine funerary objects as materials "placed with *or near* human remains," 43 C.F.R. § 10.2, but do not define "near" or impose any objective spatial, provenience, or contextual boundary. The addition of the undefined and unbound "or near" severs the connection with burials established by Congress. Once proximity to any human remains anywhere on a site is enough, the definition expands to potentially encompass every object recovered from any site that contains a burial, including materials from separate activity areas or different time periods. Moreover, Interior's redefinition of funerary object requires that this determination be made according to "Native American traditional knowledge." Both of these changes materially depart from the requirements established by Congress in NAGPRA and are therefore unlawful.

As set forth in Schedule 1 to this memorandum, BLM's attempts to dispose of the Wyoming and Eagle Rock Collections are each expressly premised on Interior's redefinition of "funerary objects" as the basis for the requisite findings. Indeed, it is Interior's addition of "or near" to the definition that allows for the entirety of these collections, including in some cases objects that predate and postdate human remains found at the site by millennia, to be swept up as "funerary objects" contrary to the definition adopted by Congress in NAGPRA.

## D.
## Redefinition of "Cultural Items," "Sacred Object" and "Objects of Cultural Patrimony" (43 C.F.R. § 10.2)

NAGPRA defines "cultural items" to mean human remains together with "funerary objects," "sacred objects," and objects of "cultural patrimony." 25 U.S.C. § 3001(3). Interior's regulations redefine each of these terms to provide that determinations as to whether material falls within those statutory categories are to be made "according to" Native American traditional knowledge. 43 C.F.R. § 10.2. By making that regulatory category the operative standard for all of these determinations, Interior permits materials to be treated as cultural items, funerary objects,

8

sacred objects, and objects of cultural patrimony without independently satisfying the elements Congress prescribed. As summarized in Schedule 1, BLM relied on these redefinitions, and specifically on their inclusion of "Native American traditional knowledge" in acting upon the Wyoming and Eagle Rock Collections.

For cultural patrimony, Congress required both ongoing importance "central to" the Native American group or culture and inalienability at the time the object was separated from the group. 25 U.S.C. § 3001(3)(D). The regulation makes those determinations "according to" Native American traditional knowledge, thereby substituting compelled deference for independent satisfaction of both statutory elements. 43 C.F.R. § 10.2. As summarized in Schedule 1, BLM relied on that regulatory standard in classifying the Eagle Rock Collection.

For sacred objects, Congress limited the category to "specific ceremonial objects" that are "needed" by traditional religious leaders for present-day religious practice. 25 U.S.C. § 3001(3)(C). The regulation again makes Native American traditional knowledge the governing standard, allowing classification without independently establishing the statutory requirements of specificity and present-day need. 43 C.F.R. § 10.2. As summarized in Schedule 1, BLM relied on that standard in classifying the Eagle Rock Collection.

### E.
### Redefinition of "Cultural Affiliation" and the Means for Determining Cultural Affiliation (43 C.F.R. §§ 10.2, 10.3)

For pre-1990 museum and federal-agency collections, NAGPRA requires lineal descent or cultural affiliation established by a preponderance of the evidence. 25 U.S.C. §§ 3001(2), 3003, 3005(a)(1), (a)(4). Cultural affiliation is a shared group identity that can be "reasonably traced historically or prehistorically" between a present-day Tribe and an identifiable earlier group. Id. §

9

3001(2). If neither lineal descent nor cultural affiliation can be established, the statute imposes no repatriation obligation and creates no right of transfer.

Interior's regulations depart from that framework by permitting cultural affiliation to be identified through one type of information, including geography; dispensing with any requirement of continuity through time; directing that the determination be made from the information available; and requiring deference to Native American traditional knowledge. 43 C.F.R. §§ 10.1(a)(3), 10.2, 10.3 (introductory paragraph), 10.3(a)(1)(x), 10.3(a)(2), 10.3(b)(2). Those provisions allow geography or another single category of information to substitute for the historically or prehistorically traceable relationship Congress required and effectively eliminate the possibility that affiliation cannot be established. As Schedule 1 shows, BLM relied on these provisions in acting upon the Wardell Bison Trap, Upper Muddy Creek Village, Shute Creek, and 48UT920 Collections.

