DARIN D. SMITH
United States Attorney
Z. Seth Griswold (WY Bar #7-5809)
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY 82003
Telephone: (307) 772-2124
Seth.Griswold@usdoj.gov

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Sara E. Costello (KS Bar No. 20898)
Grace C.Y. Mermel (NM Bar No. 165219)
Natural Resources Section
Energy and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 598-5552
sara.costello2@usdoj.gov
grace.mermel@usdoj.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **Wyoming Association of Professional Archaeologists**,<br><br>Plaintiff,<br><br>v.<br><br>**Douglas J. Burgum**, *et al.*,<br><br>Defendants. | Case No. 2:26-cv-00223-KHR |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR STAY UNDER 5 U.S.C. § 705 AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


Background ..... 2

I. NAGPRA ..... 2

II. The regulations ..... 2

III. BLM NAGPRA determinations ..... 3

IV. This action ..... 6

Standards of Review ..... 7

Argument ..... 8

I. Plaintiff has not shown any injury that justifies preliminary relief ..... 8

II. Plaintiff is unlikely to succeed on the merits ..... 11

A. The 2024 Rule is consistent with NAGPRA ..... 12

1. The 2024's Rule definition of and deference to "Native American traditional knowledge" accords with NAGPRA ..... 12

2. The 2024 Rule did not change the definition of "funerary objects," which accords with NAGPRA ..... 14

3. Including traditional knowledge in the 2024 Rule's definitions of "cultural items" accords with NAGPRA ..... 16

4. Plaintiff's arguments on "cultural affiliation" misread NAGPRA and the 2024 Rule ..... 19

B. BLM's actions are in accord with NAGPRA ..... 23

III. The balance of equities does not tip in favor of a preliminary injunction ..... 24

Conclusion ..... 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Colorado Motor Carriers Ass'n v. Town of Vail*,
153 F.4th 1052 (10th Cir. 2025) .......... 10

*Colorado v. EPA*,
989 F.3d 874 (10th Cir. 2021) .......... 7

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
356 F.3d 1256 (10th Cir. 2004) .......... 11

*GTE Corp. v. Williams*,
731 F.2d 676 (10th Cir. 1984) .......... 10

*Heideman v. S. Salt Lake City*,
348 F.3d 1182 (10th Cir. 2003) .......... 8

*Loper Bright Enters v. Raimondo*,
603 U.S. 369 (2024) .......... 8

*New Mexico Dep't of Game & Fish v. U.S. Dep't of the Interior*,
854 F.3d 1236 (10th Cir. 2017) .......... 8, 10

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 24

*PLC Partners, LLC v. Bank of Am., N.A.*,
No. 10-CV-141-D, 2010 WL 4627729 (D. Wyo. Nov. 12, 2010) .......... 7

*Prairie Band of Potawatomi Indians v. Pierce*,
253 F.3d 1234 (10th Cir. 2001) .......... 8, 11

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) .......... 8

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) .......... 8

*United States v. Corrow*,
119 F.3d 796 (10th Cir. 1997) .......... 12, 19

*United States v. Tidwell*,
191 F.3d 976 (9th Cir. 1999) .......... 19

*Vega v. Wiley*,
259 Fed.Appx. 104 (10th Cir. 2007) .......... 10

*Winnebago Tribe of Neb. v. U.S. Dept. of Army*,
175 F.4th 529 (4th Cir. 2026) .......... 12

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) .......... 7, 11, 24

*Yankton Sioux Tribe v. Army Corps of Eng'rs*,
209 F. Supp. 2d 1008 (D.S.D. 2002) .......... 24

**Statutes**

5 U.S.C. §§ 701-706 .......... 6, 7

25 U.S.C. § 3001 .......... 1, 2, 15, 16, 17, 19, 20, 21

25 U.S.C. § 3002(a) .......... 2

25 U.S.C. § 3003 .......... 2, 12, 13, 14, 17, 18, 21, 22, 23

25 U.S.C. § 3005 .......... 2, 12, 13, 20, 21, 25

25 U.S.C. § 3006 .......... 3

25 U.S.C. § 3010 .......... 14

25 U.S.C. § 3011 .......... 1

**Regulations**

43 C.F.R. § 10.1(d)(2) .......... 14

43 C.F.R. § 10.2 .......... 2, 12, 15, 16, 17, 18, 19, 20

43 C.F.R. § 10.3 .......... 20, 22

43 C.F.R. § 10.7 .......... 4, 6, 11

43 C.F.R. § 10.7(c)(5) .......... 11

43 C.F.R. § 10.10 .......... 4, 23

**Other Authorities**

60 Fed. Reg. 62,134 (Dec. 4, 1995) .......... 2, 14, 16, 18, 20, 21

75 Fed. Reg. 12,378 (Mar. 15, 2010) .......... 3

77 Fed. Reg. 23,196 (Apr. 18, 2012) .......... 3, 16, 18, 23

87 Fed. Reg. 63,202 (October 18, 2022) .......... 3, 18

88 Fed. Reg. 86,452 (Dec. 13, 2023) .......... 1, 2, 3, 10, 13, 14, 16, 17, 18, 19, 20, 21, 23

90 Fed. Reg. 24,652 (June 11, 2025) .......... 4, 5, 11

91 Fed. Reg. 20,487 (Apr. 16, 2026) .......... 5

91 Fed. Reg. 43,400 (July 15, 2026) .......... 6

H.R. Rep. No. 101-877, 1990 U.S.C.C.A.N. 4 .......... 1

In 1990, Congress enacted the Native American Graves Protection and Repatriation Act (NAGPRA), 25 U.S.C. § 3001 et seq., which, as relevant here, recognizes the rights of Tribes in Native American human remains and cultural items. One of the major incentives for the legislation was the existence of large "collections of Native American remains" and other objects "currently held or controlled by Federal agencies and museums." H.R. Rep. No. 101-877, 1990 U.S.C.C.A.N. 4,367, 4,368. Congress recognized that past practices had "resulted in hundreds of thousands [of] Native American human remains and funerary objects being sold or housed in museums and educational institutions around the country." *Id*. at 4,369. Congress sought to provide mechanisms, such as repatriation and disposition for the return of these remains and objects to Tribes. And Congress tasked the Department of the Interior (Interior) with promulgating regulations to implement the Act. 25 U.S.C. § 3011. Since then, Interior has exercised its delegated authority to carry out NAGPRA's goals. Over two years ago, the agency promulgated comprehensive regulations (the 2024 Rule) to improve NAGPRA's implementation. *See* 88 Fed. Reg. 86,452 (Dec. 13, 2023).

