FILED

5:20 pm, 10/28/26

Margaret Botkins
Clerk of Court

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

WYOMING ASSOCIATION OF PROFESSIONAL ARCHAEOLOGISTS,

Plaintiff,

vs.

DOUGLAS J. BURGUM, et al.,

Defendants.

Case No. 26-CV-223-R

**ORDER GRANTING PLAINTIFF'S MOTION FOR STAY UNDER 5 U.S.C. § 705 AND PRELIMINARY INJUNCTION [15]**

In this case, Plaintiff Wyoming Association of Professional Archaeologists ("WAPA") challenges current Department of the Interior ("DOI") regulations implementing the Native American Graves Protection and Repatriation Act, 25 U.S.C. §§ 3001–3013 ("NAGPRA" or "the Act"). WAPA claims that certain components of the regulations, on their face, are contrary to the terms of the statute and in excess of statutory authority. WAPA also challenges specific Bureau of Land Management ("BLM") actions taken pursuant to the regulations that purportedly subject six archaeological collections in Wyoming and Colorado to disposition or transfer. Pending final judgment, WAPA seeks interim relief pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 705, and Federal Rule of Civil Procedure 65 to prevent further action by BLM that would risk

disposition or transfer of the collections. The Court, having carefully reviewed the Motion for Preliminary Injunction, [ECF No. 15], Response in Opposition, [ECF No. 21], and Reply [ECF No. 25], grants Plaintiff's Motion for Stay Under 5 U.S.C. § 705 and Preliminary Injunction.

## BACKGROUND

Before weighing WAPA's Motion, the Court will provide an overview of the relevant provisions of NAGPRA and the challenged regulations, as well as their applicability to the collection-specific BLM actions at issue.

### NAGPRA

Congress enacted NAGPRA in 1990 to provide for the protection and return of certain Native American cultural items, a term defined by statute to include human remains, funerary objects, sacred objects, and objects of cultural patrimony. 25 U.S.C. § 3001(3); *see also* 60 Fed. Reg. 62,134, 62,134 (Dec. 4, 1995). NAGPRA was intended to "balance[] the interest of Native Americans in the rightful and respectful return of their ancestors with the interest of our Nation's museums in maintaining our rich cultural heritage, the heritage of all American peoples." 136 Cong. Rec. S17,173 (daily ed. Oct. 26, 1990) (statement of Sen. McCain).

To determine the ownership or control of Native American cultural items, NAGPRA distinguishes between cultural items in the possession of Federal agencies or museums at the time of the Act's passage in 1990, and those discovered on Federal or tribal land thereafter. *See* 25 U.S.C. §§ 3002–3003 (2026). For cultural items in the possession of federal agencies or museums before passage of the Act, §§ 3003–3005 apply to

determine whether such items should be repatriated[1] to an Indian tribe or Native Hawaiian Organization. Sections 3003 and 3004 require federal agencies and museums to compile inventories and to create summaries of collections or holdings in their possession at the time of the Act's passage. Section 3005 outlines the process for repatriation to an Indian tribe or Native Hawaiian organization if certain conditions are met following preparation of an inventory or summary, including, principally, whether "cultural affiliation" with the tribe or organization has been shown. If cultural affiliation is not shown through an inventory or summary, § 3005 still provides for repatriation of funerary objects where the requesting tribe or organization "can show cultural affiliation by a preponderance of the evidence based upon geographical, kinship, biological, archaeological, anthropological, linguistic, folkloric, oral traditional, historical, or other relevant information or expert opinion." § 3005(a)(4). Similarly, § 3005 provides for the return of sacred objects and objects of cultural patrimony where the requesting party is a lineal descendent, or the requesting tribe or organization can show ownership. § 3005(a)(5). Thus, § 3005 requires an affirmative showing of cultural affiliation or ownership before repatriation is to occur.

For cultural items discovered on federal or tribal land after passage of the Act, § 3002 applies and describes the priority for claims of ownership or control. While a determination of "cultural affiliation" weighs on the priority of claims, it is not a threshold requirement for ownership as under §§ 3003–3005. *See* § 3005(a)(2). So long as an object

[1] Repatriation, as contemplated in § 3005, refers to the return of cultural items to Indian tribes or Native Hawaiian Organizations with which they are culturally affiliated.

qualifies as a cultural item, § 3002 does not pose a bar to ownership by a tribe or organization.

NAGPRA also defines explicitly its operative terms, including each type of cultural item and the meaning of "cultural affiliation." § 3001(2), (3). "Funerary objects" (both associated and unassociated) are defined as "objects that, as part of the death rite or ceremony of a culture, are reasonably believed to have been placed with individual human remains either at the time of death or later." § 3001(3)(A), (B). "Associated" and "unassociated" distinguish whether the Federal agency or museum in possession of the funerary object also presently possesses the human remains with which the objects are associated. *Id*. "Sacred objects" are defined as "specific ceremonial objects which are needed by traditional Native American religious leaders for the practice of traditional Native American religions by their present day adherents," and "cultural patrimony" is defined as:

> an object having ongoing historical, traditional, or cultural importance central to the Native American group or culture itself, rather than property owned by an individual Native American, and which, therefore, cannot be alienated, appropriated, or conveyed by any individual regardless of whether or not the individual is a member of the Indian tribe or Native Hawaiian organization and such object shall have been considered inalienable by such Native American group at the time the object was separated from such group.

*Id*. § 3001(3)(C), (D). Lastly, "cultural affiliation" is defined to mean "that there is a relationship of shared group identity which can be reasonably traced historically or

prehistorically between a present day Indian tribe or Native Hawaiian organization and an identifiable earlier group." *Id*. § 3001(2).

Taken together, NAGPRA establishes a comprehensive framework detailing the process for determining ownership and control of Native American cultural items, the steps for making relevant determinations, the priority of such claims, and the definitional thresholds for items to qualify.