**III.**
**BLM's REGULATORY ACTIONS**
**WITH REGARD TO THE WYOMING AND EAGLE ROCK**
**COLLECTIONS IN RELIANCE ON THE CHALLENGED REGULATIONS**

As summarized in Schedule 1 attached hereto, between June 11, 2025, and July 15, 2026, BLM has issued Notices of Inventory Completion, Notices of Intended Disposition, statements of disposition, and other directions in reliance on the *ultra vires* regulations summarized above purporting to provide for the repatriation and disposition of the entirety of the Wyoming and Eagle Rock Collections. By the present motion, WAPA asks the Court to stay these regulations and regulatory actions with respect to the Wyoming and Eagle Rock Collections, eliminating any basis for their repatriation, disposition, or physical transfer to any nonfederal third party pending judicial review.

**IV.**

**WAPA IS ENTITLED TO THE REQUESTED INTERIM RELIEF**

By its motion, WAPA seeks a stay of the regulations and collection-specific actions summarized in Schedule 1 as applied to the six Collections, together with corresponding relief under Rule 65, to prevent their disposition or physical transfer to nonfederal transferees pending judicial review. For the reasons set out below, the Court has the authority to grant this relief and WAPA has shown its entitlement to it.

**A.**

**The Court Has Authority to Grant the Requested Interim Relief**

Section 705 of the Administrative Procedure Act provides the Court with broad authority to stay agency action pending review:

> [T]o the extent necessary to prevent irreparable injury, the reviewing court ... may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705. *See also Make the Road New York v. Mullin*, 179 F.4th 16, 29–30 (D.C. Cir. 2026) ("5 U.S.C. § 705 has been understood to authorize courts to issue stays when they are engaged in judicial review under the APA."); *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) ("We have the power to stay the agency's action 'to the extent necessary to prevent irreparable injury'" (*quoting* 5 U.S.C. § 705)).  This is so regardless of whether the agency action has already taken effect. *Texas v. Biden*, 646 F. Supp. 3d 753 (N.D. Tex. 2022) ("whether the effective date of [the agency action] has passed is irrelevant to this Court's ability to issue a Section 705 stay. Courts—including the Supreme Court—routinely stay already-effective agency action under Section 705."); *African Communities Together v. Lyons*, 799 F. Supp. 3d 362 (S.D.N.Y. 2025) (collecting cases). *See also*

11

*Louisiana by & through Murrill v. Food & Drug Admin.,* 175 F.4th 310, 315 (5th Cir. 2026) (staying post-effective date agency action under 5 U.S.C. § 705).

A stay of agency action under § 705 preserves the status quo pending judicial review "by temporarily suspending the source of authority to act . . . not by directing an actor's conduct." *Make the Road New York v. Mullin*, 179 F.4th 16, 31 (D.C. Cir. 2026) (quoting *Nken v. Holder*, 556 U.S. 418, 428–29 (2009)). WAPA seeks corresponding protection under Rule 65 as an additional and alternative basis.

### B.
### The Factors Determining When a Court Should Grant a Stay Under 5 U.S.C. § 705 And a Preliminary Injunction Support Granting the Requested Interim Relief

In the Tenth Circuit, the preliminary injunction "factors also determine when a court should grant a stay of agency action under section 705 of the APA." *Colorado v. U.S. EPA*, 989 F.3d 874, 883 (10th Cir. 2021). Those factors consider whether: (i) the movant is likely to succeed on the merits, (ii) it is likely to suffer irreparable harm absent relief, (iii) the balance of equities tips in its favor, and (iv) an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019). As explained below, each of those factors is satisfied here.