Plaintiff Wyoming Association of Professional Archeologists challenges the 2024 Rule and its application to several collections. Plaintiff moved for a preliminary injunction. Plaintiff's motion seeks to prevent Interior's Bureau of Land Management (BLM) from physically transferring human remains and cultural items housed at the University of Wyoming back to their Tribes, as well as completing consultation on another collection in BLM custody. Plaintiff, contrary to its burden, provides no *actual evidence* of harm that would warrant the extraordinary remedy it seeks. On the merits, the 2024 Rule is consistent with NAGPRA's text, context, and purpose. Many aspects of the 2024 Rule that Plaintiff claims are "new" requirements or definitions were included

in previous versions of the NAGPRA regulations. Lastly, a preliminary injunction will harm the relevant Tribes' interests, interfere with NAGPRA's orderly administration, and prevent the expeditious return of human remains and cultural items. Plaintiff's motion should be denied.

## Background

### I. NAGPRA

As relevant here, NAGPRA governs the disposition and repatriation of human remains or cultural items by museums or Federal agencies. Cultural items include funerary objects (both associated and unassociated), sacred objects, and objects of cultural patrimony. 25 U.S.C. § 3001(3); 43 C.F.R. § 10.2. NAGPRA sets forth how the ownership or control of Native American human remains and cultural items recovered from Federal or tribal lands after November 16, 1990, shall be determined for disposition purposes, under 25 U.S.C. § 3002(a), (b). NAGPRA's repatriation process is implemented by several statutory provisions. NAGPRA requires that museums and Federal agencies create either inventories or summaries of existing holdings or collections, under 25 U.S.C. §§ 3003, 3004, depending on whether the holdings or collections that a museum or Federal agency has possession or control over include human remains or a particular category of cultural items. NAGPRA requires repatriation of remains and cultural items under 25 U.S.C. § 3005(a).

### II. The regulations

The previous regulations. The first version of the NAGPRA regulations was published in December 1995 (1995 Rule). 60 Fed. Reg. 62,134 (Dec. 4, 1995) (Ex. 1). From 1997 through 2015, various corrections, amendments, and new sections were published to supplement the 1995 Rule. *See* 88 Fed. Reg. at 86,452. In 2010, a final rule

was adopted that added a section to the regulations to govern the disposition of culturally unidentifiable human remains, including those which could not be culturally affiliated with a Tribe. 75 Fed. Reg. 12,378 (Mar. 15, 2010). In 2012, Interior published a proposed rule to revise the regulations. 77 Fed. Reg. 23,196 (Apr. 18, 2012). After 2012, Interior "repeatedly" received feedback on the Act's implementation through the regulations. 87 Fed. Reg. at 63,203. As a result of consultation, public comment, and input from the NAGPRA Review Committee (a Federal advisory committee, 25 U.S.C. § 3006), Interior developed a draft set of regulations. *Id.* Interior then published a proposed rule to improve NAGPRA's implementation in 2022. *Id.*

The 2024 Rule. In December 2023, Interior published the final Rule. 88 Fed. Reg. at 86,452 (Ex. 2).[1] It became effective January 12, 2024. *Id.* The 2024 Rule responds to hundreds of comments received from the public and during consultation. *Id.* The 2024 Rule "clarif[ies] and improve[s] upon the systematic processes for the disposition or repatriation of Native American human remains, funerary objects, sacred objects, or objects of cultural patrimony." *Id.* It "provide[s] a step-by-step roadmap with specific timelines for museums and Federal agencies to facilitate disposition or repatriation." *Id.*

## III. BLM NAGPRA determinations

Plaintiff cites six BLM NAGPRA determinations—five involving collections housed at the University of Wyoming (the Wyoming Collections) and one collection in BLM custody (the Eagle Rock Collection). Dkt. No. 16 (Br.) at 1-2.

---

[1] The Rule is titled *Native American Graves Protection and Repatriation Act Systematic Processes for Disposition or Repatriation of Native American Human Remains, Funerary Objects, Sacred Objects, and Objects of Cultural Patrimony*.

Wyoming determinations. In 2024, BLM initiated tribal consultation for BLM collections that included human remains and cultural items housed at two repositories at the University of Wyoming. Damone Decl. ¶¶ 5-7. These BLM collections include the Wyoming Collections at issue here. *Id.* ¶ 4; Dkt. No. 14 ¶ 14. They are from the following sites: Shute Creek (48LN1296), 48UT920, Wardell Bison Trap (48SU301), Upper Muddy Creek Village (48CR325), and Studhorse Butte (48SU4479).[2] *Id.* ¶ 4. Following the tribal consultation, BLM completed an inventory of human remains and associated funerary objects consistent with 43 C.F.R. § 10.10(d). In June 2025—more than a year before Plaintiff filed its present suit—the agency published a notice of inventory completion in the Federal Register, *see* 43 C.F.R. § 10.10(e). 90 Fed. Reg. 24,652 (June 11, 2025). The inventory included human remains and associated funerary objects from, among others, the Shute Creek, 48UT920, and Wardell Bison Trap, Upper Muddy Creek Village sites. *Id.* at 24,653-54. The notice explained that based on the information available and the results of the consultation, the agency determined the cultural affiliation for the remains of 41 individuals of Native American ancestry and over 24,000 associated funerary objects. *Id.* at 24,654. It also stated there was a connection between the human remains, associated funerary objects, and 15 Tribes. *Id.*

While completing the inventory process, BLM determined that, for the human remains and associated funerary objects that were discovered after 1990, it needed to follow the disposition process in 43 C.F.R. § 10.7. Damone Decl. ¶ 8. In June 2025—also

[2] These site numbers represent the Smithsonian trinomial number for these areas. This is the standard identifier used for archaeological sites in the United States. The system was developed to organize and track these sites with a three-part code for state (two numbers), county (two letters) and site numbers (unlimited numbers).

more than a year before Plaintiff filed its present suit—BLM published a notice of intended disposition covering, among others, human remains and associated funerary objects from the Studhorse Butte collection. 90 Fed. Reg. 24,663 (June 11, 2025). The notice explained that the agency determined the remains described therein were of 4 individuals of Native American ancestry and that over 40 items were associated funerary objects (13 of which were attributable to Studhorse Butte). *Id.* The notice then identified the Tribes that had priority for disposition. *Id.* After receiving repatriation requests, on July 16, 2025, BLM issued letters to three Tribes,[3] which served as written repatriation and disposition statements for all human remains and associated funerary objects in the June 2025 notices. Damone Decl. ¶ 10. BLM later published revised notices to correct certain site numbers and counts of associated funerary objects. *See* 91 Fed. Reg. 20,487 (Apr. 16, 2026); 91 Fed. Reg. 20,480 (Apr. 16, 2026).