**Implementing Regulations**

Against this statutory backdrop, DOI first promulgated implementing regulations in 1995 (the "1995 Rules"). *See Native American Graves Protection and Repatriation Regulations, Final Rule*, 60 Fed. Reg. 62,134 (Dec. 4, 1995) (codified at 43 C.F.R. pt. 10); 25 U.S.C. § 3011. The regulatory definitions contained in the 1995 Rules largely tracked the statutory definitions while providing additional guidance and specificity as to the objects falling under the rubric of "cultural item." *See* 60 Fed. Reg. at 62,134; 43 C.F.R. pt. 10 (1995). Regulatory definitions from the 1995 Rules remained substantively unchanged until DOI issued revised regulations in late 2023, effective in early 2024 (the "2024 Rules"). 88 Fed. Reg. *Native American Graves Protection and Repatriation Act Systematic Processes for Disposition or Repatriation*, 86,452 (Dec. 13, 2023) (codified at 43 C.F.R. pt. 10).

Among the comprehensive changes reflected in the 2024 Rules, DOI clarified that "[the] regulations require deference to the Native American traditional knowledge of lineal descendants, Indian Tribes, and Native Hawaiian organizations." 43 C.F.R. § 10.1(a)(3) (2026). "Native American traditional knowledge" is defined by regulation as:

> knowledge, philosophies, beliefs, traditions, skills, and practices that are developed, embedded, and often safeguarded by or confidential to individual Native Americans, Indian Tribes, or the Native Hawaiian Community. Native American traditional knowledge contextualizes relationships between and among people, the places they inhabit, and the broader world around them, covering a wide variety of information, including, but not limited to, cultural, ecological, linguistic, religious, scientific, societal, spiritual, and technical knowledge. Native American traditional knowledge may be, but is not required to be, developed, sustained, and passed through time, often forming part of a cultural or spiritual identity. Native American traditional knowledge is expert opinion.

*Id*. § 10.2.

Beyond the general requirement for deference, the 2024 Rules specifically incorporate Native American traditional knowledge into the regulatory definitions of each type of cultural item. *See id*. Each is defined "according to the Native American traditional knowledge of a lineal descendant, Indian Tribe, or Native Hawaiian organization." *Id*.

The 2024 Rules also make other targeted changes to the regulatory definitions. For example, the updated definition of "funerary object" replaces the modifying phrase "as part of the death rite or ceremony of a culture" found in the statute and 1995 Rules with the phrase "connected . . . to a death rite or ceremony." *See id.*; §10.2 (1995). Further, while both the 1995 Rules and 2024 Rules expanded the definition of "funerary object" to encompass items placed with "or near" human remains, the 2024 Rules omit a stated evidentiary standard and limiting language contained in the earlier version. *See* § 10.2 (2026); § 10.2 (1995). Similarly, changes were made to the definition of "cultural affiliation." While the statute requires "a relationship of shared group identity which can be reasonably traced . . . to an identifiable earlier group" to establish cultural affiliation, the updated regulatory definition requires "a reasonable connection between human

remains or cultural items . . . based on a relationship of shared group identity" which can be established "reasonably by the geographical location or acquisition history of the human remains or cultural items." 25 U.S.C. § 3001(2); 43 C.F.R. § 10.2 (2026). Further, in describing the process to determine cultural affiliation, the 2024 Rules note that, while a broad range of information may be relevant, one type of information alone may be determinative, including geographical or Native American traditional knowledge. *Id.* § 10.3(a)(2). These changes, together with a number of other amendments under the 2024 Rules, constituted the first comprehensive overhaul of DOI regulations implementing NAGPRA.

**BLM Actions**

In June 2025, pursuant to the revised 2024 Rules, BLM Wyoming issued notices determining that five archaeological collections housed at the University of Wyoming Archaeological Repository ("UWAR") were eligible for repatriation and disposition under NAGPRA. *See Notice of Inventory Completion*, 90 Fed. Reg. 24,652 (June 11, 2025); *Notice of Intended Disposition*, 90 Fed. Reg. 24,663 (June 11, 2025). The five collections (collectively, the "Wyoming Collections") correspond to archaeological sites at Shute Creek (48LN1296), 48UT920, Wardell Bison Trap (48SU301), Upper Muddy Creek Village (48CR325), and Studhorse Butte (48SU4479). The contents of the collections vary widely, containing soil samples, lithic debitage, obsidian flakes, scrapers, tools, fauna, flora, and projectile points, among other things. *See, e.g.,* 90 Fed. Reg. at 24,653–54. The collections have been compiled through discoveries dating back to the 1950s, containing collectively tens of thousands of diverse archaeological materials. *Id.*

One of the notices issued by BLM in June 2025, a Notice of Inventory Completion under the authority of § 3002 (the "June 2025 NIC"), referenced human remains of 41 individuals of Native American ancestry and determined that 24,161 different objects from the Wyoming Collections constituted associated funerary objects. 90 Fed. Reg. at 24,654. The June 2025 NIC stated there was "a connection between the human remains and associated funerary objects described in [the] notice" and number of different Tribes. *Id*. The other notice, a Notice of Intended Disposition issued under the authority of § 3003 (the "June 2025 NID"), referenced the human remains of four individuals and determined that 44 objects from the Wyoming Collections were associated funerary objects. 90 Fed. Reg. at 24,663.

One month after issuing the notices, BLM Wyoming issued corresponding disposition statements, noting respectively that BLM Wyoming "relinquishe[d] possession and control of the 19 human remains and 27,738 funerary objects to the Eastern Shoshone Tribe" and that BLM Wyoming "relinquishe[d] possession and control of the 1 human remains and 380 associated funerary objects to the Northern Cheyenne Tribe." [ECF No. 16-8, Ex. G; ECF No. 16-9, Ex. H]. BLM also asserted, through a letter to UWAR, that the claimed objects from the Wyoming Collections were "no longer archaeological resources" as defined by the Archaeological Resources Protection Act of 1979 ("APRA"), and were instead associated funerary objects under NAGPRA. [ECF No. 16-2, Ex. A]. The letter directed UWAR to remove the claimed associated funerary objects from its archaeological collections and move them to the Human Remains Repository, also located at the University of Wyoming. *Id*. In April 2026, BLM issued updated notices correcting

inconsistencies in site numbers and artifact counts in the versions from June 2025, followed in May 2026 with renewed disposition statements. *Notice of Inventory Completion*, 91 Fed. Reg. 20,487 (Apr. 16, 2026); *Notice of Intended Disposition*, 91 Fed. Reg. 20,480 (Apr. 16, 2026); [ECF No. 16-10, Ex. I; ECF No. 16-11, Ex. J]. As of now, BLM has not taken further actions with respect to the Wyoming Collections.