### 1.
### WAPA is Likely to Succeed on the Merits

Under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400–01 (2024), this Court determines the best reading of NAGPRA for itself with no deference given to Interior's interpretation of the statute. An agency's "power is no greater than that delegated to it by Congress," *Lyng v. Payne*, 476 U.S. 926, 937 (1986), and a general rulemaking provision does not expand the substantive coverage of a statute, *Board of Governors v. Dimension Financial Corp.*, 474 U.S. 361, 374 (1986). Nor may an agency pursue a statute's perceived purpose "at all costs"

beyond the means Congress enacted. *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam). Measured against those principles, and as set forth in detail in Sections II and III *supra*, Interior's challenged regulations and its use of those regulations to attempt to repatriate or dispose of the Wyoming and Eagle Rock Collections (*see* Schedule 1 *infra*) plainly exceed the authority granted by Congress in NAGPRA. Accordingly, WAPA is likely to succeed on the merits of its claim.

That conclusion follows from the constitutional rule governing disposition of federal property. "Power to release or otherwise dispose of the rights and property of the United States is lodged in the Congress by the Constitution," and federal officers may exercise that power only when Congress has conferred it upon them. *Royal Indem. Co. v. United States*, 313 U.S. 289, 294 (1941). The federal government likewise holds and protects the public domain in a public, rather than merely proprietary, capacity. United States v. Beebe, 127 U.S. 338, 342 (1888). Accordingly, Interior may not enlarge by regulation the categories of federal property that Congress made eligible for transfer under NAGPRA. If the challenged regulations extend repatriation or disposition beyond NAGPRA's statutory categories and predicates, neither those regulations nor collection-specific actions resting upon them supply lawful authority to relinquish federal ownership, control, or possession of the six collections.

### 2.
### WAPA's Members Are Likely to Suffer Imminent, Irreparable Harm Absent Relief

The repatriation, disposition, and physical transfer of the Wyoming and Eagle Rock Collections from the secure repositories where they are now curated to sovereign Tribes that are nonparties beyond the Court's practical remedial reach threatens irreparable harm to WAPA members, on whose behalf WAPA asserts its claim. Six WAPA members are currently engaged in active and ongoing scientific research projects and educational programs that require access to

13

the Wyoming and Eagle Rock Collections, which will be permanently halted if the collections are transferred out of federal control: (i) one WAPA member is preparing a comprehensive report on the chronology and stratigraphy of the Wardell Bison Trap site that requires access to organic materials from the collection for radiocarbon dating, Vlcek Decl. ¶¶ 5-10; (ii) another is engaged in active research on the ecology of Late Prehistoric communal bison hunting that requires stable-isotope analysis of juvenile bison mandibles held in the Wardell collection, Garner Decl. ¶¶ 6-9; (iii) another is engaged in ongoing research regarding the genetic history and population dynamics of American bison over the past ten thousand years based on ancient-DNA extraction and high-precision radiocarbon dating of bison petrous bone, which requires access to petrous specimens from the Wardell collection, Todd Decl. ¶¶ 4-11; (iv) another is engaged in a long-term study of Late Prehistoric cultural identity and geographic orientation in the Wyoming Basin which requires direct physical access to the ceramic and obsidian assemblages from the Wardell, Upper Muddy Creek Village, 48UT920, and Shute Creek collections, McNees Decl. ¶¶ 8-11; (v) another is engaged in ongoing soil, faunal, and pollen analyses and a comprehensive site report for the Eagle Rock Shelter site which requires continued access to the Eagle Rock collection to complete, Gardner Decl. ¶¶ 5-12; and (vi) another personally delivers hands-on educational programming to local second- and third-grade students at the Green River Valley Museum in Big Piney, Wyoming centered on two displays of Wardell materials held on loan from UWAR, which would cease, because the Wardell displays would be dismantled, if the collection is transferred, Johnson Decl. ¶¶ 4-10.