In April 2026, BLM worked with the repository on the University of Wyoming campus to facilitate the physical transfer of three sets of human remains and one set of associated funerary objects, identified in the June 2025 notices, to the claimant Tribes. Damone Decl. ¶ 15. The human remains and associated funerary objects that have been physically transferred are associated with sites *not* involved in this litigation. *Id.* In May 2026, BLM sent written repatriation and disposition statements that applied to the human remains and associated funerary objects identified in the corrected notices to two Tribes.[4] *Id.* ¶ 14. Through the letters, BLM relinquished possession and control of

---

[3] The Eastern Shoshone Tribe of the Wind River Reservation, Wyoming; Arapaho Tribe of the Wind River Reservation, Wyoming; and the Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana.

[4] The Eastern Shoshone Tribe of the Wind River Reservation, Wyoming and Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana.

the human remains and objects to the claimant Tribes. *See*, *e.g.*, *id.* ¶ 10. Other human remains and associated funerary objects continue to be held in the repositories awaiting physical transfer. *Id.* ¶ 16.

Eagle Rock determination. The other collection (5DT813) originates from archaeological excavations at the Eagle Rock Shelter in Delta County, Colorado that have occurred formally since 2007. 91 Fed. Reg. 43,400, 43,401 (July 15, 2026); Ben-Horin Decl. ¶¶ 4-7. The collection was housed at Wyoming's Fort Bridger State Historic site. *Id.* ¶ 8. On July 15, 2026, BLM published a notice that the agency identified one lot of unassociated funerary objects, sacred objects, and objects of cultural patrimony from the Eagle Rock Collection. 91 Fed. Reg. at 43,400. The notice specified that the Ute Indian Tribe of the Uintah & Ouray Reservation, the Ute Mountain Ute Tribe, and the Southern Ute Indian Tribe have priority for the disposition of the objects. *Id.* at 43,401. The Eagle Rock Collection is now housed at BLM's Canyon of the Ancients Visitor Center and Museum. Ben-Horin Decl. ¶ 16. BLM continues to consult, consistent with the procedures in 43 C.F.R. § 10.7, with the Ute Tribes to determine which objects are within the one lot of NAGPRA cultural items identified in the notice. *Id.* ¶ 14. BLM has not received any claims for disposition. *Id.* ¶ 13. If BLM receives a claim for disposition, it will follow the disposition process outlined in 43 C.F.R. § 10.7(c). *Id.* ¶ 14.

## IV. This action

In July 2026, Plaintiff filed this suit under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. Plaintiff challenges the 2024 Rule and the 2010 amendment of the NAGPRA regulations,[5] claiming that the regulations exceed the statute's

[5] Plaintiff's motion raises no arguments based on the 2010 amendment.

boundaries. Dkt. No. 14 ¶ 1. On August 10, 2026, Plaintiff moved for a preliminary injunction and stay under APA, § 705. Dkt. Nos. 15, 16. Plaintiff requests that the Court stay the BLM NAGPRA determinations at issue. Dkt. No. 15-1 at 2. Plaintiff also asks the Court to stay the application and implementation of several regulatory provisions to the Collections. *Id.* at 4-5. Plaintiff asks the Court to enjoin Interior from taking numerous actions, including among others, issuing new decisions, responding or recognizing ownership claims, relinquishing ownership or control, facilitating transfer, and suspending any request that the University of Wyoming release custody of the resources. *Id.* at 5-6. To facilitate briefing the motion, the parties agreed that Plaintiff would not seek to prevent transfer of the Eagle Rock Collection to the Canyon of the Ancients. Dkt. No. 10 at 4. The parties also agreed that BLM would not take certain actions regarding the Collections until at least October 28, 2026. *Id.*

**Standards of Review**

Preliminary injunctions. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008) (citation omitted). A plaintiff seeking a preliminary injunction must demonstrate four elements: (1) a likelihood of irreparable harm absent injunctive relief; (2) a likelihood of success on the merits; (3) a balance of hardships that tips in their favor; and (4) that the public interest weighs in favor of granting the injunction. *Id.* at 20. "The burden of proving that all of these requirements have been met rests squarely on the shoulders of the party seeking the injunction." *PLC Partners, LLC v. Bank of Am., N.A.*, No. 10-CV-141-D, 2010 WL 4627729, *3 (D. Wyo. Nov. 12, 2010) (citation omitted). "These four factors also determine when a court should grant a stay of agency action under section 705 of the APA." *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021).

Statutory interpretation. "[W]hen an agency interprets a statute, judicial review of the agency's interpretation is de novo." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 179 (2025). "Courts exercising independent judgment in determining the meaning of statutory provisions consistent with the APA, may—as they have from the start—seek aid from interpretations of those responsible for implementing particular statutes." *Loper Bright Enters v. Raimondo*, 603 U.S. 369, 394 (2024). Executive Branch statutory interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). "[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Id.*

## Argument

### I. Plaintiff has not shown any injury that justifies preliminary relief.

Plaintiff's motion should be denied because the facts do not demonstrate an irreparable harm that warrants the extraordinary remedy of a preliminary injunction. That is so for three reasons.