Separately, in July 2026, BLM Colorado issued a Notice of Intended Disposition under the authority of § 3002 (the "July 2026 NID"), which determined that an archaeological collection assembled from the Eagle Rock Shelter (5DT813) (the "Eagle Rock Collection") contained "one or more" objects that were eligible for repatriation. *Notice of Intended Disposition*, 91 Fed. Reg. 43,400, 43,401 (July 15, 2026). The notice stated that the objects were unassociated funerary objects or "sacred objects/objects of cultural patrimony" and that three Ute Tribes had priority in claims for disposition. *Id*. The Eagle Rock Collection remains in BLM custody, and no further transfer or disposition has yet taken place. *See* [ECF No. 14, at 9].

**WAPA's Claims**

WAPA, a nonprofit voluntary professional association of field archaeologists, academic researchers, and museum and repository professionals, brought this action "to halt ongoing unlawful transfers of, and denial of research access to, archaeological resources owned, administered, curated, or regulated by the United States, including without limitation the six specific examples from Wyoming and Colorado." [ECF No. 14, at 2]. As this matter is before the Court on WAPA's Motion for Stay and Preliminary

Injunction, [ECF No. 15], and that motion is directed to the Wyoming and Eagle Rock Collections, the Court will focus its discussion here on those collections.

Regarding the six collections, WAPA broadly contends that relying on the challenged regulations to categorize the wide-ranging archaeological materials as funerary objects, sacred objects, or objects of cultural patrimony overlooks statutory limits imposed by Congress. [ECF No. 14, at 6]. WAPA urges that the regulations disregard the definitional thresholds expressly set out in NAGPRA and, once vacated, actions taken under them with respect to the six collections cannot stand. *Id*. at 83, 86. In support of this contention, WAPA looks to the history and provenance of the disputed objects.

WAPA first highlights determinations made regarding materials found at the 48UT920 site. *See id*. at 55. WAPA contends that the thousands of objects found at the 48UT920 site, determined by BLM to be associated funerary objects connected with human remains from the nearby Bridger Gap burial site, were in fact from "[a] spatially, temporally, and behaviorally distinct location[]." *Id*. at 55–56. WAPA states that the sites were grouped together in certain records "because of an administrative error" and are, in reality, distinct and unrelated. *Id*. at 56. While the 48UT920 site shows "evidence of periodic reuse . . . over a span of several thousand years," as well as a historic component dating to approximately 1910 AD, the burial site itself likely dates to the 17th or 18th century AD. *Id*. at 55–56. WAPA concludes that "none of the artifacts from 48UT920 are related to the Bridger Gap burial" and are incorrectly considered associated funerary items. *Id*. at 56.

WAPA then turns to the Wardell Bison Trap (48SU301), "a major communal bison hunting site with evidence of at least three distinct periods of use between approximately 1400 and 1000 years before the present." *Id*. The site consists of layered deposits of bone-bearing sediments, "including over 100,000 bison bones intermixed with ceramics, projectile points, flakes" and other artifacts. *Id*. Among the bones and artifacts, "records identify a single fragment of a human proximal femur recovered from one of the stratified bone levels." *Id*. WAPA contends that BLM used "the presence of a single human bone fragment in this massive bison bonebed" to wrongly bring all contents of the bison bonebed within the reach of NAGPRA. *Id*. at 56–57.

WAPA urges a similar result with respect to the remaining three collections in Wyoming. *Id*. at 57–59. For Shute Creek (48LN1296), WAPA notes that site reports originally observed no associated funerary objects "other than limestone slabs placed beneath and above the human remains." *Id*. at 57. Nonetheless, BLM has "treated the entire site collection . . . as associated funerary objects." *Id*. For Upper Muddy Creek Village (48CR325), excavated in 1979 and containing one of Wyoming's only known burial mounds, WAPA contends that BLM now belatedly claims 380 additional artifacts from locations at the site beyond the burial mound. *Id*. at 57–58. For Studhorse Butte (48SU4479), WAPA highlights the report from the 2002 excavation finding that the structure in which a single human burial was found "appeared to have functioned as a dedicated burial structure distinguishable from the eight surrounding habitation structures" and "that the burial was not associated with funerary objects." *Id*. at 59. Despite the express

determination in the report, WAPA argues, BLM has now determined that 3,944 unconnected artifacts are associated funerary objects. *Id*.

Finally, WAPA turns to Eagle Rock Shelter (5DT813), a site which experienced repeated occupation and use from approximately 13,000 to 1,800 years before the present. *See id*. at 59–61. In 2011, the remains of a single individual were encountered at the back of the site dating to approximately 3,900 years before the present; contemporary reports identified no associated funerary objects. *Id*. at 60. WAPA claims that "BLM Colorado classified the collection, as a single lot, as [cultural items]" despite that the archaeological collection amassed form the site "spans occupations that nearly all either predate the burial by thousands of years or postdate it by centuries." *Id*.

WAPA thus disputes broadly the determinations made by BLM in reliance on the challenged regulations and the assertions that objects contained in the Wyoming and Eagle Rock Collections qualify as cultural items for the purposes of NAGPRA. *See id*. at 55–60. WAPA urges in this case that the Wyoming and Eagle Rock Collections should be maintained as resources owned and controlled by the United States, and outside of the reach of NAGPRA. *Id*.

**Motion for Stay and Preliminary Injunction**

While the case is pending, and in order to prevent transfer or disposition of the Wyoming and Eagle Rock Collections, WAPA requests that the Court stay: (i) the continuing legal force, effect, and implementation of collection-specific agency actions; and (ii) the application and implementation of the challenged regulatory provisions with respect to the six collections. [ECF No. 15]. WAPA seeks a corresponding injunction

restraining the Federal Defendants from issuing or implementing new notices, determinations, disposition statements, or transfer authorizations concerning those collections in reliance on the challenged regulations pending final judgment. *Id*. The Court addresses WAPA's Motion for Stay and Preliminary Injunction below.