Thus, the harm to WAPA's members is irreparable in the strictest sense. The destruction or dispersal of unique Native American artifacts and archaeological materials is an irreparable injury because such objects are, "by their nature, unique, and their historical and cultural

14

significance make them difficult to value monetarily." *United States v. Jenkins*, 714 F. Supp. 2d 1213 (S.D. Ga. 2008); see also *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of the Interior*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010). Transferred collections are subject to reburial and dispersal; scientific information recoverable only from physical specimens, radiocarbon dates, ancient DNA, isotopes, pollen, may be permanently lost to research if the specimens are reburied, dispersed, destroyed, or otherwise removed from professional curation and access, and analytical methods not yet invented can never be applied to materials that no longer exist in curated form. Todd Decl. ¶¶ 5, 7–8; Gardner Decl. ¶ 11. Thus, the injury to WAPA if interim relief is not granted is "certain, great, actual and not theoretical." Heideman v. South Salt Lake City, 348 F.3d 1182, 1189 (10th Cir. 2003).

BLM's own notices and statements demonstrate the imminence of the threatened harm to WAPA's members. As to the five Wyoming Collections, BLM contends that every administrative step it deems necessary is complete and contends that its repatriation and disposition notices and statements (Madden Decl. Exs. A-E, G-J) have already assigned ownership or control of the collections to the Tribes identified in the challenged agency actions, even as the collections remain physically at UWAR. Madden Decl. ¶ 14, Ex. A. Thus, according to BLM, nothing stands in the way of the Wyoming Collections being transferred, absent relief from this Court. As to the Eagle Rock Collection, BLM Colorado's Notice of Intended Disposition permits a disposition statement assigning the collection to a Tribe on or after August 14, 2026, and, although under the parties' interim agreement BLM has committed not to issue such a statement or transfer the collection before October 28, 2026 (ECF No. 10), no such protection will exist after that date absent interim relief from the Court.

15

**3.**

**The Balance of Equities and the Public Interest Favor Granting the Requested Relief**

The balance of equities and the public interest factors merge where the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Defendants suffer no cognizable harm from an order that stays the challenged regulations and agency actions as applied to the six Wyoming and Eagle Rock Collections, maintaining the collections in secure, federally compliant repositories pending judicial review. A brief delay in transfers the agency lacks statutory authority to make injures no legitimate interest. *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."). What interim relief prevents is the one outcome that cannot be corrected, the permanent loss of irreplaceable materials under regulations later held unlawful. The requested relief also serves the strong and longstanding federal interest in preserving the Nation's archaeological resources and preventing their irretrievable loss, codified in the Antiquities Act, the NHPA, and ARPA, pursuant to which Congress and federal agencies have, for more than a century, treated archaeological materials as public resources of historical, scientific, educational, and cultural importance worthy of investigation, protection, and preservation.

**C.**

**WAPA Has Standing, Its Claims Are Ripe and Timely, and No Absent Party Prevents the Court from Granting Interim Relief**

**1.**

**Standing**

To establish standing in an APA case, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the

defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024). Here, WAPA has associational standing to sue on behalf of its members because its members would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to its purposes, and neither the claim asserted nor the relief requested requires the participation of individual members. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Each of these elements, both of standing in general and associational standing, is satisfied here.

As set out in Section IV(B)(2) supra, WAPA members use the six collections for ongoing scientific research and educational programs and will lose those opportunities if the collections leave federal control. Their threatened injuries are traceable to the challenged regulations and collection-specific actions, which supply the asserted federal authority for disposition and transfer, and are redressable because a § 705 stay and corresponding injunction would suspend that authority and preserve the collections pending review. See *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 112–17 (2025) (recognizing causation and redressability where regulated third parties predictably respond to agency action).