First, Plaintiff's alleged injury is speculative because it assumes rights Plaintiff's members do not have. "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical," *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003), not "merely serious or substantial," *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001). "Purely speculative harm will not suffice." *New Mexico Dep't of Game & Fish v. U.S. Dep't of the Interior,* 854 F.3d 1236, 1250 (10th Cir. 2017). Plaintiff grounds its purported injury in the claim that "[t]he repatriation, disposition, and physical transfer" of the Collections threatens irreparable

harm because "[s]ix members are currently engaged in active and ongoing scientific research projects and educational programs" that will be halted if the Collections are transferred out of federal control. Br. at 13-14. But Plaintiff admits research depends on access, which they do not currently have.[6]

Concerning the Wyoming Collections, none of Plaintiff's declarants allegedly "currently engaged in ongoing research" that "require access" to this collection actually have access. *See* Garner Decl., Dkt. No. 16-16, ¶¶ 5, 6; McNees Decl., Dkt. No. 16-18, ¶¶ 9-10 (discussing future plans); Surovell Decl., Dkt. No. 16-19, ¶ 5 (discussing different collections); Todd Decl., Dkt. No. 16-20, ¶¶ 4, 6, 9 (discussing access to an irrelevant site and a potential plan to seek access to a relevant site); Vleck Decl., Dkt. No. 16-21, ¶ 8.[7] And Plaintiff has not alleged that any member has sought, will seek, or has been denied consent from the Tribal claimants to access or perform research on these items. Concerning the Eagle Rock Collection, Plaintiff readily acknowledges that its motion seeks to "*preserve the opportunity* for Dr. Gardner and other qualified members *to seek renewed federal research access*." Dkt. No. 14 ¶ 182 (emphasis added). Thus, even absent the BLM actions at issue, Plaintiff's members presently lack the right to undertake the desired research. Indeed, "WAPA does not contend that [the desired

[6] *See* Gardner Decl., Dkt. No. 16-14, ¶ 2; Dkt. No. 16-15 ¶ 5; Garner Decl., Dkt. No. 16-16 ¶5; McNees Decl., Dkt. No. 16-18 ¶ 11; Todd Decl., Dkt. No. 16-20 ¶ 11; Vleck Decl., Dkt. No. 16-21 ¶ 8.

[7] The "educational programs" Plaintiff believes will be halted is a non-issue. Br. at 13-14 (relying on the Johnson Declaration). The Johnson Declaration states that a portion of the archeological collection from 48SU301 is on display at the Green River Valley Museum through a loan from the University of Wyoming. Dkt. No. 16-17, ¶ 4. BLM became aware of this through Plaintiff's filing. Because BLM did not expressly consult on these items, BLM does not consider these items covered by the NAGPRA compliance process described above. *See* Damone Decl. ¶ 18.

preliminary] relief automatically restores access." *Id.* The harm Plaintiff seeks to avoid is therefore speculative. Plaintiff also fails to demonstrate the harm is not speculative because Plaintiff does not describe the injury with sufficient particularity to meet the burden of proof. "[T]o satisfy the irreparable harm factor, [the movant] 'must establish both that harm will occur, and that, when it does, such harm will be irreparable.'" *New Mexico Dep't of Game & Fish,* 854 F.3d at 1251 (quoting *Vega v. Wiley*, 259 Fed.Appx. 104, 106 (10th Cir. 2007)). A movant who "alleges the mere possibility of an unidentified class and degree of harm" fails to make "a clear showing." *Id.* Plaintiff does not discuss the degree of harm that the challenged action poses or quantify that harm in terms sufficient to establish an injury. Plaintiff also fails to show that the harm is irreparable.[8]

Second, with respect to the Wyoming Collections, Plaintiff sat on its rights. The Tenth Circuit has repeatedly made clear that long delays in seeking a preliminary injunction are fatal to claims of irreparable harm. *See Colorado Motor Carriers Ass'n v. Town of Vail*, 153 F.4th 1052, 1066 (10th Cir. 2025) (determining that a year-long delay before moving for a preliminary injunction undercut the plaintiff's showing of irreparable harm and justified denying relief).[9] The 2024 Final Rule that Plaintiff challenges was published and took effect *over two-and-a-half years* ago. 88 Fed. Reg. 86,453 (Ex. 2). After conducting tribal consultations, BLM published notices of

[8] At most, one member hints at the possibility, stating in the event of a "relocation," harm *could* be irreparable through any "loss, damage, separation, or disruptions of those materials." Gardner Decl., Dkt. No. 16-15 ¶ 7. But that assertion is still speculative.

[9] *See also GTE Corp. v. Williams*, 731 F.2d 676 (10th Cir. 1984) (emphasizing that a movant's delay in seeking a preliminary injunction is a significant factor in determining whether irreparable harm exists and that courts must weigh any delay when evaluating the necessity of preliminary relief).

inventory completion and intended disposition on June 11, 2025. *See* 90 Fed. Reg. at 24,652; 90 Fed. Reg. at 24,663. Plaintiff has had numerous opportunities to timely move for an injunction over the last few years, squandered them, and asks to be rewarded for its untimely actions.

Third, for the Eagle Rock Collection, Plaintiff's alleged harm is not imminent. The point of preliminary injunctive relief is to prevent irreparable harm that would otherwise occur while the case is litigated. *Prairie Band*, 253 F.3d at 1250. Plaintiff has not shown that this collection will be transferred before the Court can resolve this case. Publication of the July 15, 2026, notice is only a preliminary step in the BLM's completion of the disposition process in 43 C.F.R. § 10.7.[10] So far, BLM has not received any claims for disposition under the July 15 notice. Ben-Horin Decl. ¶ 13. As the Supreme Court and Tenth Circuit have made clear, a plaintiff must establish *probable* irreparable harm. *Winter*, 555 U.S. at 22; *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004). Plaintiff has failed to substantiate its claims of irreparable harm and its motion should be denied.

## II. Plaintiff is unlikely to succeed on the merits.

Plaintiff is also unlikely to succeed on the merits of its claims. Plaintiff's narrow view of NAGPRA is inconsistent with the statute. The Tenth Circuit has recognized that the importance of broadly repatriating cultural objects is embedded in the statute. "NAGPRA's reach in . . . restoring countless ancestral remains and cultural and sacred items to their tribal homes warrants its aspirational characterization as human rights

---

[10] BLM still needs to receive and consider any claims for disposition, respond, and send a written disposition statement to the claimants. 43 C.F.R. § 10.7(c)(5). Throughout this process, BLM will continue to consult with the Ute Tribes as described above.

legislation." *United States v. Corrow*, 119 F.3d 796, 800 (10th Cir. 1997) (internal quotations omitted). Indeed, "NAGPRA provides broadly for repatriation of Native American human remains and associated objects that are 'possessed or controlled' by federal agencies and federally funded museums." *Winnebago Tribe of Neb. v. U.S. Dept. of Army*, 175 F.4th 529, 532 (4th Cir. 2026). Plaintiff disregards the statutory and regulatory text and context to make its arguments. The challenged definitions in the 2024 Rule follow directly from NAGPRA's statutory language. Many of the 2024 Rule's definitions that Plaintiff claims are new were also included in the 1995 Rule. Having failed to show that the 2024 Rule contradicts NAGPRA, Plaintiff also fails to show that BLM's actions relying on the Rule are unlawful.