## Relevant Law

Section 705 of the APA affords the Court with broad authority to stay agency action pending review:

> [T]o the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705; *see also Make the Road New York v. Mullin*, 179 F.4th 16, 29–30 (D.C. Cir. 2026) ("5 U.S.C. § 705 has been understood to authorize courts to issue stays when they are engaged in judicial review under the APA."). A stay of agency action under § 705 preserves the status quo pending judicial review "by temporarily suspending the source of authority to act . . . not by directing an actor's conduct." *Id*. at 31 (D.C. Cir. 2026) (quoting *Nken v. Holder*, 556 U.S. 418, 428–29 (2009)). In the Tenth Circuit, the preliminary injunction factors "also determine when a court should grant a stay of agency action under section 705 of the APA." *Colo. v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021).

Courts use the four-factor test described in *Winter v. Natural Res. Def. Council, Inc.* to determine whether a party is entitled to a preliminary injunction. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *see also Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019). First, the moving party must show a

substantial likelihood of success on the merits. *Id.* Second, the moving party would suffer irreparable harm if the motion is denied. *Id*. Third, the threatened injury outweighs the opposing party's injury if the injunction is granted. *Id*. Last, the moving party must show that granting the injunction is not contrary to public interest. *Id.* Where the federal government is the party opposing a motion for preliminary injunction, the balances of harms and public interest factors merge. *Nken*, 556 U.S. at 435.

## RULING OF THE COURT

The Court will discuss each of the *Winter* factors below. As WAPA has made the requisite showing as to each of the factors, the Court grants WAPA's Motion for Stay and Preliminary Injunction.

### I. Irreparable Harm

"'[B]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements' will be considered." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (quoting *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017)). To constitute irreparable harm, an injury must be "certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). WAPA contends that the disposition or transfer of the Wyoming and Eagle Rock Collections from the repositories where they are now curated, to nonparties beyond the Court's practical remedial reach, threatens such an injury. [ECF No. 16, at 13–14]. The Court agrees.

First, WAPA's stated harm is "actual." WAPA offers declarations from members engaged in a range of active and ongoing scientific research projects that require access to the collections, which will be permanently impacted if the collections are transferred out of federal control. *See* [ECF No. 16-14–21]. Projects include, among others, a report on the chronology and stratigraphy of the Wardell Bison Trap site, a long-term study of Late Prehistoric cultural identity and geographic orientation in the Wyoming Basin requiring direct access to assemblages from a number of sites in Wyoming, and a comprehensive site report for the Eagle Rock Shelter site. *See id.* The nature and specificity of these projects supports a finding of actual harm if the collections are transferred.

In response, Federal Defendants contend that the stated harm is insufficiently particular and merely speculative; no declarant currently has research access and the claimed injuries assume rights that the members do not have. [ECF No. 21, at 8]. The declarations illustrate plainly that this is not the case. For example, Dudley A. Gardner states that BLM Colorado "directed [him] in a telephone conversation to stop [his] work on the Eagle Rock Shelter collection" on or about June 23, 2026. [ECF No. 16-15, at 2]. He further notes that, as of that date, "[he] had yet to receive reports on [a] third party laboratory analysis" from samples submitted before he was told to stop his work. *Id*. Nor is Mr. Gardner's ongoing work on the collection only recent: he has served as the Principal Investigator of the site since 2007, and has since "personally paid for forty of the radiocarbon dates from the site at a cost of more than $20,000." [ECF No. 16-14, at 1–2]. Similarly, Daniel R. Garner has been working with UWAR in advancing actively funded dissertation research requiring access to bison bone specimens in Wyoming for which "the

Wardell Bison [Trap] site (48SU301) and its collection . . . are directly relevant." [ECF No. 16-16, at 2]. While Federal Defendants rightfully point out that Mr. Garner has not yet sought formal access the Wardell Bison Trap collection, they do not acknowledge his request for access to another UWAR collection, nor UWAR's response that BLM has implemented "a blanket research prohibition on all BLM collections it holds pending completion of [the Tribal] consultation process." *See id*. Another declarant, David T. Vlcek, a retired BLM archaeologist who previously assisted with excavations of numerous cites in Wyoming, including Wardell, has been working on an ongoing report regarding the Wardell site since 2025. [ECF No. 16-21, at 1–2]. Mr. Vlcek wrote to BLM Wyoming requesting research access to the site; and he received in response a letter denying his request in January 2026. [ECF No. 28-3]. The letter stated that such requests are "paused until ongoing Tribal consultations have been completed," noting only secondarily that his proposal did not "sufficiently demonstrate how the requested radiocarbon dating would significantly advance" the scientific or educational objectives required under 36 CFR §79.10(a)." *Id*. Federal Defendants thus appear technically correct in arguing that "[WAPA] members presently lack the right to undertake the desired research," [ECF No. 21, at 9], but are only persuasive to the extent they discount how those rights are determined. All considered, it would be difficult to conclude that WAPA's stated harm is merely speculative or insufficiently particular.

Second, loss of the unique artifacts and archaeological materials contained in the collections is "certain [and] great." *Heideman*, 348 F.3d at 1189. As to the Wyoming Collections, BLM has already issued disposition statements which "relinquish[ed]

possession and control" of thousands of claimed objects to the named Tribes. [ECF No. 16-10, at 2–3; ECF No. 16-11, at 1]. The next—and final—step is to arrange the physical transfer and removal of the items from UWAR. *See id*. Once removed, "scientific information recoverable only from [the archaeological materials] may be permanently lost to research if the specimens are reburied, dispersed, destroyed, or otherwise removed from professional curation and access." [ECF No. 16, at 15]. Thus, the alleged harm to the Wyoming Collections is also imminent[2]—which Federal Defendants appear to acknowledge in noting that "[an injunction] will pause the already completed legal transfer to the culturally affiliated Tribes." [ECF No. 21, at 25]. As to the Eagle Rock Collection, the only operative hurdle preventing resumption of the disposition process is an agreement by the parties expiring on October 28, 2026. *See* [ECF No. 16, at 15]. Once the agreement expires, no barriers remain in place to prevent issuance of a disposition statement or the subsequent disposition and transfer of the collection. *See id*.

As WAPA has described an injury to its members that is "certain, great, actual, and not theoretical," the Court finds that WAPA has made the requisite showing of irreparable harm in the absence of an injunction.