The remaining associational-standing requirements are also satisfied. Preserving archaeological resources and supporting members' professional research and public education are central to WAPA's purposes. Madden Decl. Ex. L § III(2). And this facial statutory-authority challenge presents legal questions that do not require the participation of individual members because WAPA seeks prospective relief in the form of vacatur of regulations and agency actions. *Hunt,* 432 U.S. at 343 ("whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief,

17

it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.").

**2.**
**Finality and Ripeness**

The Court has jurisdiction under 28 U.S.C. § 1331 and 25 U.S.C. § 3013. Section 702 of the APA supplies a cause of action and waives sovereign immunity for the nonmonetary relief sought, while § 704 authorizes review of final agency action. 5 U.S.C. §§ 702, 704. The challenged regulations constitute final agency action because Interior completed the rulemaking process, published the final rules, and made their binding requirements effective. The challenged collection-specific actions also satisfy both requirements for finality: they represent definitive agency determinations rather than tentative or interlocutory positions, and they produce legal consequences under the regulatory process. As to the Wyoming Collections, the Federal Register notices and subsequent repatriation and disposition statements embody BLM's completed determinations, recognize or effectuate repatriation or disposition, and supply asserted federal authority for physical transfer. As to the Eagle Rock Shelter Collection, the Notice of Intended Disposition and its underlying determinations definitively subject the collection to the challenged disposition process and establish the legal predicate for BLM to recognize a claim and issue a disposition statement. See *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597–600 (2016).

The dispute is ripe and remains live. Interior has completed the challenged rulemakings and BLM has taken definitive collection-specific actions; the central question—whether the challenged regulations and actions exceed the authority conferred by NAGPRA—is predominantly legal and requires no further agency action or material factual development. Delaying review would cause immediate hardship because the Wyoming Collections remain exposed to physical

18

transfer pursuant to BLM's completed determinations and authorizations. Nor does BLM's characterization of the Wyoming repatriations as administratively complete render the claims moot. A case remains live whenever the Court can grant "any effectual relief" to the prevailing party. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). Because the Wyoming Collections remain physically at UWAR and the challenged actions continue to supply the asserted federal authorization for their release, relief under 5 U.S.C. § 705 staying their continuing legal force, effect, and implementation—together with relief restraining federal reliance upon and facilitation of those actions—can preserve the collections and the Court's ability to afford meaningful final relief. The Eagle Rock Shelter Collection likewise remains in federal possession or control and has not been disposed of or transferred to a nonfederal recipient; the Court can therefore preserve effective relief by staying the challenged regulations and collection-specific actions as applied to that collection and restraining Federal Defendants from issuing or implementing a disposition statement, relinquishing federal ownership or control, or transferring the collection to a nonfederal recipient.

### 3.
### No absent party is required for the Court to grant relief

The Tribes identified in the challenged agency actions are not required parties, and their absence does not prevent the Court from granting the relief WAPA seeks. This action challenges federal regulations and federal agency actions, and all requested relief runs exclusively against the Federal Defendants. WAPA seeks no order directing any Tribe to act or refrain from acting, no adjudication of any Tribe's rights arising independently of the challenged federal actions, and no return of materials already physically delivered to a nonfederal recipient. The Court can accord complete relief among the existing parties by staying and ultimately setting aside the challenged

19

federal actions and restraining the Federal Defendants from implementing or relying upon them. See Fed. R. Civ. P. 19(a)(1)(A).

Adjudicating the legality of the challenged federal actions would not improperly impair a legally protected interest under Rule 19(a)(1)(B). Any asserted entitlement to obtain the collections through the challenged NAGPRA process depends upon the legal force of BLM's regulations, determinations, notices, statements, and authorizations. The central merits question is whether NAGPRA authorized BLM to create those asserted consequences. If BLM exceeded the authority Congress conferred, its actions cannot create an enforceable entitlement to their continued implementation or insulate themselves from judicial review merely because a third party expects to benefit from them. The Federal Defendants are present and fully capable of defending the statutory authority, validity, and legal consequences of their own actions. In *Sac & Fox Nation of Missouri v. Norton*, the Tenth Circuit held that an absent tribe was not required where complete relief could be afforded among the existing parties and the federal defendants adequately represented the tribe's interest in defending the challenged agency decision. 240 F.3d 1250, 1258–60 (10th Cir. 2001).