## A. The 2024 Rule is consistent with NAGPRA.

### 1. The 2024's Rule definition of and deference to "Native American traditional knowledge" accords with NAGPRA.

Plaintiff objects to the definition of Native American traditional knowledge included in the 2024 Rule and the Rule's deference to such knowledge. Neither objection has merit. When determining cultural affiliation, NAGPRA provides that evidence, such as "geographical, kinship, biological, archaeological, anthropological, linguistic, folkloric, oral traditional, historical, or *other relevant information or expert opinion,*" can be considered. 25 U.S.C. § 3005(a)(4) (emphasis added). The Act also requires consultation with Tribes throughout the decision-making process. *See id.* § 3003(b)(1)(A), § 3004(b)(1)(B). The 2024 Rule notes that "[c]onsistent with the Act, these regulations require deference to the Native American traditional knowledge of lineal descendants, Indian Tribes, and Native Hawaiian organizations." *Id.* § 10.1(a)(3). In section 10.2, the Rule provides a definition of *Native American traditional*

*knowledge*.

Plaintiff's objections to this definition (Br. at 5) ignore that NAGPRA places no limit on the types of evidence that museums and Federal agencies can consider during the repatriation process. To the contrary, NAGPRA provides a wide variety of possible evidence that can be considered when determining cultural affiliation. 25 U.S.C. § 3005(a)(4). And the statute mandates consultation with Tribes. *See id.* § 3003(b)(1)(A), § 3004(b)(1)(B). Plaintiff speculates that the definition could cover almost any Native American claim of knowledge. Br. at 5. But the 2024 Rule explains that this term has been regularly used by Federal agencies during land management and the use of natural or cultural resources. *See* 88 Fed. Reg. at 86,477. And, as the Rule points out, "any difficulty understanding this definition could be resolved through adequate consultation." *Id.* Plaintiff's other complaints about the definition fare no better. Plaintiff questions the fact that there is no temporal limit on what qualifies as Native American traditional knowledge. Br. at 5. But this is in line with the Act, which instructs museums and Federal agencies to consider *all* available evidence and the totality of the circumstances. 25 U.S.C. §§ 3003(d), 3005(a)(4). Nothing in the Act suggests that Native American traditional knowledge should be limited to knowledge that existed at a certain pre-determined time or that such knowledge cannot evolve, adapt, or develop. Plaintiff also expresses concerns about traditional knowledge being kept confidential. Br. at 5. But the 2024 Rule does not mandate confidentiality. While the Rule encourages entities not to make "information of a particularly sensitive nature" public, the Rule ultimately recognizes that it "cannot dictate how a museum or Federal agency responds to a request for disclosure of sensitive information." 88 Fed. Reg. at 86,458. This is not new. The 1995 Rule recommended the same. *See* 60 Fed. Reg. at

62,154.

Plaintiff is also wrong to suggest that the 2024 Rule makes all cultural affiliation and other determinations under NAGPRA subordinate to Native American traditional knowledge. Br. at 6. The reason for the 2024 Rule's deference provision is so that museums and Federal agencies recognize, as relevant here, that Tribes are the primary experts on their cultural heritage and must defer to them for the accuracy of the information shared. *See* 88 Fed. Reg. at 86,467. That is consistent with NAGPRA's text, which acknowledges the special relationship between the Federal government and Tribes. 25 U.S.C. § 3010. NAGPRA mandates that Federal agencies consult Tribes, *id.* § 3003(b)(1)(A), 3004(b)(1)(B), and the 2024 Rule requires Federal agencies to make reasonable efforts to accommodate Native American traditional knowledge, 43 C.F.R. § 10.1(d)(2). At the same time, the 2024 Rule expressly acknowledges that Interior "cannot remove the decision-making authority vested in museums and Federal agencies because doing so would be inconsistent with the Act." 88 Fed. Reg. at 86,460. Contrary to Plaintiff's claim (Br. at 5), the 2024 Rule does not make Native American traditional knowledge a "dispositive 'expert opinion.'" In response to comments, Interior repeatedly maintained that NAGPRA requires that the decision-making authority rests with Federal agencies and museums—not with Tribes. *See* 88 Fed. Reg. at 86,467, 86,470, 86,472, 86,478, 86,481. In line with this principle, Interior rejected proposed regulatory language that would strengthen deference to Tribes. *Id.* Plaintiff fails to show that the 2024 Rule's deference provision is contrary to NAGPRA.

**2. The 2024 Rule did not change the definition of "funerary objects," which accords with NAGPRA.**

Plaintiff asserts that the 2024 Rule changed the definition of funerary objects to

include more than the statute intended. Br. at 7-8, 13. But Plaintiff is wrong that the inclusion of *or near* in the definition is new. Plaintiff's claim that the definition is too broad also lacks merit. Over 30 years ago, Interior explained how incorporating *or near* follows from NAGPRA's statutory text.