**II. Substantial Likelihood of Success on the Merits**

On the merits, WAPA asks the Court both to vacate the challenged regulations and to set aside the collection-specific actions taken under them. [ECF No. 14, at 91–95]. WAPA thus brings challenges to both the regulations promulgated by DOI and the specific

[2] Even if not for WAPA members' letter-writing campaign in response to the June 2025 NIC, the Court finds that the delay in seeking an injunction was not unreasonable. Even assuming it was unreasonable, BLM has not shown how it was prejudiced by such a delay.

actions taken by BLM with respect to the Wyoming and Eagle Rock Collections. *Id*. at 70–87. The challenges are brought under the APA, which directs a reviewing court to hold unlawful and set aside agency action that is not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. § 706(2)(A), (C).

In delineating its challenges, WAPA makes clear that it does not ask the Court to determine whether any particular items within the Wyoming and Eagle Rock Collections qualify as cultural items as defined by NAPGRA, only whether the challenged regulatory standards applied to those collections are unlawful. *See* [ECF No. 14, at 55]. WAPA argues that once the standards are vacated, BLM actions taken in reliance on them cannot stand independently. *Id*. at 83, 86.

WAPA's requested stay and injunction, in contrast, is circumscribed solely to preserving the Wyoming and Eagle Rock Collections. [ECF No. 15]. WAPA does not request immediate access to the collections, nor does it seek a broader stay of the 2024 Rules. WAPA only seeks narrowly to prevent further action with respect to the six collections pending final judgment. *Id*.

In order to prevail on the merits as to the six collections relevant here, WAPA does not need to succeed on all challenges included in the Amended Complaint. Namely, challenges embodied in Counts I and V, relating to the "Culturally Unidentifiable Human Remains Rule" and access, research, and consent restrictions, are neither within the scope of the requested interim relief nor are they determinative of whether WAPA will succeed as to the six collections. *See* [ECF No. 14, at 70–75, 79–82]. It is therefore unnecessary to

weigh these challenges here for purposes of the likelihood-of-success inquiry. The Court will instead address only those relevant to the final relief that WAPA seeks to preserve. This narrow approach comports with direction in the APA that "the reviewing court shall decide relevant questions of law "[t]o the extent necessary and when presented." 5 U.S.C. § 706.

For purposes of assessing WAPA's likelihood of success on the merits, the Court also draws a practical distinction between the two types of challenges presented. While challenges to the collection-specific actions are cast in the first instance as challenges to the broader regulatory standards, WAPA's success on the latter does not necessarily imply success on the former. The APA directs a reviewing court to hold unlawful and set aside agency action, findings, or conclusions that are contrary to law; however, that regulations may be contrary to law does not invariably mean that every action taken under them must also be. *See* § 706(2)(A). Such agency actions may instead have a valid, independent statutory basis, requiring a court to analyze whether the regulatory defect was prejudicial or whether it constituted harmless error. *See id.* (noting that "due account shall be taken of the rule of prejudicial error"). Moreover, here, if the collection-specific actions can stand independently of the regulations, the Court need not analyze the broader facial challenge to determine that WAPA is unlikely to succeed as to the corresponding final relief requested. Thus, before addressing whether WAPA has made the requisite showing as to the facial challenge, the Court will first consider whether they have shown that the challenged actions likely violated the APA.

In weighing the likelihood-of-success factor, the Court underscores that "the very purpose of an injunction . . . is to give temporary relief based on a preliminary estimate of the strength of the plaintiff's suit, prior to the resolution at trial of the factual disputes and difficulties presented by the case." *DTC Energy*, 912 F.3d at 1273 (citation modified). Therefore, "a plaintiff must present a prima facie case but need not show a certainty of winning." *Id.* (citation modified).

*A. Challenge to the Collection-Specific Actions*

As to the Wyoming and Eagle Rock Collections, WAPA has shown it is substantially likely that BLM actions taken under the challenged regulations exceed the authority granted by Congress in NAGPRA. WAPA's uncontested description of the nature and provenance of the collections, as well as the historical and geographical context of the objects, indicate that BLM, in reliance on the 2024 Rules, subjected objects to disposition that fall outside of statutory limits.

With respect to the 48UT920 site, WAPA points to the archaeological record in contending that the collection does not meet the standards outlined in NAGPRA. [ECF No. 14, at 55–56]. According to those records, the over 3,000 objects claimed in the June 2025 NIC were located 300 meters from the burial site of one individual with which they are purportedly connected. *Id*. at 55. The objects include, among other things, cores, projectile points, bifaces (prehistoric stone tools) and debitage (waste material produced in the making of prehistoric stone implements). 90 Fed. Reg. at 24,653. Viewed together, it seems

doubtful that all, or many, of these claimed materials constitute associated funerary objects as defined by NAGPRA.

First, while Federal Defendants do not dispute that the human remains likely date to the 17th or 18th century AD, many of the objects described are prehistoric and would not meet the statute's definitional threshold of being placed "at the time of death or later." 25 U.S.C. § 3001(3)(A). Second, even if the objects postdated the human remains, it is not presumptive that materials found 300 meters from a burial site are connected to it. While the 1995 Rules accounted for the possibility that certain Northern Plains tribes would place objects near burials instead of with them, no such claim was made in the June 2025 NIC or otherwise with respect to the 48UT920 site. *See* 60 Fed. Reg. at 62,138. Third, the types of objects—including prehistoric stone tools and tool-making waste—do not, without more, fit readily under the umbrella of "funerary objects" or objects forming "part of the death rite or ceremony of a culture." § 3001(3)(A). That the objects are so numerous and varied further reinforces that notion. Fourth, and more broadly, determinations in the June 2025 NIC come over 30 years after both the discovery of the human remains and the passage of NAGPRA. As discussed above, the June 2025 NIC was issued under the authority of § 3003, which applies to objects already in the possession of federal agencies or museums in 1990 and directs such entities to compile an inventory of objects within five years of the Act's passage; the record does not indicate that such an inventory was incomplete or inadequate at that time. *See* 90 Fed. Reg. at 24,654. Lastly, neither the June 2025 NIC, nor any other notice or statement in the record, offer evidence to infer the requisite showing of cultural affiliation was made for purposes of § 3005. While such a

showing may well be gathered from facts already ascertained, Federal Defendants do not offer evidence sufficient to make that determination with respect to the 48UT920 site.