The nature of WAPA's requested interim relief further limits any effect upon absent parties. A stay under 5 U.S.C. § 705 operates upon the legal force of the challenged agency action rather than commanding the conduct of a third party. A stay achieves its result by "temporarily suspending the source of authority to act," rather than by directing an actor's conduct. *Nken v. Holder*, 556 U.S. 418, 428–29 (2009). Applying that distinction, the D.C. Circuit recently explained that a § 705 stay "does not order parties to do anything" but instead "operates on the legal status of the challenged agency action" by suspending its operative force pending judicial review. *Mullin*, 179 F.4th at 31. Staying BLM's actions therefore would not bind any Tribe or

20

adjudicate or extinguish any independently existing tribal right; it would temporarily suspend only the federal determinations and authorizations whose legality is before the Court.

Even if the Court concludes that a Tribe identified in the challenged agency actions is a required party that cannot feasibly be joined, the action should proceed under Rule 19(b). WAPA has confined the requested relief to the Federal Defendants and the legal force and implementation of their actions, thereby minimizing any prejudice to absent parties. Dismissal, by contrast, would leave WAPA without an adequate means of obtaining judicial review. In *Manygoats v. Kleppe*, the Tenth Circuit, after treating the affected tribe as a required party, nevertheless held that an action challenging federal compliance could proceed in the tribe's absence because the requested relief ran against federal action, no tribal proceeding could supply the requested review, and dismissal would produce the anomalous result that no one other than the tribe could obtain judicial review. 558 F.2d 556, 558–59 (10th Cir. 1977). Those considerations likewise provide a basis for proceeding here if the Court reaches Rule 19(b).

### 4.
### WAPA's claims are timely

WAPA's challenge is timely under 28 U.S.C. § 2401(a). An APA claim does not accrue upon promulgation of a regulation unless the plaintiff is injured at that time; it accrues when the challenged final agency action first causes the plaintiff a completed and present injury. *Corner Post, Inc. v. Board of Governors*, 603 U.S. 799, 825–26 (2024). WAPA's claims arise from injuries occurring within the six-year limitations period through the 2024 regulations and BLM's recent application of the challenged regulatory provisions to the six collections, including the 2025 and 2026 Federal Register notices, the repatriation and disposition statements, and the resulting exposure of the collections to disposition and physical transfer to nonfederal entities. Those collection-specific actions also constitute recent final agency actions independently subject to

21

review. The claims are therefore timely even to the extent they challenge regulatory provisions originally promulgated in 2010. See *id.* at 814–26.

## V.
## THE REQUESTED RELIEF IS NARROW, AND NO BOND SHOULD BE REQUIRED

The requested relief is limited to the six identified collections pending final judgment. It would not operate nationwide, affect materials already physically delivered to a nonfederal recipient, direct any Tribe's conduct, or require recovery or relocation of any collection. It would only suspend the challenged federal authority for disposition or transfer of the Wyoming Collections and preserve federal possession or control of Eagle Rock.

No security should be required. Section 705 contains no mandatory bond requirement, and the Court has broad discretion under Rule 65(c) to require no security where the restrained party is unlikely to suffer compensable harm. *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009). The Federal Defendants identify no material monetary loss from maintaining the collections in their present repositories and preserving federal ownership or control during review. The Court should require no bond or, alternatively, nominal security.

## VI.
## CONCLUSION

For the foregoing reasons, the Court should grant WAPA's motion for a stay under 5 U.S.C. § 705 and a preliminary injunction and enter the accompanying proposed order. Because the parties' interim commitments lapse on October 28, 2026—the date on which BLM will no longer be bound and will be free to act—WAPA respectfully requests that the Court rule on the motion, and hold any hearing it deems necessary, before that date.