NAGPRA defines both *associated* and *unassociated funerary objects* as "objects that, as a part of the death rite or ceremony of a culture, are reasonably believed to have been placed with individual human remains either at the time of death or later . . . ." 25 U.S.C. § 3001(3)(A), (B). For cultural items to be associated funerary objects, both the human remains and associated funerary objects must be presently in the possession of a Federal agency or museum. *Id.* § 3001(3)(A). Cultural items are unassociated funerary objects if the human remains that they are reasonably believed to have been placed with are not in the possession or control of a Federal agency or museum but, by a preponderance of the evidence, can be identified as related to specific individuals, families, or known human remains, or as having been removed from a specific burial site. *Id.* § 3001(3)(B). The 2024 Rule defines *funerary object* as "any object reasonably believed to have been placed intentionally with or near human remains" that is "connected, either at the time of death or later, to a death rite or ceremony of a Native American culture according to . . . Native American traditional knowledge." 43 C.F.R. § 10.2. It provides further definitions clarifying the difference between associated and unassociated funerary objects. *Id.*

Although Plaintiff argues that the 2024 Rule redefined *funerary object*, Br. at 7-8, the *or near* phrase is not new to the 2024 Rule. The 1995 Rule used the same language in the definition of funerary object. It defined the term as "items that, as part of the death rite or ceremony of a culture, are reasonably believed to have been placed

intentionally at the time of death or later with *or near* individual human remains." 60 Fed. Reg. at 62,159 (emphasis added). At the time, Interior explained why including *or near* in the funerary object definition aligned with NAGPRA. *Id.* at 62,138. NAGPRA's text explicitly refers to objects that are "part of the death rite or ceremony." 25 U.S.C. § 3001(3)(A), (B). The clause was included in the regulations to "accommodate variations in Native American death rites or ceremonies." 60 Fed. Reg. 62,138. "Some Indian tribes, particularly those from the northern plains, have ceremonies in which objects are placed near, but not with, the human remains at the time of death or later." *Id.* In 2024, Interior retained *or near* in the definition after determining that it appropriately covers the many possible death rites or ceremonies of the Tribes whose rights are recognized by NAGPRA. 88 Fed. Reg. at 86,471.

Further, Plaintiff discounts the language in the 2024 Rule when insisting that the definition is inconsistent with NAGPRA. To qualify as a funerary object, the object must be "placed intentionally."43 C.F.R. § 10.2. The intentionality requirement in the regulation cuts against Plaintiff's claim that the definition severs the statute's connection between objects and burials. The intentionality requirement means that "[i]tems that inadvertently came into proximity or contact with human remains are not considered funerary objects." 88 Fed. Reg. at 86,471. The fact that funerary objects must be placed intentionally maintains the requisite connection with burials. Plaintiff does not show that the 2024 Rule's definition of funerary object exceeds NAGPRA.[11]

### 3. Including traditional knowledge in the 2024 Rule's definitions of "cultural items" accords with NAGPRA.

[11] Plaintiff also references its argument about including Native American traditional knowledge in the definition. Br. at 8. We address this argument in detail below.

Rehashing its earlier claims, Plaintiff contends that, by including Native American traditional knowledge in the 2024 Rule's definitions of various cultural items, the Rule exceeds NAGPRA. Br. at 8-9. This argument again lacks merit. NAGPRA specifies that *cultural items* "means human remains and associated funerary objects, unassociated funerary objects, sacred objects, and cultural patrimony." 25 U.S.C. § 3001(3)(A)-(D). The statute then provides definitions for each type of cultural item. *Id*. The 2024 Rule, by comparison, states that *cultural items* "means a funerary object, sacred object, or object of cultural patrimony according to the Native American traditional knowledge or a lineal descendant, Indian Tribe, or Native Hawaiian organization." 43 C.F.R. § 10.2. It too provides specific definitions for each item, which also incorporate Native American traditional knowledge. *Id*.

In attempting to turn the differences between the statutory and regulatory definitions into a legal error, Plaintiff ignores that NAGPRA mandates consultation with Tribes during the decision-making process. *See* 25 U.S.C. § 3003(b)(1)(A), 3004(b)(1)(B). The inclusion of the phrase "according to . . . Native American traditional knowledge" in the challenged regulatory definitions gives effect to these statutory consultation requirements. *See* 88 Fed. Reg. at 86,469-70, 86,472, 86,477-78, 86,480-81. In line with the statute, incorporating Native American traditional knowledge in these definitions ensures meaningful consideration of information provided by Tribes during consultation. Consultation aids with identifying cultural items. As explained in the 2024 Rule, "[t]he definitions of funerary objects, sacred objects, and objects of cultural patrimony all rely on information that may only be available to or shared by" Tribes. 88 Fed. Reg. at 86,477. Further, Plaintiff mistakenly claims that the 2024 Rule redefines cultural items and its sub-definitions. Br. at 8. But Interior's acknowledgment

that identifying cultural items relies, in part, on Native American traditional knowledge is not new to the 2024 Rule. The same principle was recognized in the 1995 Rule. *See* 60 Fed. Reg. at 62,148. There, Interior explained that "[i]dentification of specific sacred objects or objects of cultural patrimony must be done in consultation with Indian tribe representatives and traditional religious leaders since few, if any, museums or Federal agencies have the necessary personnel to make such identifications." *Id.*

Plaintiff also claims that the 2024 Rule permits materials to be treated as cultural items without independently satisfying NAGPRA's elements. Br. at 8-9. But Plaintiff overstates the role traditional knowledge plays when identifying such items. It does not replace the statutory criteria. Instead, it is one of several forms of evidence that can inform whether objects meet the Act's criteria for cultural items. Take the definition of *object of cultural patrimony*, Plaintiff fails to appreciate that the 2024 Rule *still* requires that the item must have been considered inalienable by the group at the time the object was separated to be an object of cultural patrimony. 43 C.F.R. § 10.2; 88 Fed. Reg. at 86,477-78. Consultation helps inform whether the item was indeed inalienable by the group at the time of separation, as required by the Act and the 2024 Rule. *See* 87 Fed. Reg. at 63,213; 88 Fed. Reg. at 86,477-78. The same applies to Plaintiff's objections (Br. at 9) to the definition of *sacred object*. *See* 43 C.F.R. § 10.2. The 2024 Rule explicitly states that "[w]hile many items might be imbued with sacredness in a culture, this term is specifically limited to an object *needed* for the observance or renewal of a Native American religious ceremony." 88 Fed. Reg. at 86,521-22 (emphasis added). It explains the three elements that must be satisfied to meet the definition and rejects the view that any object that is deemed sacred by an Indian Tribe, without anything more, would qualify. *Id.* at 86,481.