So too does WAPA cast doubt on determinations made with respect to the other five collections in Wyoming. The 3,300 artifacts from Wardell Bison Trap (48SU301), a collection also contemplated in the June 2025 NIC, include, among other things, fauna, bone, charcoal, and utilized flakes. *See* 90 Fed. Reg. at 24,653–54. WAPA states—and Federal Defendants do not dispute—that archaeological records identify only "a single fragment of a human proximal femur recovered from one of the stratified bone beds" with which to associate the objects. [ECF No. 14, at 56–57]. Federal Defendants do not meaningfully explain how these human remains of "unknown age" discovered in 1962 should now bring over 3,000 varied and seemingly unrelated artifacts from the site within the reach of NAGPRA. *See* 90 Fed. Reg. at 24,653–54. For two of the other sites, Shute Creek (48LN1296) and Studhorse Butte (48SU4479), WAPA points out that site and excavation reports had determined contemporaneously that no associated funerary objects were found. [ECF No. 14, at 57–60]. For Upper Muddy Creek Village (48CR325), although certain burial-associated objects were belatedly recognized as cultural items and accessioned thereafter to UWAR, WAPA notes that BLM now claims an additional 380 artifacts from locations beyond the burial mound. *Id*. at 57–58.

Similar inferences can be drawn regarding the objects from Eagle Rock Shelter (5DT813) contemplated in BLM Colorado's July 2026 NID. 91 Fed. Reg. at 43,300. The archaeological record at Eagle Rock Shelter demonstrates "repeated occupation and use . . . spanning nearly the entire period of prehistoric presence in the region." [ECF No. 14,

at 60]. In 2011, human remains dating to roughly 3,900 years before the present were discovered at the back of the shelter. *Id*. WAPA states that, although no objects were found in association, "BLM Colorado [has now] classified the collection, as a single lot, as unassociated funerary objects 'and/or' sacred objects or objects of cultural patrimony." *Id*. Beyond preliminary questions of timing and proximity of the objects, Federal Defendants do not explain why objects spanning thousands of years—including from before the time of the associated burial—were classified as a single lot together under three distinct statutory terms. 91 Fed. Reg. at 43,301.

In response to WAPA's characterizations of the six collections, Federal Defendants do not attempt to contest site- or collection-specific factual assertions; they instead look to the validity of the regulations themselves. *See* [ECF No. 11–23]. In doing so, Federal Defendants correctly emphasize that WAPA does not seek to mount a direct challenge to particular BLM actions, and WAPA's success on the merits, as pleaded, does not hinge on prevailing as to the six collections. *Id*. at 23. Further, and salient here, Federal Defendants have not yet filed the administrative record showing the information on which they relied in making the determinations at issue. Thus, in their Response, Federal Defendants focus their argument on showing WAPA is unlikely to succeed on the broader facial challenge. *See id*. That challenge is addressed in greater detail below.

To the extent Federal Defendants do address site- or collection-specific determinations, they urge that the process followed and actions taken accord with both NAGPRA and the 2024 Rules. In support, Federal Defendants offer declarations from G.L. "Buck" Damone III, Tribal Liaison and Archeologist for BLM Wyoming, and Dani Ben-

Horin, the Field Manager for the Uncompahgre Field Office for BLM Colorado. [ECF No. 21-3 and 21-4]. Regarding the Wyoming Collections, Mr. Damone's declaration notes that, during December 2024 consultations at the University of Wyoming, "[t]he eight Tribes attending . . . collectively concluded that the archaeological resources . . . constituted associated funerary objects." [ECF No. 21-3, at 3]. Further, "[b]ased on available information and with deference to the accuracy and meaning of the Native American traditional knowledge provided by the Tribes," BLM determined that the archaeological resources in question were associated funerary objects and culturally affiliated with the Tribes. *Id*. Regarding the intended disposition of the Eagle Rock Collection, Ms. Ben-Horin noted that in an April 2025 formal consultation meeting, Tribes "expressed that the full Eagle Rock collection should be considered under NAGPRA." [ECF No. 21-4, at 3]. Such deference, Federal Defendants emphasize, is appropriate given the Act's requirement for consultation with tribes throughout the decision-making process. *See* [ECF No. 21, at 12]. Federal Defendants do not otherwise introduce evidence or meaningfully dispute WAPA's description or related factual assertions regarding the collections.

WAPA's description of the archeological sites and corresponding collections thus casts sufficient doubt on whether the objects claimed by BLM fall within limits imposed by NAGPRA, and, at least at this juncture, Federal Defendants have not meaningfully challenged that finding. Importantly, though, such doubt does not amount to certainty, nor does it imply an ultimate decision regarding the collections or the actions taken with respect to them. Rather, it shows narrowly that WAPA has carried its burden here for purposes of showing a substantial likelihood of success on the merits.

*B. Facial Challenge*

Having canvassed the six collections and BLM actions taken with respect to them, the Court turns to the broader facial challenge. While WAPA has made the requisite preliminary showing that BLM actions taken with respect to the collections exceed NAGPRA's statutory authority, that does not end the likelihood-of-success inquiry. In the Court's view, the reasons for this are two-fold. First, WAPA makes clear that, on the merits, they do not challenge BLM's actions directly, only the regulations upon which those actions rely. *See, e.g.*, [ECF No. 14, at 55 ("The [collections are examples] offered to demonstrate . . . injuries to WAPA and its members, not to ask the Court to resolve site-specific factual disputes.")] WAPA's ultimate success on the merits—as pleaded—thus hinges on whether they can prevail on their claim that the 2024 Rules exceed NAGPRA's statutory authority. Second, and relatedly, the parties' briefing, and the claims discussed, are not intended to meaningfully address the collection-specific actions. So, while necessary to make a showing as to the collection-specific actions, that showing alone is not sufficient for purposes of the likelihood-of-success inquiry.