Respectfully submitted this 10th day of August, 2026.


/s/ Robert Madden_____
Robert Madden
Texas Bar No. 00784511
1360 Walnut Street, Suite 302
Boulder, Colorado 80302
Tel: (713) 302-9408
rjmadden@mac.com
Admitted Pro Hac Vice

Mary Elizabeth Galvan
Wyoming Bar No. 5-1879
Galvan & Fritzen
410 East Grand Avenue, Suite 211
P.O. Box 1071
Laramie, Wyoming 82073-1071
Tel: (307) 745-7091
mgalvan@wyoming.com
Local Counsel

Attorneys for Plaintiff Wyoming Association
of Professional Archaeologists


## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2026, I electronically filed the foregoing Memorandum in Support of Plaintiff's Motion for Stay Under 5 U.S.C. § 705 and Preliminary Injunction with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Robert Madden
Robert Madden

**SCHEDULE 1**
**ULTRA VIRES REGULATORY BASES FOR CHALLENGED AGENCY ACTIONS**

| Date | Agency Action | Affected Collection(s) | *Ultra Vires* Regulatory Basis |
|---|---|---|---|
| 6/11/2025 | Notice of Intended Disposition *(90 Fed. Reg. 24,663) (Madden Decl. Ex. C)* | Studhorse Butte (48SU4479) | 43 C.F.R. § 10.2: Definition of "cultural item" ("according to the [NATK]") <br> 43 C.F.R. § 10.2: Definition of "funerary object" ("with or near human remains ... according to the [NATK]") <br> 43 C.F.R. § 10.2: Definition of "Native American traditional knowledge" |
| 6/11/2025 | Notice of Inventory Completion *(90 Fed. Reg. 24,652) (Madden Decl. Ex. B)* | Wardell Bison Trap (48SU301) Upper Muddy Creek Village (48CR325) Shute Creek (48LN1296) 48UT920 | 43 C.F.R. § 10.1(a)(3): Mandatory deference to Native American traditional knowledge <br> 43 C.F.R. § 10.2: Definition of "cultural item" ("according to the [NATK]") <br> 43 C.F.R. § 10.2: Definition of "funerary object" ("with or near human remains ... according to [NATK]") <br> 43 C.F.R. § 10.2: Definition of "cultural affiliation" ("identified ... reasonably by the geographical location or acquisition history") <br> 43 C.F.R. § 10.2: Definition of "Native American traditional knowledge" <br> 43 C.F.R. § 10.3 (introductory paragraph): Cultural affiliation "must be determined by the information available" and does not require "continuity through time" <br> 43 C.F.R. § 10.3(a)(1)(x): Cultural affiliation may rest on "Native American traditional knowledge" <br> 43 C.F.R. § 10.3(a)(2): "One type of information" may determine cultural affiliation <br> 43 C.F.R. § 10.3(b)(2): Cultural affiliation may be identified by "one type of information," including "geographical information" |
| 7/16/2025 | Disposition Statement *(Kristina Kirby [BLM] to Teanna Limpy letter) (Madden Decl. Ex. H)* | Upper Muddy Creek Village (48CR325) | Derivative of and implements the Notice of Inventory Completion (90 Fed. Reg. 24,652), which rests on the challenged provisions listed above. |
| 7/16/2025 | Disposition Statement *(Kristina Kirby [BLM] to Joshua Mann letter) (Madden Decl. Ex. G)* | Wardell Bison Trap (48SU301) Shute Creek (48LN1296) 48UT920 Studhorse Butte (48SU4479) | Derivative of and implements the Notice of Inventory Completion (90 Fed. Reg. 24,652) and, as to Studhorse Butte, the Notice of Intended Disposition (90 Fed. Reg. 24,663), which rest on the challenged provisions listed above. |
| 7/17/2025 | BLM Demand and Direction Letter to UWAR *(Kristina Kirby [BLM] to Spencer Pelton letter) (Madden Decl. Ex. A)* | Wardell Bison Trap (48SU301) Upper Muddy Creek Village (48CR325) Shute Creek (48LN1296) 48UT920 | Derivative of and implements the Notice of Intended Disposition (90 Fed. Reg. 24,663) and the Notice of Inventory Completion (90 Fed. Reg. 24,652), which rest on the challenged provisions listed above. |