The context in which NAGPRA was enacted also supports the conclusion that including Native American traditional knowledge in the challenged definitions accords with the statutory framework. When discussing cultural items, the relevant Senate Report acknowledged that the definitions "will vary according to the [T]ribe, village, or Native Hawaiian community." S. Rep. 101-473, at 4 (1990). Congress intended to make space for the fact that Tribes have "distinct cultures and traditional and religious practices that are unique to each community," and it drafted the Act accordingly by requiring consultation with Tribes before making determinations. *Id*. And as Interior pointed out, "[c]ourts have clarified that Indian Tribes play a role in determining whether items possess the requisite cultural significance to meet NAGPRA's definitions, especially regarding 'cultural patrimony.'" 88 Fed. Reg. at 86,470 (citing *United States v. Tidwell*, 191 F.3d 976, 981 (9th Cir. 1999); *Corrow*, 119 F.3d at 805). In sum, incorporating Native American traditional knowledge in the challenged definitions aligns with, and helps effectuate, the statutory requirements by ensuring the rights of Tribes—including the statutory rights to consultation and to receive reasonable efforts in the identification of cultural items—are preserved throughout the NAGPRA process.

#### 4. Plaintiff's arguments on "cultural affiliation" misread NAGPRA and the 2024 Rule.

Plaintiff raises multiple complaints about the definition of "cultural affiliation" and the means for determining this affiliation. Br. at 9-10. But Plaintiff's complaints have no grounding in the statute, its legislative history, or the 2024 Rule. NAGPRA provides that *cultural affiliation* "means that there is a relationship of shared group identity which can be reasonably traced historically or prehistorically between a present day Indian tribe or Native Hawaiian organization and an identifiable earlier group." 25

U.S.C. § 3001(2). The 2024 Rule similarly defines *cultural affiliation* as "a reasonable connection between human remains or cultural items and an Indian Tribe or Native Hawaiian organization based on a relationship of shared group identity." 43 C.F.R. § 10.2. The regulation goes on to explain how the affiliation is determined, 43 C.F.R. § 10.3, and includes a list of types of relevant information, *id.* § 10.3(a)(1).

Preponderance of evidence. Plaintiff initially errs by stating that for pre-1990 museum and federal-agency collections, NAGPRA requires cultural affiliation be established by a preponderance of evidence. Br. at 9 (citing 25 U.S.C. §§ 3001(2), 3003, 3005(a)(1), (a)(4)). Plaintiff overreads the statute. NAGPRA does not make a preponderance of evidence standard generally applicable. Instead, NAGPRA references this evidentiary standard in just three sections. First, the definition of *unassociated funerary objects*, 25 U.S.C. § 3001(3)(B). Second, the disposition of human remains or cultural items recovered from Federal lands after NAGPRA's passage, *id.* § 3002(a)(2)(c)(2). Third, the process for an Indian Tribe or Native Hawaiian organization to overcome a determination that human remains or cultural items in a museum or Federal agency collection or holding *cannot* be culturally affiliated, *id.* § 3005(a)(4) (emphasis added). None of these sections address the process for a museum or Federal agency to make a cultural affiliation determination for purposes of completing an inventory or responding to a request for repatriation, which apply separate standards. And NAGPRA does not include this standard in the definition of cultural affiliation. *Id.* § 3001(2). The 1995 Rule did apply a preponderance of evidence standard to all cultural affiliation determinations. 60 Fed. Reg. at 62,160. But Interior intentionally revised the 2024 Rule to more closely align with NAGPRA's statutory language. 88 Fed. Reg. at 86,482-83.

Lines of evidence. Plaintiff argues that the 2024 Rule departs from NAGPRA's framework because the Rule permits cultural affiliation to be identified through only one type of information. Br. at 10. But Plaintiff again misreads the statute. NAGPRA does not require more than one line of evidence to determine cultural affiliation. Instead, NAGPRA notes that determinations of cultural affiliation in inventories must be "based on information possessed by such museum or Federal agency," 25 U.S.C. § 3003(a), and that summaries must be completed "based upon available information held by such agency or museum," *id.* § 3004(a). The statute also specifies that Tribes may provide their own additional evidence, where no such cultural affiliation was previously determined in an inventory or summary, *id.* § 3005(a)(4). Since 1995, the regulations have referenced the list in § 3005(a)(4) as relevant to all cultural affiliation determinations. 60 Fed. Reg. at 62,168; 88 Fed. Reg. at 86,522. The 2024 Rule only added a clarification that expert opinion includes Native American traditional knowledge. 88 Fed. Reg. at 86,482.[12]

Through time. Plaintiff also incorrectly suggests (Br. at 10) that the 2024 Rule does not require a showing of "shared group identity which can be reasonably traced historically or prehistorically . . . ." 25 U.S.C. § 3001(2). The 1995 Rule used "historically or prehistorically" in its criteria for determining cultural affiliation. 60 Fed. Reg. at 62,167. The 2024 Rule merely replaces "historically or prehistorically" with "through time" in its required criteria. 88 Fed. Reg. at 86,522. Indeed, consistent with NAGPRA, the 2024 Rule requires a "relationship of shared group identity between the earlier group and the Indian Tribe or Native Hawaiian organization that can be reasonably

[12] Plaintiff's concern (Br. at 10) with including Native American traditional knowledge was analyzed above.

traced *through time*" as one of the three factors needed for demonstrating cultural affiliation. 43 C.F.R. § 10.3(b)(1)(iii) (emphasis added). Plaintiff focuses on the introduction to 43 C.F.R. § 10.3, *see*, *e.g*., Dkt. No. 14 ¶ 117, which states "[c]ultural affiliation does not require exhaustive studies, additional research, or continuity through time." The regulation continues, noting that "[c]ultural affiliation is not precluded solely because of reasonable gaps in the information available." 43 C.F.R. § 10.3. But this language comes from the same Senate Report that Plaintiff highlights in its Amended Complaint, Dkt. No. 14 ¶¶ 70, 186, which notes: "it may be extremely difficult, unfair or even impossible in many instances for claimants to show an absolute continuity from present day Indian tribes to older, prehistoric remains without some reasonable gaps in the historic or prehistoric record." S. Rep. No. 101-473, at 9. When that is the case, cultural affiliation "should not be precluded solely because of gaps in the record." *Id*. Nothing in NAGPRA requires the type of continuity that Plaintiff seeks to enforce to prevent repatriations.