Before weighing WAPA's challenge, the Court pauses to note that, under *Loper Bright Enterprises v. Raimondo*, courts applying the APA exercise independent judgment in determining the meaning of a statute, and may not defer to an agency's interpretation of its authorizing legislation. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). WAPA's claims present questions of whether the challenged regulations are consistent with NAGPRA's text and structure, and those questions are subject to *de novo* judicial review. Further, the Court again notes the directive of 5 U.S.C. § 706, that reviewing courts

shall decide questions of law "[t]o the extent necessary to decision and when presented." As this matter is before the Court on a motion for stay and preliminary injunction, the Court will only address questions of statutory interpretation to the extent necessary to render a decision for that purpose.

In that regard, while WAPA challenges various components of the regulations, the Court finds relevant here the challenge to the incorporation of "Native American traditional knowledge" into the definitions of "cultural items," "funerary objects," "object of cultural patrimony," and "sacred object" in the 2024 Rules. 43 C.F.R. § 10.2. In contrast with language found in NAGPRA or the 1995 Rules, the 2024 Rules qualify that each term is defined "according to the Native American traditional knowledge of a lineal descendant, Indian Tribe, or Native Hawaiian organization." *Id*. The definition of "Native American traditional knowledge" is notably broad, covering "knowledge, philosophies, beliefs, traditions, skills, and practices that are developed, embedded, and often safeguarded by or confidential to individual Native Americans, Indian Tribes, or the Native Hawaiian Community." *Id*. Further, such knowledge "may be, but is not required to be, developed, sustained, and passed through time." *Id*. WAPA argues that, taken together, the updated regulatory definitions expand and impermissibly supplant the definitional limits outlined by Congress in NAGPRA.

Federal Defendants raise several arguments in response to this challenge. [ECF No. 21, at 11–23]. At the outset, and as a general contention, Federal Defendants claim that WAPA "disregards the statutory and regulatory text and context to make its arguments." *Id*. at 12. Moreover, "[t]he Tenth Circuit has recognized . . . the importance of broadly

repatriating cultural objects, and that "NAGPRA provides broadly for repatriation of . . . associated objects." *Id*. at 11–12. Here, too, the Court underscores the important goals and values embodied in NAGPRA. But those goals, and the authorities cited in support of them, do not inform the threshold question of what constitutes a cultural item eligible for repatriation.

Turning specifically to the incorporation of Native American traditional knowledge, Federal Defendants contend WAPA "ignores that NAGPRA mandates consultation with Tribes during the decision-making process." [ECF No. 21, at 17]; 25 U.S.C. §§ 3003(b)(1)(A), 3004(b)(1)(B). They note further that "incorporating Native American traditional knowledge in these definitions ensures meaningful consideration of information provided by Tribes during consultation." [ECF No. 21, at 17]. While Federal Defendants are correct to highlight the significant role of consultation in the statutory scheme, they incorrectly conflate a question of procedure with one of substance. Federal Defendants state that incorporating Native American traditional knowledge into the regulatory definitions "gives effect to [the] statutory consultation requirements," and that "[c]onsultation aids with identifying cultural items." *Id*. This is undeniably true: consultation is surely indispensable in *identifying* cultural items. Crucially, though, *how* objects are identified is a question distinct from *which* objects should be identified. The Court firmly agrees that Native American traditional knowledge both should be meaningfully considered and may credibly inform the identification of cultural items. Here, however, those specific claims are not materially at issue. Agencies may rightfully consider a wide range of evidence—undoubtedly including traditional knowledge—to determine

whether an object meets the criteria defined in NAGPRA without relying on that same evidence to define the criteria itself. The narrow question here is whether the regulatory definitions extend beyond the limits set out in NAGPRA.

Federal Defendants next address the core of WAPA's challenge: that the regulatory definitions incorporating Native American traditional knowledge are overbroad. Federal Defendants contest that "[WAPA] overstates the role traditional knowledge plays when identifying such items" arguing instead that "it is one of several forms of evidence that can inform whether objects meet the Act's criteria for cultural items." *Id*. at 22. Other definitional components, Federal Defendants argue, effectively circumscribe the range of objects that may be eligible under the regulations.

As an initial matter of interpretation, the Court agrees that the definition of "Native American traditional knowledge" sweeps broadly to encompass an indeterminate range of characterizations. The definition includes "knowledge, philosophies, beliefs, traditions, skills, and practices that are developed, embedded, and often safeguarded by or confidential to individual Native Americans . . . ." 43 C.F.R. § 10.2. Such knowledge "may be, but is not required to be, developed, sustained, and passed through time." *Id*. Read together, it's not clear what this definition would effectively exclude. The breadth of the definition appears to be, understandably, by design and not defect; it recognizes that Congress "intended to make space for . . . 'distinct cultures and traditional and religious practices that are unique to each community.'" [ECF No. 21, at 19]; S. Rep. 101-473, at 4 (1990). Though laudable in its aim, this definition, as incorporated and combined with the updated

regulatory definitions, appears to extend beyond the established limits explicitly set out by Congress in NAGPRA.

To illustrate by way of example, "funerary object" is defined in the 2024 Rules to mean "any object reasonably believed to have been placed with or near human remains . . . . [that] is connected, either at the time of death or later to a death rite or ceremony of a Native American culture according to the Native American traditional knowledge . . . ." 43 C.F.R. § 10.2. First, this definition departs subtly from the statutory definition in that it leaves behind the requirement that placement be "part of the death rite or ceremony of a culture." 25 U.S.C. § 3001(3)(A). No corresponding requirement is reflected in the regulatory definition, only the requirement that the object be "connected" to a death rite or ceremony. Second, because of the expansive definition accorded to "Native American traditional knowledge," it is seemingly uncontestable what may be considered "connected" in this context. The inclusion of Native American traditional knowledge seems to permit the definition to capture nearly any object claimed so long as it is "reasonably believed to have been placed intentionally with or near human remains." *Id*. Perhaps individually these changes do not conflict with the statute but, taken together, they step beyond the limits defined by Congress.

At this juncture, and for purposes of this analysis, the Court need not exhaustively review each of the challenged regulatory definitions or other challenged components of the 2024 Rules to determine that WAPA has made the requisite showing as to its facial challenge. For now, in light of the scope of WAPA's requested stay and injunction, the challenge above will suffice. Moreover, because WAPA has also shown it is substantially

likely that the collection-specific actions cannot stand independently under the terms of NAGPRA, the Court finds that WAPA has shown a substantial likelihood of success on the merits. WAPA has therefore carried its burden under the second *Winter* factor.