| Date | Agency Action | Affected Collection(s) | *Ultra Vires* Regulatory Basis |
|---|---|---|---|
| | | Studhorse Butte (48SU4479) | |
| 4/16/2026 | Notice of Intended Disposition *(91 Fed. Reg. 20,480) (Madden Decl. Ex. E)* | Studhorse Butte (48SU4479) | 43 C.F.R. § 10.2: Definition of "cultural item" ("according to the [NATK]")<br>43 C.F.R. § 10.2: Definition of "funerary object" ("with or near human remains ... according to [NATK]")<br>43 C.F.R. § 10.2: Definition of "Native American traditional knowledge" |
| 4/16/2026 | Notice of Inventory Completion *(91 Fed. Reg. 20,487) (Madden Decl. Ex. D)* | Wardell Bison Trap (48SU301) Upper Muddy Creek Village (48CR325) Shute Creek (48LN1296) 48UT920 | 43 C.F.R. § 10.1(a)(3): Mandatory deference to Native American traditional knowledge<br>43 C.F.R. § 10.2: Definition of "cultural item" ("according to the [NATK]")<br>43 C.F.R. § 10.2: Definition of "funerary object" ("with or near human remains ... according to [NATK]")<br>43 C.F.R. § 10.2: Definition of "cultural affiliation" ("identified ... reasonably by the geographical location or acquisition history")<br>43 C.F.R. § 10.2: Definition of "Native American traditional knowledge"<br>43 C.F.R. § 10.3 (introductory paragraph): Cultural affiliation "must be determined by the information available" and does not require "continuity through time"<br>43 C.F.R. § 10.3(a)(1)(x): Cultural affiliation may rest on "Native American traditional knowledge"<br>43 C.F.R. § 10.3(a)(2): "One type of information" may determine cultural affiliation<br>43 C.F.R. § 10.3(b)(2): Cultural affiliation may be identified by "one type of information," including "geographical information" |
| 5/28/2026 | Disposition Statement *(Tanya Thrift [BLM] to Teanna Limpy letter) (Madden Decl. Ex. J)* | Upper Muddy Creek Village (48CR325) | Derivative of and implements the Notice of Inventory Completion (91 Fed. Reg. 20,487), which rests on the challenged provisions listed above. |
| 5/28/2026 | Disposition Statement *(Tanya Thrift [BLM] to Margaret Wagon letter) (Madden Decl. Ex. I)* | Wardell Bison Trap (48SU301) Shute Creek (48LN1296) 48UT920 Studhorse Butte (48SU4479) | Derivative of and implements the Notice of Inventory Completion (91 Fed. Reg. 20,487) and, as to Studhorse Butte, the Notice of Intended Disposition (91 Fed. Reg. 20,480), which rest on the challenged provisions listed above. |
| 7/15/2026 | Notice of Intended Disposition *(91 Fed. Reg. 43,400) (Madden Decl. Ex. F)* | Eagle Rock Shelter (5DT813) | 43 C.F.R. § 10.2: Definition of "cultural item" ("according to the [NATK]")<br>43 C.F.R. § 10.2: Definition of "funerary object" ("with or near human remains ... according to the [NATK]")<br>43 C.F.R. § 10.2: Definition of "object of cultural patrimony" ("according to [NATK]")<br>43 C.F.R. § 10.2: Definition of "sacred object" ("according to [NATK]")<br>43 C.F.R. § 10.2: Definition of "Native American traditional knowledge" |

25