<u>Information available</u>. Lastly, Plaintiff complains (Br. at 10) that the 2024 Rule violates NAGPRA because it directs that "[c]ultural affiliation must be determined by the information available." 43 C.F.R. § 10.3. But, as noted above, NAGPRA emphasizes that cultural affiliation must be based on available information. 25 U.S.C. §§ 3003(a), 3004(a). Thus, the 2024 Rule is consistent with this statutory directive. Plaintiff contends that the 2024 Rule means that museums and Federal agencies will be compelled to make cultural affiliation findings, effectively eliminating the category of culturally unidentifiable remains. Br. at 10. But the 2024 Rule does not require that every analysis result in a finding of cultural affiliation. In adopting the rule, Interior acknowledged that NAGPRA "anticipated that not all human remains could be

determined to have cultural affiliation . . . ." 88 Fed. Reg. at 86,482. Interior also noted "the voluminous comments that described museum and Federal agency practices as overly expansive in designating human remains and associated funerary objects as culturally unidentifiable." *Id.* at 86,483. In Interior's view, "in most cases, sufficient information on geographic origin and acquisition history exists and can be used to either clearly or reasonably identify" cultural affiliation. *Id.* But again, this will not apply to *all* cases. The 2024 Rule specifically considers this outcome by including a discretionary process for museums or Federal agencies to transfer those human remains or associated funerary objects with no cultural affiliation. 43 C.F.R. § 10.10(k). Thus, the 2024 Rule does not pre-ordain a cultural affiliation determination.

In sum, the 2024 Rule's cultural affiliation definition and related instructions are fully consistent with NAGPRA.

**B. BLM's actions are in accord with NAGPRA.**

Contrary to Plaintiff's claim (Br. at 13), BLM's reliance on the 2024 Rule in making the determinations on the Wyoming and Eagle Rock Collections does not exceed the authority granted in NAGPRA. Plaintiff does not ask the Court to adjudicate any site-specific dispute related to BLM's actions. *See* Dkt. No. 14 ¶¶ 224, 231. Nor does Plaintiff argue that any of BLM's determinations are arbitrary and capricious under the APA. *Id.*, Counts I-VI. Plaintiff only contends that the regulatory standards are unlawful. As shown above, that argument fails. BLM complied with NAGPRA and the 2024 Rule as they completed the NAGPRA processes to which Plaintiff objects. *Supra* Background Sect. III. Further, many of the "redefinitions" and "changes" that Plaintiff claims are new to the 2024 Rule—are not. The 1995 Rule included the same language in the funerary objects definition. The 1995 Rule recognized that Native American traditional

knowledge plays a role in identifying cultural items. Neither NAGPRA nor the 1995 Rule requires more than one line of evidence to determine cultural affiliation. And the 1995 Rule included the same list of relevant evidence for showing cultural affiliation. Thus, BLM could have reached the same determinations under the pre-2024 regulations as under the 2024 Rule. Plaintiff has not shown that BLM's actions exceed NAGPRA.

## III. The balance of equities does not tip in favor of a preliminary injunction.

Plaintiff's request for a preliminary injunction should also be denied because the equities and the public interest favor Defendants. If the federal government is a party, the third and fourth injunction factors "merge." *Nken v. Holder*, 556 U.S. 418, 420, 435 (2009). Courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief[,] and [i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences." *Winter*, 555 U.S. at 24 (citations omitted).

Plaintiff claims that there will be no cognizable harm from a preliminary injunction. Br. at 16. But Plaintiff seeks expansive interim relief to stop a wide range of potential agency actions, not just an injunction as to the six BLM collections discussed above. *See* Dkt. No. 15-1. Plaintiff also fails to recognize that "NAGPRA represents the culmination of decades of struggle by Native American tribal governments and people to . . . [effect the repatriation of] thousands of dead relatives or ancestors, and to retrieve stolen or improperly acquired cultural property." *Yankton Sioux Tribe v. Army Corps of Eng'rs*, 209 F. Supp. 2d 1008, 1016 (D.S.D. 2002) (alteration in original) (internal citations omitted). Thus, a weighing of the equities must consider the relevant Tribes' interests in having human remains and cultural items returned to them. As to the

Wyoming Collections, an injunction will delay the transfer of physical custody of human remains and associated funerary objects for which BLM has relinquished possession or control or recognized ownership claims. This will pause the already completed legal transfer to the culturally affiliated Tribes of their title, rights, and interests in and to the items in those collections. For the Eagle Rock Collection, an injunction will delay BLM's ability to review the collection and engage in meaningful consultation with the Ute Tribes and other potentially culturally affiliated Tribes. Along with curtailing tribal rights, an injunction will also impose on the discretion, operations, and management of a Federal agency. NAGPRA includes a statutory obligation for Federal agencies, like BLM, to expeditiously return human remains and cultural items to culturally affiliated individuals or tribal entities. 25 U.S.C. § 3005(a)(1)-(2), (4). The public interest is served by NAGPRA's orderly administration and the respectful return of items. Neither NAGPRA nor the other laws related to objects of antiquity, archaeological resources, or historic properties cited by Plaintiff (Br. at 4, 16) mandate that Plaintiff be provided access or use of these collections. While NAGPRA does *not* create an entitlement for Plaintiff, the statute *does* create entitlements for Tribes. Such interests will be harmed if a preliminary injunction is entered. Plaintiff has also provided no evidence that it will suffer imminent irreparable harm. The balance thus cannot tip in favor of a preliminary injunction.

## Conclusion

Plaintiff has not met its burden of proving that the extraordinary remedy of a preliminary injunction should issue. Thus, the Court should deny Plaintiff's motion.

Respectfully submitted this 15th day of September, 2026.

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Energy and Natural Resources Division

/s/ *Sara E. Costello*
SARA E. COSTELLO (KS Bar No. 20898)
GRACE C.Y. MERMEL (NM Bar No. 165219)
Trial Attorneys
Natural Resources Section
Energy and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 598-5552
sara.costello2@usdoj.gov
grace.mermel@usdoj.gov

DARIN D. SMITH
United States Attorney

/s/ *Z. Seth Griswold*
Z. SETH GRISWOLD (WY Bar #7-5809)
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY 82003
Telephone: (307) 772-2124
Seth.Griswold@usdoj.gov

Attorneys for Defendants

OF COUNSEL:

ELANA M. OSER
LEAH J. VASARHELYI
Office of the Solicitor
U.S. Department of the Interior