**III. Balance of Harms and Public Interest**

Finally, for the last two *Winter* factors, WAPA must show that the balance of harms and public interest tip in its favor. These factors "merge" where the Government is the opposing party as "the government's interest *is* the public interest" *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original).

Here, the Court again emphasizes the narrow scope of WAPA's requested interim relief, which is directed solely to the Wyoming and Eagle Rock Collections.[3] The request would stay the challenged regulations and agency actions as applied only to the collections, "maintaining the collections in secure, federally compliant repositories pending judicial review." [ECF No. 16, at 16]. WAPA does not ask the Court to mandate any affirmative action on the part of BLM, vacate the challenged actions, or seek to assert control over the collections. [ECF No. 15, at 3–5]. Nor does WAPA contend that relief automatically restores access or binds any Tribe. *Id*. Given the limited scope of the relief, WAPA argues

[3] Federal Defendants state that "[WAPA] seeks expansive interim relief to stop a wide range of potential agency actions, not just an injunction as to the six BLM collections discussed." [ECF No. 21, at 24]. It is not clear where Federal Defendants ground this assertion: the Motion for Stay and Preliminary Injunction, which they cite, repeatedly and explicitly circumscribes all relief to the Wyoming and Eagle Rock Collections. *See* [ECF No. 15].

that Federal Defendants "suffer no cognizable harm" from the requested injunction. [ECF No. 16, at 16].

Federal Defendants, in response, implore the Court to consider the orderly administration of NAGPRA and the relevant Tribes' interests in the expeditious return of human remains and other cultural items. [ECF No. 21, at 24–25]. While the Court is mindful of the important goals embodied in NAGPRA and significant interests at issue in this case, Federal Defendants have not shown how these would be meaningfully impaired should the Court grant an injunction.

First, WAPA's stay and injunction would not prevent, nor does it contemplate preventing, the transfer or disposition of human remains. WAPA's Motion only extends to the Wyoming and Eagle Rock Collections, not the human remains purportedly associated with them. *See* [ECF No. 15]. As to the Wyoming Collections, they are housed and curated separately from any human remains held at the University of Wyoming. *See* [ECF No. 14, at 9–10]. BLM's July 2025 letter to UWAR acknowledges as much in requesting that "objects be removed from UWAR's archaeological collections and re-associated with the corresponding human remains in the Human Remains Repository." [ECF No. 16-2, at 1]. As to the Eagle Rock Collection, human remains representing the sole individual excavated from Eagle Rock Shelter have already been returned to the requesting Tribes. [ECF No. 14, at 60].

Second, in light of the curatorial history of the collections, the harm from temporarily delaying the process under NAGPRA does not tip the scale in favor of Federal Defendants. The collections at issue have long been preserved under federal control as

archaeological resources of the public, and have only recently been classified otherwise. The Wyoming Collections, as indicated by the notices issued by BLM, contain resources that have been under Federal control since at least 2005, with the majority from before the passage of NAGPRA in 1990. *See, e.g.*, 90 Fed. Reg. at 24,652. The Eagle Rock Collection contains resources discovered up until 2019 when excavations were halted. [ECF No. 14, at 55]. That the collections have been in federal control for as long as they have does not undercut the importance of orderly and expeditious repatriation, but it does weigh on the question of harm from further delay. In relative terms, the requested injunction would delay further action only briefly while the case proceeds on the merits. Measured against the interest in preserving intact the unique resources pending a full determination of rightful ownership, the Court finds that the delay does not favor Federal Defendants.

## CONCLUSION

The Court finds WAPA has demonstrated that irreparable harm will result in the absence of a preliminary injunction, that WAPA has a substantial likelihood of success on the merits as to the six archaeological collections which are the subject of the injunction, and that the balance of harms and public interest factors tip in their favor. Accordingly, WAPA has made the requisite showing for issuance of a preliminary injunction under the *Winter* factors.

The findings and conclusions set forth herein do not constitute a determination on the merits but are findings made in light of the requested stay and preliminary injunction. Further, the Court emphasizes that the stay and preliminary injunction, as ordered below, runs only against Federal Defendants, and only with respect to the six collections at issue;

it does not direct the conduct of any tribe or adjudicate any independently existing tribal right, nor does it extend beyond the six collections contemplated above and federal actions taken with respect to them.

**NOW, THEREFORE, IT IS ORDERED** Plaintiff's Motion for Stay under 5 U.S.C. § 705 and Preliminary Injunction, [ECF No. 15], is **GRANTED** as set forth below:

1. Pursuant to 5 U.S.C. § 705, and to preserve the status and rights of the parties pending final judgment in the above-captioned matter, the continuing legal force, effect, implementation, and use as federal authorization of agency actions taken since June 11, 2025, with respect to the Wardell Bison Trap (48SU301), Upper Muddy Creek Village (48CR325), Shute Creek (48LN1296), 48UT920, Studhorse Butte (48SU4479), and Eagle Rock Shelter (5DT813) site collections (collectively, the "Collections"), are **STAYED**.

2. To give effect to the foregoing stay, and pursuant to Federal Rule of Civil Procedure 65 and, alternatively, as necessary and appropriate process under 5 U.S.C. § 705 to preserve the status quo and the parties' status and rights pending judicial review, Defendants, Douglas J. Burgum, in his official capacity; the United States Department of the Interior; the Bureau of Land Management; and the Acting State Directors of BLM Wyoming and BLM Colorado (collectively, the "Federal Defendants"), together with their officers, agents, employees, and successors, are **ENJOINED**, pending final judgment, from taking further action with respect the six Collections, including actions that would risk disposing or otherwise transferring the six Collections from Federal control.

3. This Order is limited to the six Collections and does not operate nationwide. Nothing in this Order directs, binds, or adjudicates the rights of any nonfederal party. All relief operates solely against the Federal Defendants and their challenged agency actions.

4. No security is required under Federal Rule of Civil Procedure 65(c).

5. This order shall remain in effect until final judgment in this action or further order of the Court.

Dated this 28th day of October, 2026.

Kelly H. Rankin
United States District Judge